UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

| | |
|---|---|
| BETTER HOLDCO, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| BEELINE LOANS, INC., | : |
| | : |
| Defendant. | : |
| | : |

No. 20-CV-_____

**COMPLAINT**

-------------------------------------------------------------- x

Plaintiff, Better Holdco, Inc. ("Better"), by its attorneys, Friedman Kaplan Seiler & Adelman LLP, as and for its Complaint against defendant Beeline Loans, Inc. ("Beeline"), alleges as follows based on personal knowledge as to Better and its own acts and as to all other matters, based upon information and belief or, where specifically indicated, the sworn admissions of Better's former employee, non-party Jack Abramowitz ("Abramowitz"):

**NATURE OF THE ACTION**

1. This case arises from the brazen, willful and deliberate misappropriation of Better's confidential information and trade secrets by Beeline, a younger and smaller, but direct competitor of Better. Rather than grow and compete legally, Beeline seeks to jump-start its fledgling business by free-riding on Better's hard work and smart ideas. To that end, Beeline intentionally and unlawfully obtained, possesses, and is using Better's confidential information and trade secrets, which Beeline obtained from Better's former employee Abramowitz, whom Beeline hired in no small part because of his knowledge of, and access to, Better's confidential and proprietary information.

2.      As soon as Better learned that Abramowitz was seeking to use Better's confidential information with a direct competitor and at Beeline, Better contacted Beeline to inquire whether Abramowitz remained under its employ, and to demand that Beeline take all necessary and appropriate steps to ensure that it does not possess, is not disseminating and is not using any non-public information concerning Better's business.  When Beeline responded dismissively, claiming "Beeline doesn't give a damn about anything that Better does inside its business," Better promptly launched its own investigation into Abramowitz's conduct to determine the scope of the information Abramowitz stole from Better and provided to Beeline.

3.      Better's continuing investigation has revealed that Beeline executives knowingly sought, received and accepted Better's proprietary and confidential information from Abramowitz.  For instance, before Abramowitz started work for Beeline, he emailed Beeline's Co-Founder and CEO, Nick Liuzza, and its Co-Founder and President, Peter Gonzalez, that he "just got word" of Better's loan origination volume for June 2020.  That information was clearly proprietary and not public.  Yet using that information, Abramowitz provided Liuzza and Gonzalez with projections of Better's revenue for fiscal year 2020, explaining that he "[t]hought it might be useful for you guys / can update your comps analysis if you have one."  Neither Liuzza nor Gonzalez notified Better that Beeline had received or was using Better's confidential information.

4.      On a separate occasion, on his first day of work at Beeline, Abramowitz met with Beeline's General Counsel/Chief Compliance Officer ("CCO"), Jessica Kennedy, in her office and showed her hard copies of five confidential agreements between Better and its key marketing partners that he stole from Better.  Abramowitz left Kennedy's office and loaded the agreements onto Beeline's Google Drive.  Abramowitz has since admitted under oath that Kennedy did not instruct Abramowitz to destroy the agreements or to return them to Better, nor

did Kennedy notify Better that Beeline had these confidential agreements in its possession.  In fact, although Beeline eventually claimed to have conducted a "substantive" investigation in response to Better's concerns over the theft of its confidential and proprietary information, Beeline admitted to possessing these agreements only after Better informed Beeline that Better knew about the meeting in Kennedy's office and the subsequent loading of the agreements onto Beeline's Google Drive.

5.      On yet another occasion, during a videoconference with Beeline VP of Marketing Jay Stockwell, Abramowitz accessed Better's confidential Facebook Ad Manager account, and with Stockwell's encouragement, took screenshots of and downloaded substantial volumes of data (together, the "Ad Data") from the account, which Abramowitz then loaded onto Beeline's Google Drive.  Again, Beeline failed to notify Better that Beeline had accessed Better's Facebook Ad Manager account or that it had taken the Ad Data from the account.  And again, despite representations of a "substantive" investigation, Beeline did not disclose these facts until *after* Better informed Beeline that it had discovered them.

6.      In short, Beeline cannot claim ignorance of Abramowitz's wrongful dissemination of Better's proprietary and confidential information to Beeline executives. Beeline also cannot claim ignorance of Abramowitz's saving of this information to Beeline's Google Drive, which Better believes is accessible by other Beeline employees.  After Better had contacted Beeline inquiring into Abramowitz's employment at Beeline, Abramowitz affirmed to Beeline's Gonzalez that he had loaded documents containing Better's proprietary information onto Beeline's Google Drive.  True to form, after this conversation, Gonzalez did not inform Better that documents containing its proprietary and confidential information had been saved to Beeline's Google Drive.

7.     Perhaps the most egregious example uncovered by Better's investigation is the dissemination of data from Better's highly confidential, proprietary business model (the "Operating Model Data")—the product of a six-year undertaking with tens of thousands of entries, and the "secret sauce" to Better's success.  With this information, Beeline—or any other competitor into whose hands this information might fall—can engineer a matching business model and strategy, short-circuiting Better's years of work, trial and error, and millions of dollars spent developing the model.

8.     It is beyond dispute, and indeed Abramowitz has admitted under oath, that during his employment at Beeline, he wrongfully used and disseminated Better's confidential and proprietary information.  A competitor acting in good faith would have told Abramowitz to stop – that he had no right to use or disseminate Better's confidential and proprietary information, and that it had no desire whatsoever to obtain, spread, or use any non-public information from Better.  Beeline, however, did not act in good faith.  To the contrary, its CEO, *and* its President, *and* its General Counsel/CCO, *and* its VP of Marketing – in the face of Abramowitz's blatant breaches of his obvious legal obligations to Better – did nothing to stop him and in some instances, even encouraged his breaches.  Worse still, Better has learned that both during the interview process and throughout Abramowitz's employment at Beeline, its management repeatedly pumped him for confidential information about Better, which he provided without reservation.

9.     One would expect that a good-faith competitor caught dead-to-rights in such wrongdoing would wake up and try to rectify the situation wholeheartedly, promptly and completely.  Instead, after being contacted by Better, Beeline conducted a sham internal "investigation," dragged its feet, and refused to acknowledge or meaningfully remedy its wrongdoing.  While purporting to act in good faith, Beeline repeatedly conceded only its

4

possession of specific documents that, thanks to Better's continuing investigation, Better was able to confront Beeline with – and each time has admitted to more only when Better has discovered and confronted Beeline with more.  Tellingly, in the many weeks of Beeline's "substantive" investigation, Beeline never even attempted to examine Abramowitz's Beeline-issued laptop until the same day that it had promised to provide the results of this investigation.

10.    Abramowitz no longer works for Beeline, but while he was there Beeline was absolutely fixated on Better, and on obtaining confidential information and trade secrets from him, including documents he had taken from Better and retained without Better's knowledge or authorization in violation of his confidentiality obligations.

11.    And although Beeline professes no desire to use Better's confidential and proprietary information, its actions tell a very different story.  The actions – and inactions – of Beeline's senior management firmly establish Beeline as a bad-faith competitor, bent on unlawfully obtaining and using Better's confidential business information to its own advantage and to Better's detriment.  Better does not believe, and has no reason to believe, Beeline's protestations of innocence.  Indeed, Beeline has refused to admit it has done anything wrong, and when Better demanded that Beeline provide affidavits from its management, which could establish its *bona fides* and allay Better's concerns, Beeline responded by seeking full and complete releases from liability as a condition to providing any affidavits.

12.    Despite Better's best efforts to pursue a non-litigation path to a resolution, it remains threatened with imminent and irreparable harm that its confidential information and trade secrets will be used and further disseminated, both within and outside of Beeline, by Beeline and its employees.  Judicial intervention is necessary.

13.    Accordingly, Better brings this lawsuit to obtain the Court's aid in putting a stop to Beeline's exploitation of Better's confidential information and trade secrets, and seeks

damages for Beeline's unfair competition and the unnecessary costs to Better of identifying, investigating, addressing and remediating Beeline's misconduct.

## PARTIES

14.     Plaintiff Better is a corporation formed under the laws of the State of Delaware with its principal office in New York, New York.

15.     Defendant Beeline is a corporation formed under the laws of the State of Rhode Island with its principal place of business in Providence, Rhode Island.

16.     Non-party Abramowitz is an individual who at all relevant times has been domiciled in New York City.  Better has entered into a confidential settlement with Abramowitz.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332(a)(1) and 1367(a).

18.     This Court has personal jurisdiction over Beeline pursuant to CPLR 302(a)(1), because Beeline has transacted business and/or contracted to supply services within the State of New York, including but not limited to employing people (including Abramowitz) who work for the company from locations within the State.  This Court also has personal jurisdiction over Beeline pursuant to CPLR 302(a)(3), because Beeline has committed tortious acts causing injury to Better within the State of New York, and expected or should reasonably have expected such acts to have consequences in the State and derives substantial revenue from interstate commerce.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3).

## FACTUAL ALLEGATIONS

Better's Business and Competitive Edge

20.     Better was founded in 2014 with the goal of re-engineering the mortgage process.  Starting in 2016, it has launched various businesses that focus on redefining the homeownership process from the ground up.

21.     While Better is a "startup," it is a relatively mature one, having completed three rounds of private financings totaling hundreds of millions of dollars and with six years in business.  Better has earned the #1 spot on LinkedIn's "Top Startups 2020: The 50 U.S. Companies on the Rise" list.

22.     Better's competitive advantages stem from a combination of its technology, on the one hand, to make the homeownership process faster and more efficient and human customer support, on the other hand, to help make it friendly and enjoyable.  Better does this through confidential and proprietary analytics that speed up and facilitate marketing to viable customers, highly confidential relationships with its marketing partners, and getting customers mortgages and other products and services necessary to homeownership.

Abramowitz Joins Better

23.     After a post-college stint as an analyst at Goldman Sachs, Abramowitz joined Better as a marketing analyst on or about October 2, 2018.

24.     Even before he started, Abramowitz was made aware of Better's concerns for the security of its confidential and proprietary information and, as a condition of his employment, agreed to protect it and not to steal it, misuse it, or disclose it outside the company.

25.     Better sent Abramowitz an offer letter, dated September 20, 2018, which stated that "[a]s a Better Holdco, Inc. employee, you are required to follow its rules and regulations" and that "[t]his offer of employment is contingent upon you fulfilling each of the

following terms," which included executing a "Proprietary Information and Inventions

Agreement," (the "PII Agreement") which prohibits, among other things, the unauthorized use or

disclosure of Better's confidential and proprietary information, and an "Information Security

Policy," which, among other things requires him "to keep confidential all sensitive information

… that you may learn in the course of your employment."

26.     The offer letter stated that "If you wish to accept employment at Better

Holdco, Inc. under the terms described above, please sign and date this letter and the Proprietary

Information Agreement and Security Policy and return to Better Holdco, Inc."  Abramowitz

signed the offer letter, the PII Agreement and the Information Security Policy on September 20,

2018, the same day he received them.

27.     The PII Agreement contains several provisions designed to safeguard

Better's confidential and proprietary information and prohibit Abramowitz and others from

improperly accessing, stealing, misusing and disclosing it.  The very first paragraph states as

follows:

> I will not, during and after my employment with Better Holdco, Inc. or
> any of its successors, subsidiaries, assigns, related companies and
> divisions (collectively, the "Company"), (i) directly or indirectly disclose
> to any person or entity, or use, except for the sole benefit of the Company,
> any of the Company's confidential or proprietary information or trade
> secrets (collectively, "Company Information") or (ii) publish or submit for
> publication, any article or book relating to the Company, its development
> projects, or other aspects of Company business, without the prior written
> permission from the Company's Chief Legal Officer. By way of
> illustration and not limitation, Company Information shall include the
> Company's research and development plans or projects; data and reports;
> computer materials such as programs, instructions, source and object code,
> and printouts; inventions, developments, and discoveries; data
> compilations, development databases; business improvements; business
> plans (whether pursued or not); ideas; budgets; unpublished financial
> statements; licenses; pricing strategy and cost data; information regarding
> the skills and compensation of employees of the Company; the protected
> health information of employees of the Company; strategies, forecasts and
> other marketing techniques; and the identities of the Company's suppliers

8

and contractors, and all information about those supplier and contractor
relationships such as contact person(s), pricing and other terms. I further
acknowledge and recognize that all Company Information is confidential
and proprietary, and shall remain the exclusive property of the Company.
To the extent that I have any question as to whether something constitutes
Company Information, I agree to obtain the express written permission of
my manager before using or disclosing the information in any way.

28.     The PII Agreement also states as follows:

When I leave the employ of the Company, I will immediately deliver to
the Company (and will not keep in my possession, copy, recreate or
deliver to anyone else in whole or in part) any and all drawings, notes,
memoranda, specifications, devices, and documents, together with all
copies thereof (in whatever medium recorded) and any other property or
material containing or disclosing Company Information or Third Party
Information. I further agree that any property owned by the Company,
wherever located, including disks and other storage media, computers,
filing cabinets, or lockers, is subject to inspection by Company personnel
at any time during my employment and after, with or without notice.

29.     Abramowitz also promised that for a year after the end of his employment

with Better, he would not "use Company trade secret information to attempt to call on, solicit or

take away any clients or prospects of the Company except on behalf of the Company."

30.     In addition, Abramowitz agreed to cooperate with and provide information

to Better that would make it possible for the company to monitor and confirm Abramowitz's

compliance with the terms of the agreements after his employment ended.  He promised, among

other things, as follows:

In the event my employment with the Company terminates for any reason,
I will, if requested, participate in an exit interview with the Company and
reaffirm in writing my obligations as set forth in this Agreement. I agree to
provide the Company with the name and address of my new employer,
and consent to the Company's notification to my new employer of my
rights and obligations under this Agreement.

31.     Finally, the PII provides that any breach of the agreement would constitute

irreparable harm to Better:

I recognize that my violation of this Agreement exposes the Company to
irreparable harm and that the Company shall have the right to enforce this

Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond, and without prejudice to any other rights and remedies (including recovery of monetary damages) that the Company may have for breach of this Agreement.

Beeline Is Formed and, From the Outset, Copies Better

32.     Beeline was formed in September 2018.  In 2019, the company became licensed to conduct mortgage business operations in six states and the District of Columbia, and in May 2020, it launched an online mortgage application portal.

33.     Beeline seeks to compete in the same market as Better, and emulates Better in numerous ways.  For example, Better's website states: "The traditional processes around homeownership are opaque and stressful.  Fees aren't transparent and some are simply outrageous in size.  Traditional commission structures incentivize sales, not support.  It's a system set up to benefit insiders — not you.  Better.com CEO, Vishal Garg, set out to change that."  It also states that "Better.com is redefining the homeownership process from the ground up."  Beeline's website similarly states that the company's mission is to "transform the entire home loan experience" and "invert[] the power imbalance felt during the home loan process."

34.     As another example, Better's website talks of "using technology to make [the homeownership process] faster and more efficient, and humans to help make it friendly and enjoyable," while Beeline's website touts that it is "using technology to shorten the journey, and adding old fashioned warmth and responsiveness."  Beeline's website also mimics virtually all the design elements of Better's website.

35.     As further illustration of Beeline's zeal to copy Better's every move, Beeline recently opened offices in Charlotte, North Carolina, where Better opened an office more than a year ago.  The fact that Beeline has stated it intends to hire 120 employees in

Charlotte in the next year – potentially from among Better's own team members – makes

Beeline's move there in the wake of the conduct described in this complaint even more troubling.

Abramowitz Secretly Steals Better's Information and Quits Without Notice

36.     In early 2020, while he was still employed by Better, Abramowitz met

with each of Beeline's founders: CEO Liuzza, CFO Gonzalez, VP Greg Ellis, VP Stockwell and

General Counsel/CCO Kennedy.

37.     Notwithstanding Abramowitz's existing employment with Better,

Beeline's direct competitor, during these interviews and meetings with Abramowitz, and despite

the fact that Beeline knew that Abramowitz was bound by confidentiality obligations to Better,

Beeline asked him to share proprietary/confidential information – and never asked him to stop.

To the contrary, during the interviews and meetings, Beeline executives asked Abramowitz

numerous questions about Better.  Abramowitz answered these questions, in many cases

providing information about Better that was confidential and not publicly known, without

Better's knowledge or consent.

38.     On June 15, 2020 – only weeks after its May 2020 launch – Beeline

offered Abramowitz employment as its Director, Strategy & Corporate Development with,

among other things, a higher salary than he was receiving at Better.  Beeline's offer of

employment laid out a plan whereby Abramowitz would spend his first twelve months assisting

Jay Stockwell, Beeline's VP of Marketing, with marketing; assisting Peter Gonzalez, Beeline's

CFO, with capital markets; assisting Cyle Brodeur, Beeline's Head of Accounting, with finance;

and assisting Gregory Ellis, Beeline's Head of Brand with branding.

39.     Like many New Yorkers, in mid-March 2020, Abramowitz had started

working for Better from his home in New York City because of the COVID-19 pandemic.  On

June 18, 2020, and again first thing in the morning of June 19, he sent a number of highly

confidential documents belonging to Better from his Better email address to his personal email address.  Abramowitz did so without Better's knowledge or consent.

40.      Also on June 19, Abramowitz accepted Beeline's offer of employment and gave notice to Better that he was resigning effective that same day – that is, with no notice.

41.      On his last day at work for Better, Abramowitz spoke and emailed with numerous people at Better, including telephoning Better's CEO directly, telling no one that he was going to work for Beeline.  Instead, Abramowitz lied, stating that he was planning to seek work at a venture capital fund.

42.      At the time of his resignation, Abramowitz was asked to participate in an exit interview – as he had contractually promised to do at the outset of his employment – and he refused.  He was asked to reaffirm in writing his various contractual obligations to Better (thus reminding him that he had such obligations), and he refused to do that as well.

43.      Abramowitz has also admitted that, contrary to his obligations pursuant to the PII Agreement, after the termination of his employment at Better, he intentionally retained several documents he had used in connection with his work for Better.  Abramowitz admits that he did so without Better's knowledge or consent.

Abramowitz Starts Work at Beeline and Is Pumped
for Better's Confidential Information and Trade Secrets

44.      Even before Abramowitz started work at Beeline, he began emailing and providing Better's confidential and proprietary information to personnel at Beeline.  For example, Better's investigation revealed that on July 1, he emailed to Gonzalez and Liuzza confidential information about Better's mortgage originations and revenue in the months before he left.

45.     Abramowitz has also admitted that, upon joining Beeline, he loaded onto Beeline's Google Drive confidential documents and information he had taken with him when he left Better without its knowledge or consent.

46.     Throughout Abramowitz's employment at Beeline, the company's management pumped him for confidential information about Better and, in a number of instances, personally participated in the misappropriation of Better's proprietary documents and information.  Indeed, Beeline appeared to be fixated upon Better and its business, and clearly viewed Abramowitz as a pipeline to collect information from Better without any regard for Better's rights or Abramowitz's confidentiality obligations, which Beeline knew about.

47.     During Abramowitz's employment at Beeline, he had multiple meetings and meals with Beeline personnel.  During these meetings and meals, Beeline personnel asked Abramowitz questions about Better on multiple occasions, and he has admitted under oath that he answered them.  Abramowitz has further admitted that in some instances, his answers included information that he knew about Better's business that was confidential and proprietary.

48.     In other instances, Abramowitz gave or showed Beeline employees confidential information belonging to Better.  For example, Abramowitz has admitted that after he resigned from Better, he improperly and intentionally retained hard copies of confidential agreements and associated documents (collectively, the "Confidential Agreements") between Better and certain key marketing partners.  Abramowitz has admitted that, on his first day of work at Beeline, he showed the hard-copy Confidential Agreements to Beeline General Counsel/CCO Kennedy.  That should have set off alarm bells for Kennedy in particular, given her role.  Yet she did nothing to protect Beeline from liability or to ensure that Better's Confidential Agreements were not disseminated, retained or used in Beeline's business.  With

13

Kennedy's tacit approval, Abramowitz retained the Confidential Agreements and subsequently directed a Beeline employee to scan and load them onto Beeline's Google Drive.

49.      In August 2020, during the videoconference between Beeline VP of Marketing Stockwell and Abramowitz concerning Beeline's advertising, while using computers connected to the internet, Abramowitz admits that he and Stockwell logged into Facebook and gained unauthorized access to Better's Facebook Ad Manager account.  Abramowitz has admitted that, he and Stockwell together proceeded to review and take screenshots of, as well as download, the Ad Data, which includes information about Better's online advertising strategies and results and nearly 27,000 lines of data regarding advertising analytics.  The Ad Data then were loaded on Beeline's Google Drive.

50.      Better derives an independent economic benefit from keeping the Ad Data secret because a competitor attempting to use this information could try to replicate Better's successful marketing strategy, which took many years of trial and error, testing and analysis to develop, all costing millions of dollars.  Among other things, the downloaded Ad Data included nearly four years of confidential data from the Better Account, as well as detailed confidential analytics.

51.      A Beeline executive also directed Abramowitz to insert marketing data he knew from his work at Better into a spreadsheet the executive was preparing.  Abramowitz admits that he did so, providing Better's marketing data, including the pricing that he had negotiated with Better's marketing partners.

52.      On other occasions, Abramowitz used Better's confidential information to create financial models for Beeline which were intended to be used in its business.

53.      Abramowitz also loaded onto Beeline's Google Drive a copy of Better's Operating Model Data, which he had emailed to his personal email address on the morning of the

14

day he resigned from Better.  The Operating Model Data comprises dozens of worksheets

containing Better's confidential and proprietary analysis of numerous dimensions of confidential

data, which are the very backbone of its business model and strategy.

54.     The information in the Operating Model Data constitutes a roadmap of

Better's strategies which, in the hands of a competitor, could be used to replicate in a short time

what Better has spent six years, tens of thousands of person-hours and millions of dollars

developing.  Among other things, the Operating Model Data details Better's unique and

proprietary approaches and methods for organizing, staffing (including proprietary compensation

information and other information about Better's operations), financing, marketing and executing

its business.

55.     In the hands of a competitor, the Operating Model Data could be used to

create a business plan that mimics Better's business plan to the finest detail, enabling the

competitor to, among other things, raise money from investors based not on the competitor's

hard work but on Better's years and millions of dollars of work.

56.     On yet another occasion, Abramowitz saved a copy of Better's bi-weekly

slide deck discussing its business affiliates update to Beeline's Google Drive.  This report is

highly sensitive and contains, among other things, details about Better's historical and actual

performance in each of its marketing channels and rate tables.

57.     It appears that Beeline's top management, including its General

Counsel/CCO, all of whom are touted as seasoned business professionals on Beeline's website,

knew, yet were utterly heedless of, the risks and consequences of hiring an employee of a direct

competitor and using that competitor's proprietary information in Beeline's business.  Indeed,

Beeline supposedly had a policy and practice of prohibiting employees from misusing prior

employers' information yet disregarded it entirely with respect to Abramowitz.  There can be no

innocent explanation for Beeline using Abramowitz to access Better's confidential information
and trade secrets.  Beeline obviously intended to use it to stand on Better's shoulders and skip the
years of hard work, time and money that Better has devoted to developing a competitive
advantage.

Abramowitz's Termination from Beeline

58.     On or about July 8, 2020, Abramowitz started work at Beeline.  He
performed work both at Beeline's office in Providence, Rhode Island and at his home in New
York City.

59.     In mid-August, employees at Better first noticed that Abramowitz had
updated his LinkedIn profile to include his new position at Beeline.

60.     Since Beeline is a direct competitor of Better, and in light of the
circumstances of Abramowitz's departure, it was obvious that Abramowitz's employment could
put Better's trade secrets and confidential information at risk.

61.     Better's outside counsel therefore sent a letter to Abramowitz on
Thursday, August 20, 2020, demanding he immediately comply with his obligations to Better,
including to reaffirm those obligations in writing and participate in the exit interview he had
refused to conduct when he resigned from Better in June.

62.     Abramowitz responded by email the following Monday, August 24.  He
was unrepentant:

> Thank you for your note. Unfortunately after a long search in the venture
> space, I was not able to find a job. I interviewed at 25 firms over 6 months
> and came up empty handed. During that process, Beeline approached me
> with an offer to work at the company and I took it.
>
> My responsibilities at the company are different from what I was doing at
> Better. I am learning a completely new set of skills, and not applying
> anything that was proprietary to Better in my new role. Moreover, all
> private information / materials / property were returned, and I have not

and will not direct business away from Better (as I don't work in sales and wouldn't be able to direct business in a consumer-driven market anyway). I have not and will not solicit any employees per the agreement I signed at hire with Better.

I understand my obligations under the original proprietary agreement and will not re-sign a document. I also decline to participate in an exit interview.

63.     Abramowitz's email was misleading and, in some respects, outright false. He had not been forced to accept employment at Beeline out of desperation, as he implied – he was still gainfully employed at Better throughout his job search.  Moreover, his responsibilities at Beeline were not different from his marketing job at Better; Abramowitz was hired specifically to work closely with Beeline's VP of Marketing, Jay Stockwell, on marketing and, as detailed above, he had already done so for two months when he sent the email.  And as Better later discovered, the statement that "all private information / materials / property were returned" also was false; Abramowitz had kept (and given to Beeline) numerous documents and other information belonging to Better – much of which made its way into Beeline's hands and onto its servers and systems, where it remains today.

64.     At or around the same time, Better learned that Abramowitz had reached out to a Better intern to request Better's confidential information.  Abramowitz intended to use the information that he requested in his work for Beeline.

65.     In light of Abramowitz's dismissive response to Better's letter, in the evening on August 26, Better's outside counsel wrote a letter to Beeline General Counsel/CCO Kennedy demanding that Beeline "confirm by August 28, 2020 that Mr. Abramowitz is no longer employed with Beeline or providing services to Beeline in any capacity" and provide "written confirmation that it has taken all necessary and appropriate steps to ensure that it does not possess and is not using any non-public information pertaining to Better Holdco's business that Mr. Abramowitz shared with or disclosed to Beeline."

66.     Kennedy and Beeline initially appeared to take the matter seriously, responding the next morning with an email requesting an extension until September 8 to respond. Better's outside counsel responded by email, stating that Better would wait only until Tuesday, September 1, 2020, for Beeline's response, on the condition that Beeline provide written assurance that Mr. Abramowitz's employment with Beeline was suspended in the interim.

67.     Kennedy and Beeline did not respond, prompting Better's outside counsel to send another email to Kennedy at 12:30 a.m. (i.e., after midnight) on August 28, stating, "I have not received your confirmation that Mr. Abramowitz's employment with Beeline has been suspended.  Without such confirmation, Better Holdco will expect your response to my August 26, 2020 letter on the original due date, August 28, 2020."

68.     Minutes later, at 12:36 a.m. on August 28, Kennedy responded by email as follows:

> I retained outside counsel today at Baker Hostetler.  They will be contacting you directly.
>
> Your letter and your demand of a response within 2 days is completely unreasonable and posed in bad faith.
>
> Beeline doesn't give a damn about anything that Better does inside its business but I think it's fascinating that they care about a 27 year old kid.
>
> You'll hear from my lawyers tomorrow.

69.     Baker Hostetler surfaced as outside counsel for Beeline the next day, advising that, "although Beeline has no reason to believe, at this time, that Mr. Abramowitz has violated any of his obligations to Better Holdco, Inc., as an act of good faith and in response to your request, Beeline has placed Mr. Abramowitz on administrative leave and suspended his access to Beeline systems."

70.     On September 8, 2020, Beeline terminated Abramowitz's employment.

71.     After he lost his job at Beeline, Abramowitz was more contrite.  He called Better's outside counsel to say that he and Beeline had decided to part ways and he was going to look for a job outside the mortgage industry.

72.     Abramowitz also offered to conduct an exit interview with Better and to reaffirm his obligations to Better, which he has now done.  During his exit interview, Abramowitz disclosed that he provided Better's confidential and proprietary information to Beeline in response to repeated requests from Beeline executives both before and during his employment at Beeline.

Better Attempts to Secure Its Stolen Information While Beeline Conducts a Sham Investigation

73.     While Abramowitz's tone changed, Beeline's did not.  For over a month, Beeline strung Better along, making a show of contrition, yet the company failed – and ultimately refused – to meaningfully address its participation in, and inducement of Abramowitz's wrongdoing and to remedy its continuing possession and use of Better's confidential information and trade secrets.

74.     Indeed, despite having terminated Abramowitz's employment, approximately one week later, Beeline CFO, Peter Gonzalez, called Abramowitz and asked if he could get together for coffee or a drink.

75.     In the meantime, Baker Hostetler sent a letter to Better's outside counsel representing that a "substantive investigation" had been conducted and purporting to set forth its results.  However, the "substantive investigation" turned out to have been conducted by the company's founders, who were themselves implicated in the wrongdoing at issue, and unsurprisingly, it turned out to be slapdash and incomplete upon further investigation by Better.

76.     By letter dated September 25, Better demanded that Beeline's outside counsel conduct an independent investigation and provide both a written report and affidavits

from each of its personnel who had dealt with Abramowitz.  The letter also stated, "[i]f Beeline
is not inclined to cooperate in conducting and reporting on an independent internal investigation
and providing these affidavits, please let me know immediately, so that Better may determine
promptly how to proceed."

77.    When Beeline had not responded to Better's September 25 letter by
October 6, eleven days later, Better's outside counsel again wrote to Beeline's outside counsel,
stating that unless the demanded report and affidavits were received by close of business on
October 7, Better would take appropriate legal action.  Beeline's outside counsel responded at
4:30 p.m. on October 7, stating that a response would be provided on October 9.

78.    Meanwhile, on October 9, Beeline System Administrator Rachel Erbaugh
for the first time contacted Abramowitz to ask him for the password for the laptop Beeline had
provided him and he had used during his employment there.  Beeline thus *first* attempted to
access and review the contents of Abramowitz's Beeline-issued laptop the same day it had
promised the results of its "substantive" investigation and after having represented to Better that
Beeline already had "conduct[ed] a diligent search" for all documents referencing Better.

79.    Later on October 9, Beeline's outside counsel sent a letter purporting to
respond to the September 25 letter from Better's outside counsel.  The letter did not contain a
meaningful report of an investigation, as Better had requested.  It was largely conclusory, did not
respond to a number of the issues raised in the September 25 letter, and also failed to provide or
even mention the affidavits Better had demanded.  Moreover, the letter continued to minimize
Beeline's actions and deny any misconduct despite the ample evidence of wrongdoing which
both Better and Beeline had uncovered.

80.    On October 12, Better's outside counsel asked Beeline's outside counsel
to confirm that Beeline would provide affidavits confirming under oath the various

representations in their letters of September 23 and October 9.  While Beeline's outside counsel

indicated it could provide some affidavits, it said it was willing to do so only if Better released

Beeline from liability.  This lawsuit promptly followed.

## CLAIMS FOR RELIEF

### COUNT I – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

81.    Better repeats and realleges paragraphs 1 through 80 as if fully set forth

herein.

82.    Beeline is a direct competitor of Better.

83.    Abramowitz had access to Better's Confidential Information as a result of

his employment at Better.

84.    Better took reasonable steps to maintain the confidentiality of Better's

Confidential Information by, *inter alia*, requiring all employees, including Abramowitz, to

execute a PII Agreement and by implementing the Information Security Policy, both of which

prohibited unauthorized disclosure and use of Better's confidential information.

85.    Before and throughout Abramowitz's employment at Beeline, he provided

Better's Confidential Information to Beeline, including at the request of other Beeline

employees, including its founders/management team members.

86.    Beeline has misappropriated Better's Confidential Information and is

using it to compete with Better.

87.    As a direct and proximate result of Beeline's misappropriation of Better's

Confidential Information, Better is threatened with: (a) the loss of business expectancies,

customers, employees and goodwill; (b) Beeline's use of Better's Operating Model Data to profit

off the back of Better's years of hard work; and (c) otherwise be substantially and irreparably

harmed unless Beeline is enjoined and restrained by order of the Court.

88.     Unless restrained by this Court, Beeline will cause further irreparable harm to Better.

### COUNT II – MISAPPROPRIATION OF TRADE SECRETS
### PURSUANT TO THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

89.     Better repeats and realleges paragraphs 1 through 88 as if fully set forth herein.

90.     By virtue of his employment by Better, Abramowitz was given access to and possessed Better's Confidential Information, which includes trade secrets of Better such as, *inter alia*, Better's Operating Model Data and the Ad Data.

91.     Better's Confidential Information, including its trade secrets, were developed and maintained by Better over a course of years at great time, effort and expense to Better, and are maintained on password-protected networks accessible only by certain Better employees with need to use such trade secrets on the company's behalf and for its benefit.

92.     In addition, Better has taken reasonable measures to maintain the secrecy of Better's Confidential Information, including its trade secrets, including by requiring employees, including Abramowitz, to sign agreements prohibiting disclosure and having in place policies restricting use of Better's information.

93.     Abramowitz was subject to provisions designed to protect the proprietary and confidential nature of Better's information, which were contained in his Offer Letter, the PII Agreement and Better's Information Security Policy, which required that he maintain the confidentiality of Better's information, and prohibited him from using it other than as necessary in the course of performing his duties for Better and as authorized by Better.

94.     Abramowitz had no right to retain or use any of Better's trade secrets (or any other of Better's Confidential Information) after resigning from his employment with the company.

95.     Better's Confidential Information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

96.     Beeline knew that certain of Better's Confidential Information which it elicited and received from Abramowitz contained or constituted trade secrets belonging to Better.

97.     Beeline possesses and is retaining and using Better's Confidential Information, including Better's trade secrets, to compete with and/or to otherwise harm Better.

98.     Better did not consent to Beeline's use of Better's Confidential Information or its trade secrets.

99.     Beeline has used Better's Confidential Information, including its trade secrets, without express or implied consent from Better.

100.     Beeline knew or should have known that Better's Confidential Information, including its trade secrets, (1) are confidential; (2) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (3) were developed or acquired by Better at great time, effort and expense; (4) were maintained as confidential and are not generally available to the public and Better's competitors; (5) would provide significant benefit to a competitor seeking to compete with Better; and (6) are critical to Better's ability to conduct its business successfully.

101.     Beeline misappropriated Better's Confidential Information, including its trade secrets, without Better's consent.

102.     Beeline will be or is unjustly enriched by its misappropriation of Better's Confidential Information, including its trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Better's Confidential Information, including its trade secrets.

103.     Beeline's misappropriation has been willful and malicious.

104.     As a direct and proximate result of Beeline's misappropriation of Better's Confidential Information, including its trade secrets, Better will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill and otherwise be substantially and irreparably harmed unless Beeline is enjoined and restrained by order of the Court.

105.     Unless restrained by this Court, Beeline will cause further irreparable harm to Better.

106.     Better also is entitled to a seizure order providing for the seizure from Beeline of Better's Confidential Information, including its trade secrets, insofar as necessary to prevent Beeline's propagation or dissemination of them.

107.     In addition, as a result of Beeline's conduct, Better has suffered direct and consequential damages, and is entitled to recover actual, incidental, compensatory and punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

**COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT**

108.     Better repeats and realleges paragraphs 1 through 107 as if fully set forth herein.

109.    Better and Abramowitz were parties to the PII Agreement, a valid and binding contract, which prohibits, among other things, the unauthorized use or disclosure of Better's confidential and proprietary information.

110.    Beeline knew or should have known of this agreement and the fact that Abramowitz was contractually bound to refrain from using or disclosing Better's confidential and proprietary information.

111.    Beeline intentionally procured Abramowitz's breaches of the PII Agreement.

112.    Abramowitz breached the PII Agreement.

113.    As a direct and proximate result of Abramowitz's breaches and Beeline's intentional procurement thereof, Better has been damaged in an amount to be determined at trial.

**COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

114.    Better repeats and realleges paragraphs 1 through 113 as if fully set forth herein.

115.    Abramowitz was an employee of Better.

116.    Abramowitz owed Better a fiduciary duty both during and after his employment not to use Better's confidential information and trade secrets other than for purposes of Better's business.

117.    Beeline knew that Abramowitz had been employed by Better and therefore owed Better a fiduciary duty, and further knew that in disclosing Better's confidential information and trade secrets to Beeline, Abramowitz was breaching that duty.

118.    Beeline substantially assisted Abramowitz's breach of his fiduciary duty to Better by, among other things, inducing, encouraging, requesting, incentivizing and causing

him to provide Beeline with confidential information and trade secrets of Better for Beeline to use in its business and to compete with Better.

119.    As a direct and proximate result of Abramowitz's breach and Beeline's aiding and abetting thereof, Better has been damaged in an amount to be determined at trial.

## COUNT V – VIOLATION OF
## THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030

120.    Better repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.    While employed at Beeline, Abramowitz knowingly accessed the Better Account through a protected computer without authorization or exceeding any authorization.

122.    As Abramowitz's employer, Beeline is vicariously liable for Abramowitz's actions, because its VP of Marketing affirmatively urged and encouraged Abramowitz to access the Better Account.

123.    As a direct and proximate result of Abramowitz's misconduct, including Better's efforts to identify, investigate, address and remediate such misconduct, Better has been damaged in an amount to be determined at trial, and in all events in excess of $5,000.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Better seeks judgment against Defendant Beeline as follows:

(a)    A preliminary and permanent injunction barring Beeline as well as its officers, employees and agents from possessing or using Better's confidential information and trade secrets;

(b)     A seizure order providing for the seizure from Beeline of Better's trade secrets insofar as necessary to prevent Beeline's propagation or dissemination of Better's trade secrets;

(c)     An award of damages in an amount to be determined at trial, including without limitation direct, consequential, actual, incidental, compensatory as well as the reasonable attorneys' fees and expenses Better has been forced to incur to identify, investigate, address and remediate Beeline's wrongdoing;

(d)     An award of punitive damages;

(e)     An award of reasonable attorneys' fees and expenses pursuant to the Defend Trade Secrets Act and the Computer Fraud and Abuse Act; and

(f)     Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff Better demands trial by jury for all issues so triable.

Dated:  New York, New York
        October 19, 2020

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP


s/ Anne E. Beaumont
Anne E. Beaumont
Lance J. Gotko
Priyanka Wityk
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorneys for Plaintiff*