# Exhibit 26

REVISED EDITION

# GUIDE TO INTANGIBLE ASSET VALUATION

15863-344

AICPA®

Robert F. Reilly, CPA
Robert P. Schweihs, ASA

## Notice to Readers

*Guide to Intangible Asset Valuation* does not represent an official position of the American Institute of Certified Public Accountants, and it is distributed with the understanding that the author and publisher are not rendering legal, accounting, or other professional services in the publication. This book is intended to be an overview of the topics discussed within, and the author has made every attempt to verify the completeness and accuracy of the information herein. However, neither the author nor publisher can guarantee the applicability of the information found herein. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

Copyright © 2014 by
American Institute of Certified Public Accountants, Inc.
New York, NY 10036-8775

All rights reserved. For information about the procedure for requesting permission to make copies of any part of this work, please email copyright@aicpa.org with your request. Otherwise, requests should be written and mailed to the Permissions Department, AICPA, 220 Leigh Farm Road, Durham, NC 27707-8110.

2 3 4 5 6 7 8 9 0 PIP 1 9 8 7 6 5 4

ISBN: 978-1-93735-225-7

Publisher: Linda Prentice Cohen
Acquisitions Editor: Robert Fox
Developmental Editor: Katie Hurst
Project Manager: Charlotte Ingles

# Chapter 7: Intangible Asset Damages Principles

## Introduction

There are important procedural differences between the intangible asset valuation and the intangible asset damages analysis. The analyst performing a damages analysis should understand those differences and should understand which of these two different assignments the client or counsel is requesting. It is up to the client, not the analyst, to determine the scope of the analysis. However, in controversy or forensic situations, owner/operators (or counsel) often ask the analyst to perform a valuation when they should ask the analyst to perform a damages analysis. In these instances, the analyst should be able to explain the differences between a valuation and a damages analysis. That way, the owner/operator (or counsel) can make an informed decision about which type of analysis is needed.

This chapter considers the purpose and objective of the damages analysis (with special consideration of the various damages dates), the terminology that is specific to a damages analysis, the common types of damages measurements, the common damages procedures, and the reasons why intangible asset value is typically not equal to intangible asset damages.

## Differences Between Damages Analyses and Valuations

Owner/operators may ask the analyst to estimate a value for an intangible asset based on a defined set of facts and circumstances. Such a value may be estimated as of a historical, current, or future date. Owner/operators often need intangible asset value conclusions for various transaction, accounting, taxation, and planning purposes. The value conclusion indicates the estimated price that the indicated buyer would be willing to pay and the indicated seller would be willing to accept on an indicated date. Value conclusions typically imply a transaction price, even when the current owner/operator is the indicated buyer, the indicated seller, or both (for example, in the case of owner value, the value of the intangible asset to the current owner/operator).

*Guide to Intangible Asset Valuation*, First Edition. Robert F. Reilly and Robert P. Schweihs.
© 2014 American Institute of Certified Public Accountants, Inc. Published 2014 by John Wiley & Sons, Inc.

Third, related to the cost to restore value (or cost to cure) method, the analyst can use either the income approach, the cost approach, or the market approach to value the damaged intangible asset. The measurement of the cost to restore does not mean that the analyst must use the cost approach to value the damaged intangible asset. What is important is that the analyst uses the same valuation approach before the damages event and after the damages event. In addition to restoring the value decrement, the analyst should also consider any claimant opportunity cost (such as lost profits) during the restoration period.

Fourth, with regard to the reasonable royalty rate method, the analyst can use a variety of generally accepted methods to estimate the royalty rate. The comparable uncontrolled transaction method is the most commonly used method. The analyst may also use the profit split method (or the residual profit split method) to estimate an arm's-length royalty rate. The analyst may use the residual (or excess) profit margin method to estimate the fair royalty rate. The analyst may also use the comparable profit margin method to estimate the third-party royalty rate.

Fifth, with respect to other measurement methods, the analyst should consider if the selected method (1) is reasonable for the circumstances and (2) measures the impact of the damages event (and not some other trend or phenomenon). In the case of a statutory method, the analyst should obtain legal guidance from counsel as to the application and amount of such damages.

# The Damages Award as a Taxable Event

The award of compensatory (and punitive) damages is generally a taxable event to the damaged party. The claimant typically has to recognize taxable income related to the damages award. The damages analysis objective is to place the injured party in the same financial condition as before the damages event. If the claimant pays out a portion of the damages award as income tax expense, then the claimant is usually not in the same financial condition as before the damages event. Accordingly, the finder of facts award should be sufficient (1) to cover the amount of actual damages and (2) to pay the income tax liability on the actual damages.

Analysts have developed two procedures to adjust the actual damages amount with regard to the claimant's income tax liability. The first procedure has limited application. The second procedure has more general application.

In the first procedure, the analyst projects all expected future lost income on a pretax basis. Then the present value of that pretax lost income projection is measured using an after-tax discount rate. This calculation results in a recommended damages award that includes both the future lost profits and the income tax liability on the judicial award. Although technically appropriate in certain circumstances, this procedure may be difficult to explain to a finder of fact who is used to the tax level of projected income being equal to the tax level of the discount rate. In addition, this procedure only works in instances when the remedy is based on an estimate of the claimant's future lost income.

In the second procedure, the analyst measures the amount of the claimant's actual damages, using any of the described after-tax measurement methods. Next, the analyst calculates the income tax liability related to the judicial award of actual damages and adds together these two calculated figures. The sum is the recommended judicial award that will make the injured party whole after the damages event. Exhibit 7-2 illustrates this second procedure.

## Exhibit 7-2
## Zeta Company—Recommended Judicial Award Income Tax Adjustment

| Factor | Recommended Judicial Award Component | Amount |
|---|---|---|
| 1 | Estimate of injured party intangible asset actual damages (based on any damages measurement method) | $10,000,000 |
| 2 | Estimate of income tax adjustment on the compensatory damages (1—assumed 35% income tax rate) | ÷ 65% |
| 3 | Recommended total judicial award required to restore the claimant to its financial condition before the damages event (rounded) | $15,385,000 |

Exhibit 7-3 illustrates how the injured party is restored to its predamages financial condition.

## Exhibit 7-3
## Zeta Company—Income Tax on Recommended Judicial Award—Reconciliation to Actual Damages

| Factor | Actual Damages Reconciliation Component | Amount |
|---|---|---|
| 1 | Assume the finder of fact orders the recommended total award (taxable income to the claimant) | $15,385,000 |
| 2 | Income tax expense related to the judicial award (at the 35% income tax rate) | 5,385,000 |
| 3 | Reconciliation to injured party intangible asset actual damages (rounded) | $10,000,000 |

As illustrated in exhibits 7-2 and 7-3, dividing the actual damages calculation by 1 and subtracting the claimant's tax rate will result in the judicial award that will make the injured party whole after the payment of the income taxes on the judicial award.

# Intangible Asset Damages Not Equal to Value

The amount of the damages suffered by the owner/operator could be more than or less than the intangible asset value. The amount of the intangible asset damages equals the intangible asset value only in limited circumstances.

The amount of damages could be greater than the intangible asset value. This could be the case with regard to an intangible asset that was not yet commercialized. Nonetheless, that intangible asset could be expected to generate either operating income or royalty income to the claimant.

The amount of damages could be less than the intangible asset value. The damages event could relate to the breach of a single contract related to an intangible asset that could service hundreds or thousands of contracts. In that case, the intangible asset value would be diminished, but it would likely be diminished by a small percentage of the total intangible asset value.

# Cost to Cure Documents

As an alternative to estimating lost profits or a reasonable royalty rate, the analyst may calculate a cost to cure as an estimate of damages. The cost to cure often quantifies the loss in the intangible asset value due to the wrongful event. If the loss in intangible asset value is the only type of damages suffered by the owner/operator, then the cost to cure may also be measured as the loss in the owner/operator business value. If the intangible asset was destroyed as a result of the wrongful act, then the cost to cure could be estimated as the cost to create a de novo (replacement) intangible asset.

This damages method concludes the amount of expenditures required to restore the intangible asset to the condition it was in before the damages event. It includes both direct costs and indirect costs related to the restoring the intangible asset. The cost to cure method also includes an opportunity cost component, which generally relates to any lost profits suffered by the owner/operator during the time period between the damages event and the full curing of the intangible asset.

To estimate the cost to cure, the analyst typically reviews data and documents related to the following:

1. The original costs to create the intangible asset
2. The current costs to replace the intangible asset
3. The current costs to restore the intangible asset from its damaged condition to its predamaged condition
4. The impact of the damages event (for example, lost revenue, customers, profits, consumer awareness, or first to market industry position; increased expenditures related to maintenance, research and development, selling, and promotion; and legal and other litigation-related expenses)
5. The opportunity cost during the time to cure the intangible asset (for example, any lost economic benefits associated with any intangible asset diminished capacity)

# Mitigation Documents

The analyst typically considers the effects of the plaintiff's mitigation efforts on the measurement of damages. When the intangible asset is damaged due to the defendant's wrongful acts, the plaintiff still has the obligation to perform reasonable efforts to mitigate the effects of the damages.

These mitigation efforts often involve the damaged party attempting to

1. develop a new (replacement) intangible asset;
2. enter into replacement contracts, licenses, permits, franchises, and the like;
3. find new customers, suppliers, employees, and the like;
4. inform the public about (and, therefore, counteract) the wrongful actions to the plaintiff's patents, trademarks, copyrights, and the like; and
5. enforce all other nondisclosure, noncompetition, and other available contractual remedies.

intangible asset and the application of cost trend factors (and other current cost indexes). The discussion explores the identification and quantification of the various forms of obsolescence that are components to each cost approach analysis, and, finally, considers the RUL measure.

Cost approach methods are an appropriate component of many intangible asset analyses. Cost approach methods are generally accepted with regard to intangible asset valuation. Cost approach methods may also play a role in intangible asset transfer price and damages (particularly reasonable royalty rate) analyses. The transfer price or royalty rate for some intangible assets may be calculated as (1) a fair rate of return of and on investment multiplied by (2) a cost-based value estimate for that intangible asset. The product of a rate of return multiplied by a value estimate produces the total dollar amount of the royalty payment that the licensor would expect from the licensee during a specified license period. This dollar amount could be divided by the licensee's projected sales volume to estimate a royalty rate. That royalty rate may be expressed as either a percent of sales or a dollar amount per unit of sales or production volume.

Cost approach methods may also be applicable when estimating the amount of damages suffered by the owner/operator related to a breach of contract, infringement, expropriation, breach of duty, or other type of tort. In these cases, the analyst estimates the amount of damages as the amount of benefit gained by the damaging party that performed the alleged wrongful act. One example of such an analysis is the cost of creating the intangible asset that the defendant avoided as a result of its wrongful actions. Or the analyst could estimate the intangible asset cost approach value before the defendant's wrongful actions (before the damages event). Because the intangible asset was damaged by the defendant's wrongful actions, the intangible asset's current (post-damages event) value would be less than its predamages event value. The difference between the two cost approach value indications (predamages value compared to postdamages value) may be one measure of damages.

Cost approach methods are appropriate when the analysis objective is to estimate the intangible asset cost (and not necessarily the intangible asset value). This type of cost measure may be appropriate, for example, when the owner/operator is purchasing property insurance or business interruption insurance to protect the intangible asset. Cost approach methods are also applicable when the analysis objective is to estimate the intangible asset's RUL or its projected rate of value decrease. Such RUL or value decay analyses are common procedures in quantifying obsolescence in a cost approach analysis.

## Application of the Cost Approach

Before discussing cost approach valuation procedures, it is appropriate to consider the circumstances under which the cost approach is more (or less) applicable to the analysis. Cost approach methods are generally more applicable when the intangible asset is newer and is a fungible property. Here, the term *fungible* means that the actual intangible asset could be exchanged or substituted for another intangible asset. For example, certain software compiled code may be unique. However, another program written with different code could perform the same data processing function as the actual software. In this example, the actual software intangible asset is considered to be fungible.

Cost approach methods are generally more applicable when the analyst estimates the intangible asset value to its current owner/operator under the premise of value

In the typical tangible asset valuation, the analyst is only concerned with re-creation cost. The analyst assumes that the engineer or architect does not have to reinvent the wheel and that the original intellectual content is well known to the tangible asset creator. Although the valuation may focus on either the reproduction cost new or the replacement cost new (such as for all of the structural components of the machine or the building), these are both indications of re-creation cost. The analyst doesn't include the time, effort, and expense of reinventing the wheel.

With regard to the cost approach to intangible assets valuation, the analyst should decide whether to begin with a creation cost basis or a re-creation cost. Re-creation cost assumes that the original intellectual content is already known to the intangible asset creator. Creation cost assumes that the original intellectual content has to be created—or reinvented—as part of the intangible asset.

The determination of which classification of cost is relevant in each analysis is a function of (1) the intangible asset type, (2) the analysis purpose and objective, and (3) the degree of uniqueness or propriety of the intangible asset original intellectual content. Before starting the valuation process, the analyst decides if the estimate should be of a creation cost or a re-creation cost. That decision may be documented in the cost approach analysis working papers or communicated in the valuation report.

# Generally Accepted Cost Components

The analyst consciously considers and decides which cost type to estimate in the cost approach analysis. The analyst has some latitude in the selection of the appropriate cost type to estimate. The same cannot be said for the selection of the cost components included in the analysis.

Regardless of the cost type (for example, reproduction cost new, replacement cost new, or other measure) being estimated, there are four general cost components that should be considered in the cost approach analysis:

1. Direct costs
2. Indirect costs
3. Developer's profit
4. Entrepreneurial incentive

The cost components are also sometimes referred to as the *cost elements*. Regardless of whether these factors are called cost components or cost elements, all four cost components should be considered in the analysis. These four cost components are explained in the following paragraphs.

*Direct costs* include material, labor, and overhead costs incurred directly by the intangible asset creator. The material, labor, and overhead categories of the direct cost component are described next.

Direct material costs typically include the inventor's expenditures and accruals related to the tangible elements of the intangible asset development process. These material costs do not usually represent a significant percentage of the overall cost of the intangible asset development, because there are typically few tangible manifestations of an intangible asset. Nonetheless, material costs should not be ignored in the analysis.

Such costs may include memory devices, integrated circuit masks, film or audio tape masters, engineering drawing supplies, copyrighted models or prototypes, a printed copy

the new development process, which is contrasted with the relatively low risk of continuing to use the last generation of technology, consumer brands, computer software, and so on. The foregone cash flow during the development period is the opportunity cost of the de novo intangible asset creation when compared to the purchase of a seasoned income-producing intangible asset.

This opportunity cost category (that is, foregone income—however measured—during the creation period) is considered by the analyst as part of the entrepreneurial incentive cost component. Not every intangible asset is the type of asset that a third party (nonowner/operator) would or could develop. The appropriate amount of the entrepreneurial cost component also varies considerably in different intangible asset valuations. Nonetheless, the analyst should consider the application of the entrepreneurial incentive component in each cost approach analysis.

All four cost components—direct cost, indirect cost, developer's profit, and entrepreneurial incentive—are considered in the cost approach analysis.

# When Does Cost Indicate Value?

Cost (however measured) does not necessarily equal value. Even so, the cost approach is one of the three generally accepted valuation approaches. At what point does the cost approach provide a reasonable value indication for an intangible asset? The answer presents itself when two conditions are met. The first condition is that the measure of cost included in the analysis should consider all of the cost components previously discussed. The second condition is that the measure of cost included in the analysis should be adjusted for all applicable forms of obsolescence.

The cost approach provides a reasonable value indication when all cost components are properly included in the analysis and when all forms of obsolescence are properly considered in the analysis. The concept of cost (of and by itself) is not the same as the concept of value. However, the cost approach, when properly applied, provides a reasonable value indication for many types of intangible assets. This statement is particularly true for internally generated intangible assets, intangible assets that support the use of other intangible assets, intangible assets that do not directly generate any measure of income, and intangible assets that do not readily sell (with or without other assets) in a secondary marketplace. Intangible assets that generate income or that sell in secondary markets may also be valued through the application of the income approach or the market approach. Of course, such intangible assets may also be valued by the application of the cost approach.

The analyst should avoid two common mistakes when applying the cost approach:

1. Do not exclude consideration of any relevant creation cost components.

2. Do not exclude any relevant forms of obsolescence.

When estimating the intangible asset cost measurement, the analyst adjusts the cost estimate for all relevant forms of obsolescence. This is true whether the cost measurement is reproduction cost new, replacement cost new, or some other current cost measurement. This obsolescence adjustment is appropriate because the actual intangible asset is typically not new. The actual asset is typically a seasoned intangible asset. If the intangible asset is new, then the analyst still considers all forms of obsolescence. In that situation, the analyst may conclude that there is little or no obsolescence related to the new intangible asset.