# Exhibit 33

REVISED EDITION

# GUIDE TO INTANGIBLE ASSET VALUATION

15863-344

AICPA®

Robert F. Reilly, CPA
Robert P. Schweihs, ASA

## Notice to Readers

*Guide to Intangible Asset Valuation* does not represent an official position of the American Institute of Certified Public Accountants, and it is distributed with the understanding that the author and publisher are not rendering legal, accounting, or other professional services in the publication. This book is intended to be an overview of the topics discussed within, and the author has made every attempt to verify the completeness and accuracy of the information herein. However, neither the author nor publisher can guarantee the applicability of the information found herein. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

Copyright © 2014 by
American Institute of Certified Public Accountants, Inc.
New York, NY 10036-8775

All rights reserved. For information about the procedure for requesting permission to make copies of any part of this work, please email copyright@aicpa.org with your request. Otherwise, requests should be written and mailed to the Permissions Department, AICPA, 220 Leigh Farm Road, Durham, NC 27707-8110.

2 3 4 5 6 7 8 9 0 PIP 1 9 8 7 6 5 4

ISBN: 978-1-93735-225-7

Publisher: Linda Prentice Cohen
Acquisitions Editor: Robert Fox
Developmental Editor: Katie Hurst
Project Manager: Charlotte Ingles

In figure 7-4, the yardstick projections for Alpha sales and profits are indicated with dotted lines, and the expected Alpha sales and profits after the impact of the Beta damages are indicated with dashed lines. At the bottom of the figure, the interior of the intersection of the dotted line, and the dashed line is indicated by the letters "ED." This interior area represents the expected damages amount that Alpha suffered as a result of the Beta wrongful action.

As with the other measurement methods, damages are measured by the analyst as of the current date. The analysis considers the impact of all mitigation actions performed by both the claimant and the respondent, and lost profits are measured on a contribution margin basis.

Also, as with all measurement methods, lost profits relate to lost revenue. Lost revenue includes any decrease in unit volume and any decrease in unit prices. The decrease in unit price is also known as *price erosion*. The lost revenue relates to both lost sales directly and indirectly (or consequentially) related to the damages event (for example, the loss of follow-on sales of maintenance services or replacement or repair parts).

## Cost to Restore Value

The cost to restore value method measures the difference in the intangible asset value before the damages event and after the damages event. There are typically two cost components to the lost intangible asset value (or the cost to restore—or cure—the intangible asset). Both of these cost components are typically considered in the damages analysis. The first component is the direct reduction in the intangible asset value. The second is the claimant company lost profits during the restoration period. This lost profits component may be considered as an opportunity cost or as part of the cost to restore the owner/operator to its condition before the damages event occurred.

Let's assume that retail mall owner Gamma agrees with franchise restaurant operator Delta that Delta will be the only external restaurant on the mall property. Based on this contractual agreement, Delta leases the vacant restaurant building and opens the franchise operation. After several years of operations, Delta estimates that the value of the franchise agreement is $10 million. Then, Gamma builds another restaurant on the same mall property and leases it to a franchise restaurant operator that competes directly with Delta.

Let's assume that Gamma has breached its contract with Delta. Now Epsilon, the new franchise restaurant, draws revenue and profits from Delta. One year after Epsilon opens, Delta sells the franchise agreement to another restaurant operator for $7 million. Delta had a franchise with a $10 million value before the damages event (the breach of contract). Delta has a franchise with a $7 million value after the damages event (based on the arm's-length sale of the franchise). The direct component of the cost to restore Delta to his predamages condition is $3 million ($10 million predamages value minus $7 million after-damages value).

Delta also experienced lost profits during the restoration period. The restoration (or partial restoration) event is the third-party sale of the Delta franchise. Let's assume that Delta expected to earn $2 million in contribution margin during the last year. This expectation assumes no competition from Epsilon. This expectation is based on the operating results of the Delta restaurant during the last few years. During the last year, entirely due to the Epsilon competition, Delta's restaurant actually earned only $1 million in contribution margin. So Delta experienced lost profits (an opportunity cost) of $1 million ($2 million predamages profits minus $1 million after-damages profit).

Third, related to the cost to restore value (or cost to cure) method, the analyst can use either the income approach, the cost approach, or the market approach to value the damaged intangible asset. The measurement of the cost to restore does not mean that the analyst must use the cost approach to value the damaged intangible asset. What is important is that the analyst uses the same valuation approach before the damages event and after the damages event. In addition to restoring the value decrement, the analyst should also consider any claimant opportunity cost (such as lost profits) during the restoration period.

Fourth, with regard to the reasonable royalty rate method, the analyst can use a variety of generally accepted methods to estimate the royalty rate. The comparable uncontrolled transaction method is the most commonly used method. The analyst may also use the profit split method (or the residual profit split method) to estimate an arm's-length royalty rate. The analyst may use the residual (or excess) profit margin method to estimate the fair royalty rate. The analyst may also use the comparable profit margin method to estimate the third-party royalty rate.

Fifth, with respect to other measurement methods, the analyst should consider if the selected method (1) is reasonable for the circumstances and (2) measures the impact of the damages event (and not some other trend or phenomenon). In the case of a statutory method, the analyst should obtain legal guidance from counsel as to the application and amount of such damages.

# The Damages Award as a Taxable Event

The award of compensatory (and punitive) damages is generally a taxable event to the damaged party. The claimant typically has to recognize taxable income related to the damages award. The damages analysis objective is to place the injured party in the same financial condition as before the damages event. If the claimant pays out a portion of the damages award as income tax expense, then the claimant is usually not in the same financial condition as before the damages event. Accordingly, the finder of facts award should be sufficient (1) to cover the amount of actual damages and (2) to pay the income tax liability on the actual damages.

Analysts have developed two procedures to adjust the actual damages amount with regard to the claimant's income tax liability. The first procedure has limited application. The second procedure has more general application.

In the first procedure, the analyst projects all expected future lost income on a pretax basis. Then the present value of that pretax lost income projection is measured using an after-tax discount rate. This calculation results in a recommended damages award that includes both the future lost profits and the income tax liability on the judicial award. Although technically appropriate in certain circumstances, this procedure may be difficult to explain to a finder of fact who is used to the tax level of projected income being equal to the tax level of the discount rate. In addition, this procedure only works in instances when the remedy is based on an estimate of the claimant's future lost income.

In the second procedure, the analyst measures the amount of the claimant's actual damages, using any of the described after-tax measurement methods. Next, the analyst calculates the income tax liability related to the judicial award of actual damages and adds together these two calculated figures. The sum is the recommended judicial award that will make the injured party whole after the damages event. Exhibit 7-2 illustrates this second procedure.

# Cost to Cure Documents

As an alternative to estimating lost profits or a reasonable royalty rate, the analyst may calculate a cost to cure as an estimate of damages. The cost to cure often quantifies the loss in the intangible asset value due to the wrongful event. If the loss in intangible asset value is the only type of damages suffered by the owner/operator, then the cost to cure may also be measured as the loss in the owner/operator business value. If the intangible asset was destroyed as a result of the wrongful act, then the cost to cure could be estimated as the cost to create a de novo (replacement) intangible asset.

This damages method concludes the amount of expenditures required to restore the intangible asset to the condition it was in before the damages event. It includes both direct costs and indirect costs related to the restoring the intangible asset. The cost to cure method also includes an opportunity cost component, which generally relates to any lost profits suffered by the owner/operator during the time period between the damages event and the full curing of the intangible asset.

To estimate the cost to cure, the analyst typically reviews data and documents related to the following:

1. The original costs to create the intangible asset
2. The current costs to replace the intangible asset
3. The current costs to restore the intangible asset from its damaged condition to its predamaged condition
4. The impact of the damages event (for example, lost revenue, customers, profits, consumer awareness, or first to market industry position; increased expenditures related to maintenance, research and development, selling, and promotion; and legal and other litigation-related expenses)
5. The opportunity cost during the time to cure the intangible asset (for example, any lost economic benefits associated with any intangible asset diminished capacity)

# Mitigation Documents

The analyst typically considers the effects of the plaintiff's mitigation efforts on the measurement of damages. When the intangible asset is damaged due to the defendant's wrongful acts, the plaintiff still has the obligation to perform reasonable efforts to mitigate the effects of the damages.

These mitigation efforts often involve the damaged party attempting to

1. develop a new (replacement) intangible asset;
2. enter into replacement contracts, licenses, permits, franchises, and the like;
3. find new customers, suppliers, employees, and the like;
4. inform the public about (and, therefore, counteract) the wrongful actions to the plaintiff's patents, trademarks, copyrights, and the like; and
5. enforce all other nondisclosure, noncompetition, and other available contractual remedies.

intangible asset and the application of cost trend factors (and other current cost indexes). The discussion explores the identification and quantification of the various forms of obsolescence that are components to each cost approach analysis, and, finally, considers the RUL measure.

Cost approach methods are an appropriate component of many intangible asset analyses. Cost approach methods are generally accepted with regard to intangible asset valuation. Cost approach methods may also play a role in intangible asset transfer price and damages (particularly reasonable royalty rate) analyses. The transfer price or royalty rate for some intangible assets may be calculated as (1) a fair rate of return of and on investment multiplied by (2) a cost-based value estimate for that intangible asset. The product of a rate of return multiplied by a value estimate produces the total dollar amount of the royalty payment that the licensor would expect from the licensee during a specified license period. This dollar amount could be divided by the licensee's projected sales volume to estimate a royalty rate. That royalty rate may be expressed as either a percent of sales or a dollar amount per unit of sales or production volume.

Cost approach methods may also be applicable when estimating the amount of damages suffered by the owner/operator related to a breach of contract, infringement, expropriation, breach of duty, or other type of tort. In these cases, the analyst estimates the amount of damages as the amount of benefit gained by the damaging party that performed the alleged wrongful act. One example of such an analysis is the cost of creating the intangible asset that the defendant avoided as a result of its wrongful actions. Or the analyst could estimate the intangible asset cost approach value before the defendant's wrongful actions (before the damages event). Because the intangible asset was damaged by the defendant's wrongful actions, the intangible asset's current (post-damages event) value would be less than its predamages event value. The difference between the two cost approach value indications (predamages value compared to postdamages value) may be one measure of damages.

Cost approach methods are appropriate when the analysis objective is to estimate the intangible asset cost (and not necessarily the intangible asset value). This type of cost measure may be appropriate, for example, when the owner/operator is purchasing property insurance or business interruption insurance to protect the intangible asset. Cost approach methods are also applicable when the analysis objective is to estimate the intangible asset's RUL or its projected rate of value decrease. Such RUL or value decay analyses are common procedures in quantifying obsolescence in a cost approach analysis.

## Application of the Cost Approach

Before discussing cost approach valuation procedures, it is appropriate to consider the circumstances under which the cost approach is more (or less) applicable to the analysis. Cost approach methods are generally more applicable when the intangible asset is newer and is a fungible property. Here, the term *fungible* means that the actual intangible asset could be exchanged or substituted for another intangible asset. For example, certain software compiled code may be unique. However, another program written with different code could perform the same data processing function as the actual software. In this example, the actual software intangible asset is considered to be fungible.

Cost approach methods are generally more applicable when the analyst estimates the intangible asset value to its current owner/operator under the premise of value

residential or commercial building. Likewise, a developer expects to earn a reasonable profit on the development costs incurred in the intangible asset creation.

The developer's profit can be estimated several ways. Sometimes, it is estimated as a percentage return on the developer's investment in direct and indirect costs: material, labor, and overhead. Sometimes, it is estimated as a percentage mark-up or as a fixed dollar mark-up to the amount of time involved in the development process, and sometimes it is estimated as a fixed dollar amount.

Analysts sometimes disaggregate the developer's investment into two subcomponents: (1) the amount financed by external financing sources (for example, banks and other financial institutions) and (2) the amount financed by the intangible asset owner directly. The developer's profit associated with the costs financed by external sources is considered analogous to construction period interest with regard to the tangible asset construction. Some analysts include the construction period interest in the developer's profit cost category; others include it in the overhead cost category. Usually, a higher rate of return is assigned to the cost amount financed directly by the creator as compared to the cost amount financed by external financing sources.

*Entrepreneurial incentive* is also a cost component that is frequently overlooked by the inexperienced analyst. It is nonetheless an important cost component of a cost approach analysis. The *entrepreneurial incentive* is the amount of economic benefit required to motivate the intangible asset creator to enter into the development process. From the perspective of the creator, entrepreneurial incentive is often perceived as an opportunity cost.

With regard to the application of the cost approach, it may be helpful to compare an intangible asset developer to a real estate developer (like the developer of a shopping mall or a residential apartment complex). There is an opportunity cost associated with the development process, both for the intangible asset developer and for the real estate developer. The time and resources that they devote to this development project are time and resources that they are diverting from another development project.

Both the intangible asset developer and the real estate developer want to be compensated for the conceptual, planning, and administrative efforts associated with putting together the entire development project.

Both developers expect to be compensated for the period of time between when they initially begin development of the project and when they finally realize the full commercial potential of the development project. This opportunity cost is easier to understand with regard to the real estate developer. From the time the real estate developer first begins to construct the shopping mall until the time all of the stores are leased up and occupied, the developer is likely to experience negative cash flow. This time period could be, for example, two years. If the real estate developer had purchased a shopping mall two years earlier that was already leased, the developer would likely have experienced positive cash flow during that same two-year period. The foregone cash flow during the two-year development period is one indication of the entrepreneurial incentive required to motivate the real estate developer to build a new shopping mall (instead of buying an existing shopping mall). The foregone cash flow during the two-year development period is the opportunity cost of the new mall construction when compared to the purchase of an existing income-producing mall.

The same type of entrepreneurial incentive is necessary to motivate the intangible asset creator to develop a new patent, trademark, computer program, chemical formulation, food recipe, or other intangible asset. The creator should be compensated for the risk of

the new development process, which is contrasted with the relatively low risk of continuing to use the last generation of technology, consumer brands, computer software, and so on. The foregone cash flow during the development period is the opportunity cost of the de novo intangible asset creation when compared to the purchase of a seasoned income-producing intangible asset.

This opportunity cost category (that is, foregone income—however measured—during the creation period) is considered by the analyst as part of the entrepreneurial incentive cost component. Not every intangible asset is the type of asset that a third party (nonowner/operator) would or could develop. The appropriate amount of the entrepreneurial cost component also varies considerably in different intangible asset valuations. Nonetheless, the analyst should consider the application of the entrepreneurial incentive component in each cost approach analysis.

All four cost components—direct cost, indirect cost, developer's profit, and entrepreneurial incentive—are considered in the cost approach analysis.

# When Does Cost Indicate Value?

Cost (however measured) does not necessarily equal value. Even so, the cost approach is one of the three generally accepted valuation approaches. At what point does the cost approach provide a reasonable value indication for an intangible asset? The answer presents itself when two conditions are met. The first condition is that the measure of cost included in the analysis should consider all of the cost components previously discussed. The second condition is that the measure of cost included in the analysis should be adjusted for all applicable forms of obsolescence.

The cost approach provides a reasonable value indication when all cost components are properly included in the analysis and when all forms of obsolescence are properly considered in the analysis. The concept of cost (of and by itself) is not the same as the concept of value. However, the cost approach, when properly applied, provides a reasonable value indication for many types of intangible assets. This statement is particularly true for internally generated intangible assets, intangible assets that support the use of other intangible assets, intangible assets that do not directly generate any measure of income, and intangible assets that do not readily sell (with or without other assets) in a secondary marketplace. Intangible assets that generate income or that sell in secondary markets may also be valued through the application of the income approach or the market approach. Of course, such intangible assets may also be valued by the application of the cost approach.

The analyst should avoid two common mistakes when applying the cost approach:

1. Do not exclude consideration of any relevant creation cost components.
2. Do not exclude any relevant forms of obsolescence.

When estimating the intangible asset cost measurement, the analyst adjusts the cost estimate for all relevant forms of obsolescence. This is true whether the cost measurement is reproduction cost new, replacement cost new, or some other current cost measurement. This obsolescence adjustment is appropriate because the actual intangible asset is typically not new. The actual asset is typically a seasoned intangible asset. If the intangible asset is new, then the analyst still considers all forms of obsolescence. In that situation, the analyst may conclude that there is little or no obsolescence related to the new intangible asset.