UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                            :

BETTER HOLDCO, INC.,                  :

                                        :

                     Plaintiff,        :

                                        :       20 Civ. 8686 (JPC) (SN)

        -v-                       :

                                        :       <u>OPINION AND ORDER</u>

                                        :

BEELINE LOANS, INC.,               :

                                        :

                     Defendant.     :

                                        :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Better Holdco, Inc. ("Better") brings this action against Defendant Beeline Loans,

Inc. ("Beeline") alleging violations of the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C.

§ 1836, and misappropriation, tortious interference with a contract, and aiding and abetting the

breach of a fiduciary duty under New York common law.  Better's claims stem from the actions

of its former marketing analyst, non-party Jack Abramowitz, who left Better's employ to work for

Beeline and allegedly shared with Beeline several pieces of Better's proprietary information, in

violation of a confidentiality agreement that Abramowitz signed when he started working for

Better.

      Beeline has moved for summary judgment on all four of Better's claims, and the parties

have moved to exclude testimony presented by each other's proffered experts under Federal Rule

of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For

the following reasons, Better's motion to exclude various opinions from Beeline's experts is

granted in part and denied in part, Beeline's motions to exclude expert testimony is denied, and

Beeline's motion for summary judgment is granted as to Better's tortious interference and aiding and abetting claims and denied in all other respects.

## I. Background

### A.   Facts[1]

Better and Beeline are both mortgage lending platforms. Pl. 56.1 Stmt. ¶¶ 2-3. Better was founded in in 2014, while Beeline was formed in 2018 and announced the launch of its mortgage lending platform in 2020. *Id.* ¶¶ 2, 34, 44. In September 2018, Abramowitz accepted a position as a marketing analyst with Better. *Id.* ¶ 27. Prior to commencing work, Abramowitz signed a "Proprietary Information and Intervention Agreement" (the "PII Agreement"). *Id.* ¶¶ 5, 28. The PII Agreement, among other things, prohibits unauthorized disclosure and use of Better's confidential and proprietary information and trade secrets. *Id.* ¶ 29; *see also* Dkt. 243-32 at ECF pp. 3-8 ("PII Agmt."). Specifically, the Agreement states as follows:

> **<u>Maintaining Confidential Company Information</u>.**   I will not, during and after my employment with **Better Holdco, Inc.** . . . (i) directly or indirectly disclose to any person or entity, or use, except for the sole benefit of the Company, any of the Company's confidential or proprietary information or trade secrets . . . without the prior written permission from the Company's Chief Legal Officer. By way of illustration and not limitation, Company Information shall include the Company's research and development plans or projects; data and reports; computer materials

---

[1] The following facts are drawn primarily from Beeline's statement of material facts pursuant to Local Civil Rule 56.1, Dkt. 215, Better's counter-statement of disputed material facts and statement of additional material facts pursuant to Rule 56.1, Dkt. 239 ("Pl. 56.1 Stmt."), Beeline's reply to Better's counter-statement and statement pursuant to Rule 56.1, Dkt. 268 ("Deft. Reply 56.1 Stmt.), and the exhibits attached thereto. Unless otherwise noted, the Court cites only to Better's Rule 56.1 counter-statement and statement of additional facts where the parties do not dispute the fact, the adverse party has not offered admissible evidence to refute the fact, or the adverse party lodges a meritless objection or simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact. The Court previously granted the parties' requests to maintain certain exhibits under seal and to redact certain exhibits and portions of their motion papers. *See* Dkts. 217, 221, 256, 273, 278. However, for the purposes of deciding the present motions, the Court will discuss and quote from limited portions of the sealed documents, as the probative value of doing so outweighs any prejudice to the parties. *See, e.g.*, *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *1 n.3 (S.D.N.Y. Jan. 26, 2023).

such as programs, instructions, source and object code, and printouts; inventions, developments, and discoveries; data compilations, development databases; business improvements; business plans (whether pursued or not); ideas; budgets; unpublished financial statements; licenses; pricing strategy and cost data; information regarding the skills and compensation of employees of the Company; the protected health information of employees of the Company; strategies, forecasts and other marketing techniques; and the identities of the Company's suppliers and contractors, and all information about those supplier and contractor relationships such as contact person(s), pricing and other terms. I further acknowledge and recognize that all Company Information is confidential and proprietary, and shall remain the exclusive property of the Company.

PII Agmt. ¶ 1. Abramowitz also signed Better's Data and Information Security Policy when he accepted the job offer. Pl. 56.1 Stmt. ¶ 28; Dkt. 243-33. Abramowitz joined Better on October 2, 2018, and was subsequently promoted to the role of associate. *Id.* ¶¶ 4, 30, 33. His duties "included helping the company market itself through various channels, including affiliate marketing, paid search, direct mail, digital advertising and print advertising." *Id.* ¶ 32. While at Better, Abramowitz was also subject to the "100+-page Information Security Management Program, which contain[ed] the company's policies regarding confidential information, including how such information is protected and how access to such information is regulated within the company." Pl. 56.1 Stmt. ¶ 282.

In early 2020, Abramowitz began looking for a new job. *Id.* ¶ 42. While he initially sought a position with a venture capital firm, Abramowitz subsequently became interested in working for Beeline, *id.*, and reached out to Beeline via email the day after Beeline announced the launch of its mortgage lending platform, *id.* ¶ 45. He eventually connected with Peter Gonzalez, Beeline's President and Chief Financial Officer, who then put Abramowitz in touch with Jay Stockwell, Beeline's Chief Marketing Officer. *Id.* ¶ 47. Executives at Beeline noted Abramowitz's experience in the U.S. mortgage market, gained from working at Better, which contrasted with their lack thereof. *Id.* ¶¶ 51-53. Abramowitz claimed "to have some unique knowledge that would help accelerate [Beeline's] marketing efforts," *id.* ¶ 59, and during the interviews, he mentioned

certain pieces of non-public information.  For example, he told Stockwell that "Better just did a Series D (not yet public) that values them around 2B mark," a piece of information that was useful to Beeline as something to point to get potential investors to view Beeline more favorably, even though Beeline knew that such information should not ordinarily be shared.  *Id.* ¶¶ 56-60, 64-65.

On June 6, 2020, following an interview with Beeline's Chief Executive Officer, Nick Liuzza, *id.* ¶ 71, Abramowitz emailed Beeline a copy of the PII Agreement, attached to a thank-you email, *id.* ¶ 74; Dkt. 243-32.  Characterizing the Agreement as a "non-compete," Abramowitz asked Better's General Counsel and Chief Compliance Officer, Jessica Kennedy, for some "guidance . . . on how enforceable it is."  Dkt. 243-32 at 2; *accord* Pl. 56.1 Stmt. ¶¶ 55, 74.  After Kennedy read the agreement, she and Gonzalez told Abramowitz that "we don't think there's much to worry about."  Pl. 56.1 Stmt. ¶¶ 76-77.  Beeline sent Abramowitz a formal offer letter on June 15, 2020.  *Id.* ¶ 78.  Abramowitz accepted Beeline's offer on June 19, 2020, and quit his job at Better on the same day.  *Id.* ¶ 83.  He did not tell anyone at Better that he was going to work for Beeline.  *Id.* ¶ 84.  Abramowitz began working at Beeline on July 8, 2020.  *Id.* ¶¶ 6, 117.

Better disabled Abramowitz's access to its computer network the day he left.  *Id.* ¶ 87.  Yet before Better had done so, Abramowitz downloaded over a dozen confidential documents belonging to Better onto his personal computer.  *Id.* ¶ 86.  While the record contains evidence of many instances where Abramowitz shared different pieces of confidential information with Beeline, there are three categories of information that are particularly relevant to Better's claims: (1) Better's Operating Model; (2) Better's Facebook Ad Data; and (3) Better's Partner Agreements (collectively, the "Better Information").  The Court addresses each in turn.

### 1.     The Operating Model

"The Operating Model is a massive Excel workbook comprised of dozens of worksheets which details Better's unique and proprietary approaches and methods for organizing, staffing

(including proprietary compensation information and other information about Better's operations), and financing its business, as well as marketing and executing its business." *Id.* ¶ 198.  It includes "detailed historical data, and projections of, Better's performance."  *Id.* ¶ 199.  For example, one of its tabs contains "Key Performance Indicators and Unit Economics," which are "quantifiable measures of Better's financial and operational performance, including, among other things, counts of loan applications, interest rate locks, loans funded, and the associated revenues and profits earned."  *Id.* ¶¶ 200-01.  This information would permit a competitor to replicate Better's staffing model and partnerships, and "benchmark the revenues they need to . . . secure fundraising."  *Id.* ¶¶ 215-16.  Another tab in the Operating Model contains "details regarding the number of loans offered and sold to secondary market investors and the number of days Better holds onto loans before it sells them in the secondary market."  *Id.* ¶ 203.  The Operating Model also includes information concerning Better's cash positions in 2019 and 2020, *id.* ¶¶ 205-06, and "details regarding Better's loans and marketing spend," *id.* ¶ 211, including "the revenue Better expects to earn from those loans, and the costs, such as labor and customer acquisition expenses, that Better expects to incur originating the loans," *id.* ¶ 212.  Taken together, this information "constitutes a roadmap of Better's strategies which, in the hands of a competitor, could be used to replicate in a short time what Better has spent years developing."  *Id.* ¶ 214.  Thus, "only a limited number of employees who are actively working on the Operating Model" have access to it, and such access is protected by "two-factor authentication."  *Id.* ¶¶ 284, 286.

Abramowitz began sharing information from the Operating Model with Beeline before he even started working there.  For example, on July 1, 2020, Abramowitz sent Liuzza a projected valuation of Beeline that he had created using information gleaned from the Operating Model.  *Id.* ¶ 108.  Liuzza responded with questions, and noted that he wanted the information "for comp

purposes" and "to develop Beeline's strategy to reach the same milestones as Better." *Id.* ¶¶ 109-10.  Abramowitz responded to Liuzza's questions and mentioned that he had Better's "full model on my personal computer dating back to Jan '18 which I can show you guys at some point."  *Id.* ¶ 111; *accord* Dkt. 243-20 at 134:6-10; *see also* Pl. 56.1 Stmt. ¶ 112 ("The 'full model' that Abramowitz took from Better was Better's Operating Model.").  Upon starting work at Beeline, Abramowitz uploaded the Operating Model to Beeline's Google Drive and saved the Operating Model to his Beeline-issued laptop.  *Id.* ¶¶ 113, 243.

Abramowitz has "admitted that he used Better's Operating Model in the course of his employment at Beeline, referring to it in responding to questions from Beeline personnel about Better's margins, its growth rate, and its volume of originations."  *Id.* ¶ 245.  For example, on July 13, 2020, Abramowitz emailed Liuzza and Gonzalez an excerpt from the Operating Model showing "Better's App, Lock, Fund and Revenue from 1Q18 to 3Q19."  *Id.* ¶ 250.  After sharing the information with other executives at Beeline, Liuzza instructed Abramowitz and another Beeline employee to use the information in connection with developing Beeline's "staffing model."  *Id.* ¶¶ 253-55, 270.  On August 11, 2020, Liuzza, who knew that Abramowitz had access to the Operating Model, asked Abramowitz for information regarding Better's "closings per month."  *Id.* ¶ 256; *accord id.* ¶¶ 111-12 (telling Liuzza he has access to the "full model," referring to the Operating Model).  Abramowitz pulled the relevant information from the Operating Model, which Liuzza and other Beeline executives used to refine Beeline's staffing model.  *Id.* ¶¶ 257, 259-63.  Abramowitz also convened an in-person meeting one month after starting at Beeline, during which he showed the Operating Model to Gonzalez and another Beeline executive.  *Id.* ¶¶ 265-67.  Multiple employees at Beeline knew Better's Operating Model was stored on the

Beeline Google Drive and either viewed or downloaded the Operating Model multiple times throughout August and September 2020. *Id.* ¶¶ 247-49, 263-64, 271-74.

### 2.      The Facebook Ad Data

In mid-August 2020, Abramowitz and Stockwell had a zoom call during which Abramowitz shared a considerable amount of data[2] from Better's Facebook Ad Manager Account. *Id.* ¶ 181.  Access to Better's Facebook Manager Account, and the data therein, is restricted to only those employees who actively work on Better's Facebook Advertising.  *Id.* ¶ 291.  Better's marketing group manages who has access to the account and "has a practice of terminating access . . . when an employee leaves Better." *Id.* ¶¶ 292-93; *accord* Dkt. 243-99 ("Doolittle Dep.") at 26:6-17.  The marketing group also conducts "periodic reviews of which users have access to the Facebook Ad Manager Account and revokes access if necessary."  Pl. 56.1 Stmt. ¶ 294.  However, "due to an oversight attributable to competing priorities within the" marketing group, they neglected to terminate Abramowitz's access to the Facebook Ad Manager, and he retained such access for months after he left Better.  *Id.* ¶¶ 18, 88.

During the meeting with Stockwell, Abramowitz shared his screen and logged into Better's Facebook Ad Manager account through his personal Facebook profile.  *Id.* ¶¶ 182-83.  He "proceeded to click . . . into one of Better's advertising campaigns," and Stockwell asked Abramowitz questions about some of the images used in the campaign. *Id.* ¶ 185.  At Stockwell's request, Abramowitz began to "poke[] around" the Better Facebook Ad Manager Account and click into various items whenever they were of interest to Stockwell.  Dkt. 243-2 ("Abramowitz

---

[2] As noted in *Garner's Modern English Usage*, "data" is a "skunked term: whether you write data are or data is, you're likely to make some readers raise their eyebrows."  *Data*, Bryan A. Garner, Garner's Modern English Usage 245 (4th ed. 2016).  With this in mind, the Court uses "data" as a singular.

Aff.") ¶ 22; Dkt. 243-3 ("Abramowitz Dep.") at 135:1, 136:7-9; Dkt. 243-27 ("Stockwell Dep.")
at 180:2-25.  Stockwell directed Abramowitz to take various screenshots of information on the
Facebook Ad Manager Account.  Pl. 56.1 Stmt. ¶ 188.  Moreover, Abramowitz downloaded 27,000
lines of data from Better's Facebook Ad Manager Account.  *Id.*  This data, which revealed Better's
"click-through rates, impressions, audiences, cost per result, and cost per received application for
Better's Facebook advertising," could be used "to attempt to replicate Better's . . . marketing
strategy."  *Id.* ¶¶ 193-94.  Abramowitz uploaded the screenshots and most of the raw data to
Beeline's Google Drive on August 11 and 12, 2020.  *Id.* ¶ 189.  Stockwell at some point learned
that Abramowitz had saved the Facebook Ad Data to Beeline's Google Drive, yet did nothing to
report it.  Stockwell Dep. at 182:19-83:8.  "Audit logs produced by Beeline show that Gonzalez
downloaded the screenshots and data between August 12 and 13, 2020 and that Abramowitz
downloaded the data on August 13, 2020."  Pl. 56.1 Stmt. ¶ 196.

### 3.    The Partner Agreements

Prior to his departure, Abramowitz downloaded or sent to his personal email address
Better's marketing partnership agreements with several companies including QuinStreet Inc.,
LendingTree LLC, NerdWallet Compare Inc., Credit Karma Mortgage, Inc., and Bankrate, LLC.[3]
*Id.* ¶ 86; *see also* Dkt. 194-30 ("Holzen Report") ¶¶ 31-32.  Better has a policy of restricting access

---

[3] Beeline disputes inclusion of the Bankrate "Master Advertising Services Agreement" in
the list of Partner Agreements that Abramowitz acquired from Better because the agreement "is
not executed and makes no mention of Better" and thus is merely "a standard agreement form from
Bankrate."  Deft. Reply 56.1 Stmt. ¶ 86.  While Beeline is correct that the agreement is unsigned
and does not actually reference Better, Dkt. 266-3, Abramowitz avers that the Bankrate Agreement
"belonged to Better," Abramowitz Aff. ¶ 11, and Beeline does not point to any evidence to refute
this.  Thus, "draw[ing] all justifiable factual inferences in favor of" the plaintiff, as the Court is
required to do on a defendant's motion for summary judgment, *Major League Baseball Props.,
Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008), the Court finds for purposes of this Opinion
and Order that the Bankrate Agreement belonged to Better.

to the Partner Agreements to only those employees who need to access them for their job duties. Pl. 56.1 Stmt. ¶ 296.  On his first day at Beeline, Abramowitz showed the Partner Agreements to Kennedy, telling her that "these could be valuable" and that he was planning to scan and save them to the Google Drive.  *Id.* ¶¶ 126-28.  Abramowitz subsequently did save the Partner Agreements to the Beeline Google Drive and his Beeline-issued laptop; he also shared the agreements with Stockwell.  *Id.* ¶¶ 132-34, 158.

The Partner Agreements were viewed and downloaded multiple times by multiple employees.  *Id.* ¶¶ 135-55.  Abramowitz also used the Bankrate Agreement to answer questions from Stockwell "regarding 'what sort of deal' Beeline 'should be aiming for from' Bankrate."  *Id.* ¶ 157.  Moreover, Abramowitz connected Beeline with representatives from some of the parties to the Partner Agreements.  *Id.* ¶¶ 159, 173-74.

* * *

On August 20, 2020, Better learned that Abramowitz was working at Beeline, and immediately emailed Abramowitz and demanded that he reaffirm his obligations pursuant to the PII Agreement.  *Id.* ¶¶ 7, 306.  Abramowitz forwarded the email to Liuzza, Gonzalez, and Kennedy.  *Id.* ¶ 307.  On August 26, 2020, Better's outside counsel sent a formal letter to Beeline demanding that Abramowitz be fired by August 28, 2020, and enclosed a copy of the PII Agreement.  *Id.* ¶¶ 8, 323-25.  Beeline placed Abramowitz on administrative leave on August 28, 2020.  *Id.* ¶ 9.  That same day, Abramowitz accessed the Google Drive to change some of the filenames of the Partner Agreements and the Operating Model to remove any references to Better. *Id.* ¶¶ 334-37. Beeline officially terminated Abramowitz on September 8, 2020.  *Id.* ¶¶ 10, 338. On September 24, 2020, Abramowitz participated in an exit interview with Better.  *Id.* ¶ 19.  Better and Abramowitz subsequently entered into a settlement agreement in the fall of 2020.  *Id.* ¶ 20.

**B.**     **Procedural History**

Better filed its Complaint initiating this action on October 19, 2020.  Dkt. 1.  On October 26, 2020, the Court entered a Stipulated Preliminary Injunction, enjoining Beeline from using or disclosing any of the Better Information and requiring Beeline to certify destruction of all Better Information in its possession.  Dkt. 20.

Better filed an Amended Complaint on December 16, 2020.  Dkt. 35 ("Am. Compl.").  The Amended Complaint contains five causes of action:  misappropriation of confidential information under New York common law (Count I), misappropriation of trade secrets under the DTSA (Count II), tortious interference with a contract under New York common law (Count III), aiding and abetting the breach of a fiduciary duty under New York common law (Count IV), and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count V).  Am. Compl. ¶¶ 84-126.  On February 5, 2021, Beeline moved to dismiss Count V.  Dkts. 48-50.  The Court granted Beeline's motion on July 26, 2021.  Dkt. 97; *see Better Holdco, Inc. v. Beeline Loans, Inc.*, No. 20 Civ. 8686 (JPC), 2021 WL 3173736 (S.D.N.Y. July 26, 2021).

On May 3, 2022, following the close of discovery, Better moved to exclude certain of Beeline's experts, Dkt. 193 ("Pl. *Daubert* Motion"), and on May 5, 2023, following a notification from the Clerk of Court that its initial filings on May 4, 2023 were deficient, Beeline moved both to exclude certain of Better's experts, Dkt. 209 ("Deft. *Daubert* Motion"), and for summary judgment on all four of Better's remaining claims, Dkt. 206 ("S.J. Motion").  The parties filed opposition briefs on July 13, 2023, *see* Dkts. 233 ("Opposition to Pl. *Daubert*"), 240 ("S.J.

Opposition"), 244 ("Opposition to Deft. *Daubert*"), and replies on July 27, 2023, *see* Dkts. 261 ("Pl. *Daubert* Reply"), 267 ("S.J. Reply"), 270.[4]

## II. *Daubert* Motions

As noted, in conjunction with Beeline's motion for summary judgment, the parties have filed motions, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, to exclude proffered expert testimony that the other side intends to present at trial. Beeline seeks to exclude expert opinions of Better's damages expert, Stephen Holzen. Better seeks to exclude expert opinions from each of Beeline's experts.

As a result, the Court must address whether the opinions proffered by the parties' experts are admissible before ruling on Beeline's motion for summary judgment. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) ("The summary judgment standard requires a court to consider all relevant, admissible evidence . . . ." (internal quotation marks omitted)); *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion." (citing Fed. R. Evid. 104(a))). "If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence." *Colon*, 199 F. Supp. 2d at 68. The standard for admissibility of expert testimony at the summary judgment stage is the same as it is at trial. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) ("On a motion for summary judgment, disputed issues of fact are resolved against the moving party . . . . But the question of admissibility of expert testimony is not such an issue of fact.").

---

[4] Better also moved for sanctions pursuant to Federal Rule of Civil Procedure 37, asserting spoilation of metadata associated with certain Better Information. *See* Dkts. 188-90. After Beeline subsequently produced the requested metadata, Better withdrew its motion. Dkts. 264, 272.

A.      **Legal Standard**

Under the rules of evidence governing the admissibility of expert and other scientific or

technical testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702.[5]  A district court has "broad discretion to carry out this gatekeeping function"

under Rule 702, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016), which "applies not

only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and

'other specialized' knowledge," *Kumho Tire*, 526 U.S. at 141.  *See 523 IP LLC v. CureMD.Com*,

48 F. Supp. 3d 600, 641 (S.D.N.Y. 2014) ("It is well-established that the trial judge has broad

discretion in the matter of the admission or exclusion of expert evidence." (quoting *Boucher v.

U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))).  As the Supreme Court made clear, "the

law grants a district court the same broad latitude when it decides *how* to determine reliability as

---

[5] In *Daubert*, the Supreme Court set forth four non-exhaustive factors to determine the
reliability of an expert's reasoning or methodology: (i) whether the theory or technique relied on
has been tested; (ii) whether the theory or technique has been subjected to peer review and
publication; (iii) whether there is a known or potential rate of error and the existence and
maintenance of standards controlling the technique's operation in the case of a particular scientific
technique; and (iv) whether the theory or method has been generally accepted by the scientific
community.  509 U.S. at 593-94.  The Supreme Court, however, emphasized that "[t]he inquiry
envisioned by Rule 702 is . . . a flexible one," *id.* at 594, and "*Daubert*'s list of specific factors
neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co., Ltd.
v. Carmichael*, 526 U.S. 137, 141 (1999).

it enjoys in respect to its ultimate reliability determination."  *Kumho Tire*, 526 U.S. at 142.  But Rule 702 still requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'"  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590).

Under this framework, a district court's Rule 702 inquiry entails assessing three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will 'assist the trier of fact')."  *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17 Civ. 7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)).  "Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion."  *Colon*, 199 F. Supp. 2d at 71.  In addition, the Second Circuit has instructed that a district court "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," but that "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (citation, internal quotation marks, and modification omitted).  Ultimately, the party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10 ("Preliminary questions concerning the qualification of a person to be a witness . . . should be established by a preponderance of proof."

(internal quotation marks omitted)); *In re Pfizer*, 819 F.3d at 658 ("The proponent of the expert testimony has the burden to establish these admissibility requirements . . . .").

## B.     Better's Experts

### 1.     Stephen Holzen

Better retained Holzen as its damages expert.  Holzen Report ¶ 1.  Holzen received a B.S. in mechanical engineering from Penn State University, and an M.B.A. from American University. *Id.* ¶ 6.  He is a Managing Director of "a global financial advisory firm that specializes in investment banking, valuation and financial opinions, and dispute advisory and forensic services." *Id.* ¶ 3.  Holzen has provided expert testimony in at least twelve engagements over the past five years alone, mostly involving "analysis and evaluation of economic and financial data for the purpose of determining damages" and evaluation of "damages in the context of disputes concerning, or consulting with clients to assess the value of, their intellectual property."  *Id.* ¶ 5, Exh. A at 4.

Holzen calculates what he refers to as "unjust enrichment" or "avoided cost" damages, "under the assumption that Better has established that Beeline is liable on one or more of Better's claims."  *Id.* ¶ 33.  Holzen also calculates damages in terms of a reasonable royalty that Beeline would pay to Better for the Better Information.  *Id.*[6]

---

[6] As discussed *infra*, and contrary to Beeline's contention on summary judgment, S.J. Motion at 19; S.J. Reply at 2-4, these damages theories are authorized by the DTSA.  In a civil action for misappropriation of a trade secret, the statute allows a court to award:

  (i) (I) damages for actual loss caused by the misappropriation of the trade secret; and

     (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

  (ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret . . . .

To calculate unjust enrichment damages, Holzen uses what he and the parties refer to as the "cost approach" which "measures damages based on the cost to obtain another asset of equal utility." *Id.* ¶¶ 34-35.  Holzen looks at two metrics:  replacement costs, which "estimates the cost of the Better Information based on the cost a typical business would expect to incur to create an asset having comparable utility," and "reproduction costs," which measures what Better actually spent to create the Better Information.  *Id.* ¶ 35.  To calculate both replacement and reproduction costs, Holzen accounts for "direct labor costs, benefit costs, indirect overhead costs, third-party costs, and opportunity costs," and notes that "[i]t is necessary to account for opportunity costs because . . . a prudent business would only incur the cost to develop an asset if that business expects the asset [to] generate a reasonable return on investment."  *Id.* ¶ 36 & n.102.  Holzen further explains:

> I measure direct labor costs as the salary and benefit costs of a professional tasked with reproducing or replacing the Better Information.  These costs are based on the estimated actual time spent by Better employees in developing and maintaining the Better Information multiplied by an industry average labor rate (under the Replacement Cost approach) or by Better's own actual labor rate (under the Reproduction Cost approach).  Overhead costs relate to certain indirect overhead expenses (e.g., rent, utilities, depreciation).  Third-party costs, or out-of-pocket costs, are the amounts paid to others to develop the Better Information.  The expected opportunity costs relate to the profit one would expect to earn from an investment of capital and resources.

*Id.* ¶ 36 (footnote omitted).  Holzen performed this analysis with respect to each of the Operating Model, the Facebook Ad Data, and the Partner Agreements.  He then concludes that damages measured in the form of replacement costs would be $6,267,374, and that damages measured in the form of reproduction costs would be $6,310,341.  *Id.* at 13 tbl. 1.

---

18 U.S.C. § 1836(b)(3)(B); *see Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 Civ. 211 (LGS), 2021 WL 1553926, at *6 (S.D.N.Y. Apr. 20, 2021) ("The DTSA expressly permits unjust enrichment as damages.").

As to a reasonable royalty, Holzen opines that "there is no established royalty rate for the Better Information," and so he seeks to determine a reasonable royalty "based upon the construction of a hypothetical negotiation between a willing licensee and a willing licensor at the time of the misappropriation" using fifteen factors known as the "*Georgia-Pacific* factors." *Id.* ¶¶ 109-10; *accord Vt. Microsys., Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996) ("A reasonable royalty award attempts to measure a hypothetical agreed value of what the defendant wrongfully obtained from the plaintiff.  By means of a suppositious meeting between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." (internal quotation marks omitted)).  Based on his examination of the factors, Holzen concludes "that the hypothetical negotiation in this case suggests that the parties' negotiating positions are equally balanced as it relates to the Replacement and Reproduction Costs of the Better Information," and so he opines that "the parties would consider a one-time royalty payment that ranges from $6.27 million to 6.31 million, in accordance with the principles discussed under the Cost Approach with no adjustment made based on the qualitative issues considered by the parties during the hypothetical negotiation." Holzen Report ¶¶ 144-46.

Beeline moves to exclude Holzen's application of the cost approach, primarily arguing that his methodology is unreliable.  *See* Deft. *Daubert* Motion at 8-25.  Beeline, for example, criticizes Holzen for relying on "self-serving 'interview' testimony" from Better employees, rather than "Plaintiff's actual business records, data, or information," and for not taking any steps to verify the information as reliable.  *Id.* at 8-10; *see also id.* at 13-14 ("Whether by his choosing or by Plaintiff's orders, Holzen used far too little actual data and information regarding Plaintiff, and far too many speculative assumptions. . . .  Holzen's opinions are not 'grounded on sufficient facts or data' because, inter alia, he relies primarily on unrecorded, untranscribed, and undocumented self-

serving 'interviews' to determine that thousands of hours were spent in creating and/or maintaining the Operating Model, Facebook Ads Manager Data, and Partner Agreements, and made no effort to corroborate those figures with any internal documents that Better could readily have provided him."). Beeline also faults Holzen for "not us[ing] the actual 'overhead' or 'opportunity' costs of Plaintiff, but rather that of five companies 'similar' to Plaintiff as a benchmark, and for offering no explanation "as to why he chose not to rely on Plaintiff's actual financial data instead of the Benchmark Companies." *Id.* at 11. As to opportunity costs, Beeline argues that Holzen's analysis is unreliable because "there is no evidence (nor even allegations) that Plaintiff's lost profits, nor that the alleged events underlying this litigation in any way adversely affected Better's" return on investment with respect to the Better Information. *Id.* at 12.

Beeline further attacks the authority upon which Holzen relies—primarily his reliance on a prior version of *Valuing Intangible Assets*. *Id.* at 14-15; *accord* Dkt. 211-7. Beeline points to several portions of the revised version of the treatise which, it argues, contradict certain portions of Holzen's analysis. In particular, Beeline draws a distinction between a "valuation" and a "damages" analysis, and argues that Holzen improperly equates the two. Deft. *Daubert* Motion at 16; *see also id.* at 18 ("Holzen's analysis also misconstrues the methodology upon which he purports to rely by conflating the valuation of intangible assets with costs."), 19-20 (analyzing the distinctions between a "valuation" and a "damages" analysis). Finally, Beeline attacks Holzen's calculation of damages concerning the Facebook Ad Data primarily because he improperly included third-party costs in that calculation, he failed to account for any benefits that Better received from the Data and other similar facts, he failed to consider the Data's obsolescence, and he calculated what Beeline refers to as "creation" costs" rather than "re-creation" costs. *Id.* at 20-23.

Having considered these arguments, the Court concludes that Holzen's cost approach which purports to calculate damages based on avoidance or development costs is a permissible method of calculating unjust enrichment damages—at least for the purposes of Better's DTSA claim. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 Civ. 211 (LGS), 2020 WL 5822058, at *2 (S.D.N.Y. Sept. 30, 2020), *modified on other grounds* 2020 WL 8079812 (S.D.N.Y. Oct. 15, 2020) (holding that "avoided costs" are an acceptable measure of "unjust enrichment" under the DTSA).   Thus, the question becomes whether Holzen's opinions are so "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty*, 571 F.3d at 214 (internal quotation marks omitted).  They are not.

All of Beeline's arguments attacking Holzen's analysis go to the weight and not the admissibility of his proffered testimony, and none presents a basis for exclusion.  Beeline, for example, complains that Holzen should have looked at Better's actual data rather than obtaining information from interviewing employees.  But "it is not uncommon for experts to rely on interviews with third parties in forming their opinions." *Williams v. Illinois*, 567 U.S. 50, 109 (2012) (Thomas, J., concurring); *see also Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) ("In forming their opinions, experts, of course, often rely on interviews of people with knowledge of relevant facts.").[7]  Similarly, while Beeline may fault Holzen for relying on an outdated version of a treatise, such reliance and the resulting conclusions would be a proper area of cross-examination. *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009) ("To the extent the Defendants have any questions about the weight or the

---

[7] Indeed, Beeline acknowledges as much in its opposition to Better's *Daubert* Motion, defending its own expert's reliance on witness interviews rather than actual data. *See* Opposition to Pl. *Daubert* at 15-17.

sufficiency of the evidence upon which [the proffered expert] relied, or the conclusions generated therefrom, those questions can be asked on cross-examination."); *cf. Zerega Ave. Realty*, 571 F.3d at 214 ("[C]ontentions that the assumptions are unfounded go to weight, not admissibility, of the testimony.").   In addition, Better has presented its own damages expert, Karl Weisheit, whose proffered testimony would seek to rebut Holzen's analysis.  *See generally* Dkt. 194-1 ("Weisheit Report") (critiquing Holzen's citations to *Valuing Intangible Assets*, his misconstruing valuation and damages calculations, and his inclusion of opportunity and third-party costs in damages).  As such, Beeline's motion to preclude essentially asks the Court to determine which of the two experts is more reliable.  But, having concluded that Holzen (and concluding later that Weisheit) relied on permissible methods, determining the weight to give the experts is a job for the jury.  *See Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 207 (S.D.N.Y. 2019) ("Ultimately, the credibility of competing expert witnesses, and the persuasiveness of their opinions are all questions for the jury." (internal quotation marks omitted)); *Powers v. Mem'l Sloan Kettering Cancer Ctr.*, No. 20 Civ. 2625 (LGS), 2022 WL 874846, at *5 (S.D.N.Y. Mar. 24, 2022) ("Where the parties present divergent expert testimony, it is the province of the jury to determine the credibility of the experts." (internal quotation marks and brackets omitted)).  Thus, because each of Beeline's arguments challenges the weight and not admissibility of Holzen's testimony, and because Beeline will have ample opportunity to inquire as to these topics on cross-examination, the Court concludes that Holzen's proffered testimony is sufficiently reliable to withstand *Daubert* scrutiny.

Beeline also argues that Holzen's cost approach analysis is unduly prejudicial and should be excluded under Federal Rule of Evidence 403.  Deft. *Daubert* Motion at 6-8.  While Beeline appears to have abandoned this argument in its reply brief, the Court concludes that Holzen's

testimony does not violate Rule 403.  It is true that "[i]n addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 403)); *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." (internal quotation marks omitted)).  Holzen's testimony, however, is not of the sort that would typically run afoul of this rule.  *Cf. Nimely*, 414 F.3d at 398 (district court erred in failing to exclude expert testimony opining "on the credibility of trial testimony from crucial fact witnesses" when "issues of credibility . . . lay at the heart of this trial").  In fact, Beeline merely rehashes the same arguments that it made for why Holzen's testimony is unreliable.[8]  Thus, for the same reasons as stated above, the Court finds that the proffered testimony from Holzen has significant probative value to the jury's consideration of damages in the event the jury finds liability, at least for purposes of the DTSA claim, and that value is not substantially outweighed by the risk of unfair prejudice.  Indeed, the testimony would be unfairly prejudicial only if one were to accept Beeline's arguments as to the deficiencies in Holzen's damages analysis.  *See Syntel Sterling Best Shores Mauritius Ltd. v.*

---

[8]  The only additional argument Beeline asserts is that Better had "indicated repeatedly throughout fact discovery that its damage model would be based on Beeline's 'unfair gain'" and that "[o]nly after conclusion of fact discovery and production of Holzen's Report did it come to light that Plaintiff seeks Beeline's 'avoided costs' rather than 'unfair gain.'" Deft. *Daubert* Motion at 8.  This argument is unavailing.  First, any distinction between "avoided costs" and "unfair gain" is irrelevant because both "represent the wrongful gain to the party that misappropriated the trade secret" and thus can be properly classified as "unjust enrichment" damages. *Syntel Sterling*, 2021 WL 1553926, at *7.  Second, Better disclosed to Beeline that it would seek, among other things, "damages measured by the costs Beeline has avoided by misappropriating Better's trade secrets" on July 6, 2021—six months prior to Holzen's expert Report.  Dkt. 242-5 at 4.

*TriZetto Grp.*, No. 15 Civ. 211 (LGS), 2020 WL 8079812, at *1 (S.D.N.Y. Oct. 15, 2020) ("The testimony's probative value outweighs any prejudicial effect, as the testimony is prejudicial only if one accepts Syntel's argument that his avoided cost calculation is overstated and therefore incorrect. That is a matter of reasonable dispute and proper for the jury to decide."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). It is for the jury to assess whether such deficiencies exist and how much, if any, weight to give Holzman's testimony.

Accordingly, Beeline's motion to exclude Holzen's proffered testimony is denied.

### 2.      Ronald Schnell

While Beeline has not moved to exclude any testimony from Schnell, the Court briefly summarizes Schnell's opinions that are relevant to Better's *Daubert* Motion. Schnell is an expert in computer science and software. Dkt. 194-16 ("Schnell Report") ¶ 1. Better retained Schnell to opine on nine audit logs that Beeline produced pertaining to the Beeline Google Drive (the "Google Drive Audit Logs") and to examine the image of Abramowitz's Beeline-issued laptop (the "Abramowitz Laptop") in order to recover any deleted Better Information. *Id.* ¶¶ 16, 23. As to the Google Drive Audit Logs, Schnell opines that when the "'Event Description' column . . . . indicate[s] that an individual 'downloaded' a particular document[,] . . . . this means that the individual indicated actually downloaded the document. In other words, 'downloaded' here is not an umbrella term for other actions such as access, share, etc." *Id.* ¶ 24. In examining the image of the Abramowitz Laptop, Schnell was able to recover several files or parts of files constituting Better Information that were either placed in the recycling bin but not purged, or deleted but not yet overwritten. *Id.* ¶¶ 28-30. Lastly, Schnell recovered "certain artifacts" corresponding to files that were saved on the Beeline Google Drive from the Abramowitz Laptop.

*Id.* ¶ 31 & tbl.  Of those artifacts, only two were marked as "owned" by Abramowitz.  *Id.* ¶¶ 31-32.  Schnell opines that "[t]his means that [all the other files] were shared with Mr. Abramowitz from an account other than" his Beeline email address.  *Id.* ¶ 32 (emphasis omitted).

## C.    Beeline's Experts

### 1.    Joseph Caruso

Beeline retained Caruso "as a computer forensics expert."  Dkt. 194-1 ("Caruso Report") ¶ 6.  Caruso is the President and Chief Technology Officer of a computer forensics firm in New York City.  *Id.* ¶ 1.  He is a Certified Information System Security Professional and has worked in the information technology field since 1983.  *Id.*  He graduated with a B.S./B.E. in Mathematics and Engineering Physics from New York University.  Caruso Report at 16.  He is a member of several professional societies, has published several articles in the field of computer forensics, and has received numerous academic and professional appointments and honors.  *Id.* at 16-19.

Like Schnell, Caruso offers several opinions relating to the Google Drive Audit Logs and the image of the Abramowitz Laptop.  In response to Schnell's opinion that an "Event Description" notation of "downloaded" in the Google Drive Audit Logs means that an "individual . . . actually downloaded the document,"  Schnell Report ¶ 24, Caruso asserts that "there [is] nothing in the audit logs [that] indicates that a user actually downloaded a file onto their computer or even viewed that file" and that the "downloaded" notation could be caused by "an automated process, such as a system backup."  Caruso Report ¶ 12.  In fact, Caruso opines that "there is no reliable way to determine if users downloaded files intentionally, or if the log entries were generated by normal user activity or automated processes without conducting [a] full forensic examination[] on all computers belonging to the users whose activities appeared in the logs."  *Id.* ¶ 16.  Relatedly, Caruso states that "[none of] the data and documents cited by the Sch[n]ell Report indicate that

any of the Better [I]nformation was actually used by anyone at Beeline." *Id.* ¶ 33; *accord* Dkt. 234-2 ("Caruso Affidavit")[9] ¶ 15.

Caruso also offers opinions on the behavior of certain individuals who appear on the Google Drive Audit logs. He notes, for example, that the Audit Log data shows forty-two "events where Peter Gonzalez appears to have downloaded files in the early morning hours between July 11, 2020, and October 7, 2020, in rapid succession," and concludes, based on interviews with employees in Beeline's IT department and Beeline's third-party Google Workspace provider, that those downloads "were, more likely than not, generated by automated processes." Caruso Report ¶¶ 22-25. Caruso also concludes that Stockwell, whom the Audit Logs list as having downloaded several files, "never downloaded the Facebook Ad Data contained" therein. *Id.* ¶ 28. Moreover, Caruso notes that remediation efforts by Beeline's former IT employee, Rachael Erbaugh, would have included "search[ing] for, view[ing], and download[ing] files, possibly creating copies," and that the "month and a half" Erbaugh spent on her "remediation activities" was "reasonable" and accounts for 129 entries in the Google Drive Audit Logs. *Id.* ¶¶ 17-20, 26-27.

Finally, Caruso expounds on Schnell's opinion regarding the Google Drive artifacts found on the Abramowitz Laptop. Whereas Schnell opines that all but two of the recovered artifacts "were shared with Mr. Abramowitz from an account other than his" Beeline email address, Schnell Report ¶ 32, Caruso offers his opinion that "[t]he other account that shared the files with

---

[9] In response to Better's *Daubert* Motion, Caruso submitted a supplemental affidavit clarifying and expanding on certain portions of his methodology and correcting several of what he refers to as "typographical errors" in his original Report. Dkt. 234-2. The Court may consider "declarations that address concerns raised in a *Daubert* motion about the reliability and the application of an expert's methodology" so long as the declaration "is sufficiently within the scope of the initial expert report" and does not "expound[] a wholly new and complex approach designed to fill a significant and logical gap in the first report." *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VEC), 2019 WL 5957221, at *2 (S.D.N.Y. Nov. 13, 2019) (internal quotation marks, brackets, and citations omitted).

Abramowitz's Beeline e-mail address was, in my expert opinion, more likely than not, the personal e-mail account of Abramowitz" based on, among other things, that during his exit interview, Abramowitz "acknowledges that he sent himself, to his personal Gmail account, Better documents and then uploaded those to Beeline's shared drive," Caruso Report ¶ 30.

### i.      Caruso's Opinion as to Whether Files Were "Downloaded"

Better urges the Court to preclude Caruso from telling the jury that "there is nothing in the audit logs [that] indicates that a user actually downloaded a file onto their computer or even viewed that file," Caruso Report ¶ 12, for three reasons:  first, because the opinion is based on unreliable data; second, because the opinion is inconsistent with Caruso's contention that "there is no reliable way to determine if users downloaded files intentionally . . . without forensically examining all computers"; and third, because the opinion is improperly offered on rebuttal, Pl. *Daubert* Motion at 13-15, 18 (internal quotation marks and citations omitted).  The Court disagrees with each of these arguments.

### a.      Reliability

As to the reliability of the underlying data, Better's primary gripe is that Caruso based his opinion on a review of not just the nine Google Drive Audit Logs referenced in the Schnell Report, but on a consolidated log file that included at least seventy additional audit logs.  Pl. *Daubert* Motion at 13-14.   In his Report, Caruso explains that he "was provided nine (9) Google Workspace . . . logfiles" and "was informed by Defendant's counsel that these logs corresponded to nine files which were stored on Defendant's Google Drive."  Caruso Report ¶ 10.  He further explains that he "created a consolidated log file that brought all log entries into a single file which is searchable and sortable.  The import included 21[2] events.  I was then able to correlate the log entries to the events that occurred on the Beeline Google Drive."  *Id.* ¶ 11; *accord* 194-2 ("Caruso

Dep. Tr.") at 38:6-13.  As Better points out in its motion, "[a]lthough Caruso's consolidated log file purports to be a compilation of the nine audit logs produced by Beeline, it has many more lines of data and refers to dozens of entries that do not appear in the nine audit logs" analyzed by Schnell. Pl. *Daubert* Motion at 5-6.  In his supplemental affidavit,  Caruso clarifies that his "review of the eighty-two (82) audit logs that comprise the Consolidated Log File was separate and apart from [his] review of the nine (9) audit logs referenced in Ronald Schnell's report," yet his "assessment of the original nine (9) audit logs and the eighty-two (82) logs in the Consolidated Log File led [him] to the same conclusions."  Caruso Affidavit ¶¶ 2-3; *see also id.* ¶¶ 4-6; Opposition to Pl. *Daubert* at 10.

"When a *Daubert* motion invokes concerns about the reliability and application of the expert's methodology, declarations that are responsive to such concerns are generally seen as supplying a permissible form of support."  *Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*, No. 17 Civ. 1338 (NGG) (ARL), 2021 WL 1906468, at *3 (E.D.N.Y. May 12, 2021).  While the Court may not consider a supplemental expert affidavit that "expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report," *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (internal quotation marks and brackets omitted), the Court is free to consider "declarations that merely amplify and provide more support for the opinions" already expressed,  *Phoenix Light SF*, 2019 WL 5957221, at *2 (internal quotation marks omitted).  "The key issue is whether the expert declaration is sufficiently within the scope of the initial expert report . . . so that an opposing party is not sandbagged with new evidence." *Id.* (internal quotation marks, brackets, and ellipsis omitted).

Better argues that Caruso's original Report "contained no mention of 'additional' logs or their supposed corroboration of anything" and thus Beeline "seeks through the Caruso Affidavit

to proffer a supplemental expert report with a substantially different methodology." Pl. *Daubert* Reply at 3 & n.2. But this is not the type of "wholly new and complex approach" that is impermissibly offered in a subsequent affidavit. Caruso merely clarified that he reviewed both the nine audit logs that were the subject of Schnell's analysis, and confirmed his assessment through review of the eighty-two additional audit logs. Caruso Affidavit ¶¶ 2-3; *see Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 311 (S.D.N.Y. 2015) (finding that a supplemental expert affidavit which "relie[d] on documents newly produced" fell "squarely within the scope of [the] earlier reports" and therefore could "fairly be said to provide evidentiary details for the conclusions originally espoused in the [prior reports]—which remain unchanged" (internal quotation marks omitted)).

Nor does Better seriously contend that the additional eighty-two log files which make up Caruso's consolidated audit log file are somehow of a different nature than Schnell's original nine. Schnell's nine original audit logs are Excel spreadsheets containing thirteen columns: "Item name," "Event Description," "User," "Date," "Event Name," "Item Id," "Item Type," "Owner," "Prior Visibility," "Visibility," "IP Address," "Billable," and "Visitor." *See, e.g.*, Schnell Report, Exh. A. Caruso's consolidated log file contains twelve of the same columns (excluding only "Visitor"), each of which clearly contain the same types of data. *See* Dkt. 262-1 (Caruso's later-produced Consolidated Audit Log file). While Better attacks some of the later-produced audit logs for containing "entries indicating a variety of actions" apart from "download," Pl. *Daubert* Reply at 3-4, these arguments go more towards weight than admissibility, and are properly made to the jury. *See Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005) ("[A] challenge to the facts or data relied upon by the [proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony.").

26

Finally, the Court does not agree that Caruso's opinion that "there is no reliable way to determine if users downloaded files intentionally . . . without conducting full forensic examinations," Caruso Report ¶ 16, renders his opinion as to the Google Drive Audit Logs inherently unreliable because he did not forensically examine all computers. Pl. *Daubert* Motion at 15. In contrast to Schnell, who asserts that the Google Drive Audit Logs' use an "Event Description" of "downloaded" indicates that the individual "actually downloaded the document" and that "downloaded" "is not an umbrella term for other actions," Schnell Report ¶ 24, Caruso concludes that "there is nothing in the audit logs [to] indicate that a user actually downloaded a file onto their computer," in part because the "download" notation often "represents an automated process, such as a system backup," Caruso Report ¶ 12. He is not opining that each "download" notation conclusively represents a system backup rather than a conscious download. According to his Report, the only way to determine that for sure would be to do a forensic examination.

Thus, because the underlying data is not inherently unreliable, and because Caruso's opinion as to the downloads is not inconsistent with his other opinions, the Court finds that his opinion on whether files were downloaded is sufficiently reliable under the *Daubert* standard.

### b.    Rebuttal

Better also argues that Caruso's reliance on the eighty-two additional audit logs renders his opinion as to the downloading improper on rebuttal because "Better's affirmative IT expert Schnell did not offer any opinions about those audit logs." Pl. *Daubert* Motion at 18. The Court disagrees.

An expert opinion is properly offered on rebuttal if it is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). That said, "district courts have been reluctant to narrowly construe [Rule 26(a)(2)(D)'s] phrase 'same subject matter' beyond its plain language." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (internal quotation marks omitted). Thus, while

"[a] rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice," *Ebbert v. Nassau Cnty.*, No. 05 Civ. 5445 (FB) (AKT), 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (internal quotation marks omitted), "[r]ebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party," *Scott*, 315 F.R.D. at 44. (quoting *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 Civ. 1851 (NGG) (RML), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008). As relevant here, "a rebuttal expert need not use the same methodology as the affirmative expert to stay within the 'same subject matter.'" *In re Zimmer M/L Taper Hip Prosthesis or M/L Hip Prosthesis with Kinectiv Tech. & Versys Femoral Head Prods. Liab. Litig.*, Nos. 18 MD 2859 (PAC), 18 Misc. 2859 (PAC), 2021 WL 1405185, at *3 (S.D.N.Y. Apr. 14, 2021) (internal quotation marks omitted).

As discussed above, Caruso's opinion regarding the significance of the "downloaded" notation in the Google Drive Audit Logs directly responds to Schnell's contrary opinion, even though he may have relied on additional audit logs to formulate it. *See* Caruso Report ¶ 12; Caruso Affidavit ¶¶ 2-5. Moreover, "a proper rebuttal expert's opinion is not required to be based on the same data as the expert opinion that it is offered to rebut." *E.E.O.C. v. Mattress Firm, Inc.*, No. 13 Civ. 1745 (GMN) (VCF), 2016 WL 589667, at *4 (D. Nev. Feb. 11, 2016); *see also Erie Ins. Co. v. Rauser*, No. 19 Civ. 375 (TRM) (HBG), 2021 WL 518668, at *2 (E.D. Tenn. Feb. 11, 2021) ("Rebuttal reports can use additional data not found in the expert report, so long as it relates to the same subject matter." (internal quotation marks and ellipsis omitted)). Thus, even if Caruso did render an opinion about the eighty-two additional audit logs, Better does not seriously contend that Schnell's opinion as to the significance of "download" on the nine audit logs would not be equally

applicable to the additional audit logs.  Thus, Caruso's rebuttal opinion, either way, would be well within the scope of Schnell's affirmative opinion.

* * *

Better's motion to exclude Caruso's opinion as to the downloads is therefore denied.

### ii.  Caruso's Opinion as to Whether the Better Information Was "Actually Used"

Better argues that Caruso's concluding opinion—that "the data and documents cited by the Sch[n]ell Report [do not] indicate that any of the Better [I]nformation was actually used by anyone at Beeline," Caruso Report ¶ 33; *accord* Caruso Affidavit ¶ 15—is improper on rebuttal.  Pl. *Daubert* Motion at 18.  Not so.  Holzen's analysis of the reasonable royalty negotiation specifically includes a factor analyzing "the extent to which . . . Beeline has made use of the Better Information and any evidence probative of the value of that use."  Holzen Report at 42 (capitalization omitted). Holzen goes through each of the three categories of Better Information at issue in this matter, *id.* ¶¶ 134-137, and concludes that the evidence "illustrates the value of the Better Information to Beeline" and so "this factor suggests a higher royalty rate," *id.* ¶¶ 138.   Holzen even examines what he refers to as "Beeline's Audit Trails"—presumably the audit logs—and notes that "[a]n audit of Beeline's information technology infrastructure revealed that Beeline personnel accessed and downloaded the Better Information numerous times."  *Id.* ¶ 136.  Based on this and other evidence, he concludes that "the evidence . . . indicates Beeline accessed, examined, and analyzed [*i.e.*, 'used'] information as to how Better attracts customers, how Better operates its business, and the extent to which Better earns its profits."  *Id*.  Accordingly, the Court finds that Caruso's contrary opinion is apposite rebuttal.

The Court, however, has serious concerns with the reliability of Caruso's methodology in arriving at his conclusion that there is no indication that the Better Information was *actually used*

29

by anyone at Beeline.  As noted above, Schnell's opinion regarding the Google Drive Audit Logs was limited to whether information was "*downloaded*."  Caruso spends much of his Report explaining the several tests he ran to dispute Schnell's assertion that "download" means "download."  He, for example, "tested the behavior of Google File Stream . . . by uploading files to Google Workspace and (1) opening the file in Google docs, and then (2) opening the file in Microsoft Word and reviewing the log entries for those files" which "revealed that there are often inconsistencies in how Google Drive logs activities." *Id.* ¶¶ 13-15.  He also conducted interviews of employees from Beeline's IT department and Beeline's third-party cloud storage provider which confirmed his opinion that certain of downloads were the result of automated processes rather than intentional human conduct. *Id.* ¶¶ 22-26; *see also* Caruso Affidavit ¶¶ 7-9.  While these test would logically inform an opinion that the "downloaded" notation does not always indicate that an individual intentionally downloaded the document, Caruso points to no separate methodology or expertise to justify the further conclusion that nothing indicates that the documents were actually *used*.  *See Bocoum*, 2022 WL 902465, at *12 (expert testimony is excludable if the expert "offers no cognizable methodology to bridge the logical gap between [certain] facts and his conclusion[s]").

Furthermore, at his deposition, Caruso clarified that the primary bases for this opinion was that (1) he "didn't read anywhere in Mr. Schnell's report where he states that anyone at Beeline actually used [the] data," and (2) "there's no evidence that anyone at Beeline used the data" "based on the data that was available to me and the data that I looked at."  Caruso Dep. Tr. at 130:22-131:6.  As an expert witness, Caruso is certainly "entitled to rely on facts, opinions and data developed or prepared by another" expert.  *In re M/V MSC Flaminia*, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *5 n.6 (S.D.N.Y. July 28, 2017).  Yet he must do more than merely aggregate

or recite Schnell's findings; he must make "independent findings based on his own analysis." *Bocoum*, 2022 WL 902465, at *20. Thus, Caruso cannot simply rely on the lack of indication from Schnell that there is evidence of actual use; he must employ some sort of methodology beyond what he did to analyze the downloads to reach this opinion for himself. Caruso fails to explain what evidence, in particular, he examined, or why experts in his field would typically rely on such evidence to determine whether the Better Information were actually used.

On the other hand, Better has not challenged Caruso's actual use opinion as unreliable, and thus Beeline has not yet had a chance to present arguments to the contrary. The Court finds it inappropriate therefore to exclude this opinion at this time. Accordingly, Better's motion to exclude Caruso's testimony as to whether the evidence suggests that Beeline "used" the Better Information is denied without prejudice. If Better wishes to challenge the reliability of Caruso's methodology with respect to this opinion, they may do so on a motion *in limine* before trial.

### iii.        Caruso's Opinion Regarding the Gonzalez Audit Log Entries

Better argues that Caruso's opinion regarding Gonzalez's Audit Log activity is unreliable because it is based on inadmissible hearsay. Pl. *Daubert* Motion at 14-15. Caruso opines that "42 of the events where Peter Gonzalez appears to have downloaded files in the early morning hours between July 11, 2020, and October 7, 2020, in rapid succession were, more likely than not, generated by automated processes."[10] Caruso Report ¶ 22, Exh. C; Caruso Affidavit ¶ 7. To reach

---

[10] Better also challenges this opinion as inconsistent with Caruso's opinion that "there is no reliable way to determine if users downloaded files intentionally . . . without conducting full forensic examinations on all computers belonging to the users whose activities appeared in the logs." Caruso Report ¶ 16; *accord* Pl. *Daubert* Motion at 15. Again, it is not. While true that Caruso does not appear to have forensically imaged Gonzalez's computer, his conclusion is not that, as a certainty, the downloads were generated by an automated process, just that they were "*more likely than not* generated by automated processes." Caruso Report ¶ 22 (emphasis added). And the reason he is at least 50% sure that they were automated downloads was based on his interviews.

this conclusion, Caruso first interviewed a member of Beeline's IT department who "confirmed Beeline used software to backup their Google Workspace environment via a third-party provider." Caruso Report ¶ 23; Caruso Affidavit ¶ 8.  He then spoke with an employee of the third-party vendor who "confirmed that the backup software runs under the domain admin account" registered to Gonzalez's email, Caruso Report ¶ 23, Exh. D, and "operates at times consistent with the rapid succession 'downloads' in the audit logs," Caruso Affidavit ¶ 9.

Better complains that these two witnesses were never identified in Beeline's Rule 26 disclosures and argues that Caruso's opinion is therefore based on inadmissible hearsay.  Pl. *Daubert* Motion at 1, 8-9.  But it is well-settled that "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions."  *United States v. Dukagjini*, 326 F.3d 45, 57 (2d Cir. 2003) (quoting *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993)); *see also* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").  At the same time, however, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal quotation marks omitted).

Here, Caruso's testimony would not be a mere "conduit for introducing hearsay evidence." He gleaned two specific pieces of information after meeting with the two witnesses:  (1) that the third-party provider runs backups in the early morning; and (2) that the third-party's administrator account is registered to Gonzalez's email address.  Caruso Affidavit ¶ 9.  Otherwise, the opinion is entirely his own.  He used these two pieces of information to reach his conclusion that Gonzalez likely did not purposefully download those files in the early hours of the morning.  He "did not

share the audit log files with [either of the two employees] and neither . . . asserted any opinion as to whether the Peter Gonzalez 'downloads' were, or were not, derived from an automated process." *Id.* Better is thus incorrect that Caruso's testimony would be a mere conduit for inadmissible hearsay. *See, e.g.*, *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021) ("[The expert]'s research methodology may be based on qualitative interviews that involve listening to the statements of domestic abuse victims, but her testimony will involve synthesis and interpretation of those statements, rather than the mere conveyance of those statements to the jury."), *aff'd*, No. 21-2665-cr, 2023 WL 378942 (2d Cir. Jan. 25, 2023).

Moreover, Caruso avers, and the Court has no reason to doubt, that "[t]hese interviews were the most reasonably practicable and reliable way for me to learn the information necessary . . . and is consistent with what experts and others in my profession typically do." Caruso Affidavit ¶ 9.[11]  While Better asserts that neither witness has personal knowledge since neither "was at his current job at the time of the events depicted in Beeline's audit logs from 2020," Pl. *Daubert* Motion at 9; Pl. *Daubert* Reply at 5, neither witness was asked to provide personal knowledge regarding events in 2020.  Beeline's IT employee told Caruso that Beeline contracts with a third-party vendor, and an employee of that vendor told Caruso that Beeline's account is registered to Gonzalez and runs backups in the morning.  Caruso Affidavit ¶ 8.  These statements are general; they do not recount specific events in 2020.  Moreover, this argument goes more to weight than admissibility, and can be properly made to the jury on cross-examination.

Accordingly, the Court will permit Caruso to offer his opinion about the Google Drive Audit Log entries pertaining to Gonzalez.

---

[11] Indeed, as discussed above, Better's own expert, Holzen, also relied on information gathered from employee interviews. *See supra* II.B.1.

### iv.        Caruso's Opinion Regarding the Stockwell Audit Log Entries

Better moves to exclude Caruso's opinion regarding the entries in the Google Drive Audit Logs attributed to Stockwell also on the basis that the opinion is improper on rebuttal.[12]  Pl. *Daubert* Motion at 18; Pl. *Daubert* Reply at 7-8.  In his Report, Caruso states, "[b]ased on my review of the audit logs and other relevant information reviewed by Schnell . . . it is my expert opinion, to a degree of reasonable professional certainty, that Jay Stockwell never downloaded the Facebook Ad Dada contained in [certain] spreadsheets."  Caruso Report ¶ 28.  Better contends that this opinion goes beyond the proper scope of rebuttal because "Schnell did not opine about whether . . . Stockwell downloaded certain spreadsheets—he only opined that 'download' means 'download.'"  Pl. *Daubert* Reply at 7 (quoting Schnell Report ¶ 24).  But Rule 26(a)(2)(D)'s requirement that a rebuttal expert report be based on the "same subject matter" need not be so narrowly construed.  *Zimmer*, 2021 WL 1405185, at *2.  While Schnell may not have expressly extended his opinion to Stockwell, he did opine that with respect to the nine original audit logs, "'download' . . . means that the individual indicated actually downloaded the document."  Schnell Report ¶ 24.  Several of the audit logs that Schnell reviewed indicate that "Jay Stockwell downloaded an item."  *Id.*, Exhs. B, C, D, E, F.  Thus, Schnell's opinion that "download" means an actual download extends to the instances where "Jay Stockwell downloaded an item"—and

---

[12] Better initially argued that this opinion was based solely on *ipse dixit*, Pl. *Daubert* Motion at 17-18, but appears to have abandoned this argument on reply, *see* Pl. *Daubert* Reply at 6-7.  In any event, the Court concludes that it is not.  As explained below, this opinion flows logically from Caruso's analysis regarding the significance of the "download" notation in the Google Drive Audit Logs.

Better does not seriously say otherwise.[13]   Accordingly, the Court will permit Caruso to testify as to whether the Audit Logs indicate that Stockwell downloaded Facebook Ad Data.

     **v.**     **Caruso's Opinions Regarding Rachael Erbaugh's Activities**

Better moves to exclude two of Caruso's opinions regarding Beeline's former IT employee, Erbaugh, as based on *ipse dixit*.  Pl. *Daubert* Motion at 16.  The Supreme Court has made clear that "the test of reliability is 'flexible,'" but "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire*, 526 U.S. at 141, 157; *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony.").  In assessing whether expert testimony is reliable, a court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  This means that, in order to be admissible, "[a]n expert opinion requires *some explanation* as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."  *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (emphasis added), *aff'd on other grounds*, 552 U.S. 312 (2008).  Here, Caruso offers two opinions regarding Erbaugh, and the Court agrees that each contains *ipse dixit* and should therefore be excluded.

---

[13] Notably, Better did not raise a similar argument regarding the Gonzalez Google Drive Audit Log entries, even though Schnell also does not explicitly reference Gonzalez by name in his Report.

### a.   Filtering

In his Report, Schnell analyzes one audit log pertaining to a particular document and notes that the "Item ID" column lists three separate names for the document.   Schnell Report ¶ 25.   Schnell opines that these differing Item IDs indicate that "this one document was saved in three different locations on Beeline's Google Drive."   Schnell Report ¶ 25.   Caruso disagrees; he notes that the "Google Workspace Administrator interface allows an administrator to apply filters when generating audit logs."   Caruso Report ¶ 18.   Caruso notes that "based on the testimony of Ms. Erbaugh, she would have searched for, viewed, and downloaded files, possibly creating copies while conducting the remediation she was tasked with," *id.* ¶ 17, and so these duplicate entries could have been generated by Erbaugh when searching the Google Interface by using "some portion of the file name," *id.* ¶ 19.

Caruso has provided sufficient justification for his opinion that certain filtering techniques during key word searches in the Google database can result in duplicate entries in the Audit Log. That opinion is based on Caruso's experience using Google Workspace and tests he ran.  *Id.* ¶¶ 18-20; Caruso Affidavit ¶ 10.   The problem is that Caruso has no basis to apply this opinion to Erbaugh's activity other than *ipse dixit*.   Caruso states that "based on the testimony of Ms. Erbaugh, she would have searched for, viewed, and downloaded files," Caruso Report ¶ 17, and in his supplemental affidavit, he further elaborates that Erbaugh "would find files that she believed were relevant based on particular search terms and filters" and that "it appeared that Erbaugh would change ownership of files she identified and sometimes copy these files to another folder," Caruso Affidavit ¶ 10.   But the portion of Erbaugh's deposition to which Caruso cites gives no indication that she did any of these things.   Erbaugh testified that she searched for a single keyword— "Better."   Dkt. 194-15 ("Erbaugh Dep.") at 42:7-17; *see also id.* at 42:25-43:3.   She stated explicitly that she did not "download" any of the files, *id.* at 44:22-24, 45:10-13; rather, she

generated a hit list which she subsequently exported and sent to Kennedy, *id.* at 45:3-7, 20-23. And in the instances where Kennedy would then request specific documents, Erbaugh "would leave the original intact to not disturb it and send her a copy" via email. *Id.* at 46:4-14. Contrary to Caruso's assertion, there is no indication that she ran specific keywords searches, copied documents to another folder, or did anything to "change ownership" of the documents. And in fact, when asked at his deposition whether he had any basis to conclude that Erbaugh actually "searched for, viewed, and downloaded files," he testified, "I don't know if she did that or not," commenting only that "it's not unreasonable that someone would do that." Caruso Dep. Tr. at 75:19-76:4. This is precisely the type of opinion evidence that is connected to existing evidence only by the *ipse dixit* of the expert and therefore inadmissible under Rule 702 and *Daubert*. *See, e.g.*, *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645 (KMK), 2018 WL 1889763, at *6 (S.D.N.Y. Apr. 18, 2018) (excluding expert testimony as "*ipse dixit*, pure speculation, or both" where the proffered expert set forth no methodology and "the analytical gap between known facts and [the expert]'s assertions is enormous"), *aff'd*, 773 F. App'x 608 (Fed. Cir. 2019); *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 202 (D. Conn. 2014) (observing that testimony may "be excluded or stricken if the expert unjustifiably extrapolates from an accepted premise to an unfounded conclusion (an analytic gap or attenuation between data and conclusion)"), *aff'd*, 724 F. App'x 25 (2d Cir. 2018); *cf. Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16 Civ. 1318 (GBD) (BCM), 2021 WL 4810266, at *16 (S.D.N.Y. Sept. 30, 2021) ("[A]n expert who is qualified as to certain subjects is not for that reason permitted to serve as an all-purpose 'color commentator' on the evidence, nor 'interpret' the evidentiary record for the jury outside the bounds of his expertise.").

Accordingly, while Caruso may testify generally as to how applying certain filters during key-word searching may hypothetically generate duplicate entries on an audit log, he may not opine as to whether Erbaugh's remediation activity did or did not lead to such duplicates.

**b.    Reasonableness**

Caruso also opines that because the "Beeline Google Drive, Beeline Gmail, and the Abramowitz laptop's hard drive contain 500,000 GB of data," which translates into "millions of pages of data for Ms. Erbaugh to search through," and because Erbaugh would have been required "to search through and determine whether those files were relevant, . . . the amount of time Ms. Erbaugh spent searching for files—approximately a month and a half—is reasonable."  Caruso Report ¶ 26.  Caruso, however, cites to no evidentiary basis for what Erbaugh did to search through Better's files.  And as discussed above, the record in fact indicates that Erbaugh did not search through the files herself, but rather, exported a hit list to Kennedy, and would only pull specific documents at Kennedy's request.  *See* Erbaugh Dep. at 43:7-46:15   This opinion is therefore excludable for lack of reliable foundation.

**vi.    Caruso's Opinion Regarding the Google Drive Artifacts on the Abramowitz Laptop**

Finally, Better argues that Caruso's opinion regarding the Abramowitz Laptop is "unreliable" because he "conflat[es] the *Abramowitz laptop* with the *Beeline Google Drive*."  Pl. *Daubert* Motion at 14.  Better appears to misunderstand that Caruso is not opining as to the Beeline Google Drive itself, but rather certain Google Drive *artifacts* stored on the Abramowitz Laptop that Schnell recovered during his forensic examination.  These "artifacts" correspond to files on the Google Drive, but are, themselves, located on the local hard drive of the Abramowitz Laptop.  Schnell Report ¶ 31.  Accordingly, Better's argument here fails.

* * *

In sum, the Court grants Better's motion to preclude Caruso from testifying as to Erbaugh's remediation activities.  The Court, however, will permit Caruso to testify as to his general opinion regarding whether the files on the audit logs were actually downloaded, and his opinions regarding the Gonzalez log entries, the Stockwell log entries, and the Google Drive artifacts stored on the Abramowitz Laptop.  Moreover, Better's motion to exclude Caruso's opinion regarding whether the Better Information was actually used is denied without prejudice at this time.

### 2.      Joseph Garrett

Garrett is the principal of his own "banking and mortgage banking consulting firm."  Dkt. 194-3 ("Garrett Report") at 1.  Garrett was retained to offer certain opinions related to the mortgage industry.  *Id.*  He received an M.B.A from University of California, Berkeley in 1976, and has worked in the financial industry ever since.  *Id.* at 9-10.  He has published numerous articles on banking and finance.  *Id.* at 11-12.

*First*, Garrett opines that "the existence of a 'secret sauce,' or particular vendor or pricing information providing a significant competitive advantage, is highly unlikely" in the mortgage industry because the mortgage industry is "highly commoditized" in that "everyone in the mortgage industry uses the same few vendors, everyone knows what they all do, and there are no significant secrets."  *Id.* at 3.  *Second*, Garrett refutes Holzen's opinion that Better and Beeline "are competitors."  *Id.* at 4; *accord* Holzen Report ¶ 15.  He reasons that "[d]ue to the difference in the two companies' size, Beeline does not pose a threat to Better," and points to contrary evidence demonstrating "how Better has recently harmed itself" and how Better has been "damaged" by recent "[c]hanges in the mortgage lending environment."  Garrett Report at 4-5.  *Third*, Garrett opines on the character of certain specific pieces of Better Information and concludes that none is

sufficiently unique or proprietary such that Beeline's possession of it caused them to gain an unfair competitive advantage.  *Id.* at 5-8.[14]

Better moves to exclude Garrett's testimony in full.  Pl. *Daubert* Reply at 8.  The Motion is granted in part.

### i.      Garrett's Opinion that There Is No "Secret Sauce"

Better argues that Garrett's opinion that there is no "secret sauce" in the mortgage industry should be excluded on the basis of relevance.  Pl. *Daubert* Motion at 19.  Whether expert testimony is "relevant" is governed by the same test as any other evidence—Rule 401.  *Amorgianos*, 303 F.3d at 265 ("In fulfilling th[e *Daubert*] gatekeeping role, the trial court should look to the standards of Rule 401."); *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (same). Under that rule, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015).

Better reasons that "no claim or defense in the case depends on whether Better has 'secret sauce,' and such equivocal testimony is not relevant or helpful, and should be excluded."  Pl. *Daubert* Motion at 19.  But Better unequivocally alleges in the Amended Complaint that

---

[14] Better also moves to exclude various individual sentences from the introductory section of Garrett's Report as irrelevant opinions.  *See* Pl. *Daubert* Motion at 19 (moving to exclude Garrett's opinion "that 'there is generally no value assigned to good will, no premium for the seller's technology or technological processes'" (quoting Garrett Report at 2)), 21 (moving to exclude Garrett's opinion "that he has not 'seen any evidence' that Beeline used the Better Information" (quoting Garrett Report at 2)), 23 (moving to exclude Garrett's opinion that Holzen's damages calculation is "quite dubious" and that Garrett "'has never heard of any monies being exchanged or value placed' on data like the Better Information" (quoting Garrett Report at 2)).  Beeline does not appear to oppose this portion of Better's motion, except to say that Garrett should not be precluded from attacking Holzen's damages analysis solely because he is not a "damages expert."  Opposition to Pl. *Daubert* at 36.  While the Court would not necessarily characterize these statements as "opinions" or proffered expert testimony, to the extent that they are, the Court agrees they are either irrelevant or not supported by a reliable foundation.

"[p]erhaps the most egregious example uncovered by Better's investigation is the dissemination of data from Better's highly confidential, proprietary business model . . .—the product of a six-year undertaking with tens of thousands of entries, and the '*secret sauce*' to Better's success." Am. Compl. ¶ 7 (emphasis added).  And when asked to define "secret sauce" at deposition, Garrett answered, "what somebody might call trade secrets, just some secret way of doing business that other people don't have access to, something that creates a dramatic differentiation between a company and its competitors."  Dkt. 194-4 ("Garrett Dep. Tr.") at 37:24-38:7.  As made clear by Better in very first paragraph of its Amended Complaint, "This case arises from brazen, willful and deliberate misappropriation of Better's confidential information and trade secrets by Beeline." Am. Compl. ¶ 1.  This case is all about trade secrets, and so whether trade secrets, or "secret sauce," actually exist in the mortgage industry is certainly relevant to Better's claims.[15]

Relatedly, Better also moves to exclude Garrett's discussion of loan origination systems, pricing engines, and software used by mortgage lenders because "there are no allegations that Beeline misappropriated such assets, so these 'opinions' are irrelevant and should be excluded." Pl. *Daubert* Motion at 20.  But these opinions, such as they are, were merely part of Garrett's reasoning.  Garrett opines that the reason "secret sauce" does not exist in the mortgage industry is due to its highly commoditized nature.  Garrett Report at 3.  As examples, Garrett points to certain loan origination systems, pricing engines, and fraud detection software as examples of how "[a]ll

---

[15] Better points to another portion of Garrett's deposition where, when asked, "Is it your view that mortgage lenders do not have trade secrets?", he replied, "I don't have an opinion on that.  I think they probably do, but I don't know."  Garrett Dep. Tr. at 42:21-24; *accord* Pl. *Daubert* Reply at 9.  This argument speaks to the weight of Garrett's opinion rather than its admissibility, and Better is welcome to inquire as to any inconsistency on cross-examination.  *See Scheinberg v. Merck & Co. (In re Fosamax Prods. Liab. Litig.)*, 924 F. Supp. 2d 477, 496 (S.D.N.Y. 2013) ("As with any witness, inconsistencies in an expert witness's testimony do not implicate *Daubert*, but rather are properly addressed during cross examination.").

players in the mortgage industry know who these vendors are, and if a mortgage company employee has switched jobs a few times, he or she has most likely used all of the various tools and worked with, or learned of, all the vendors." *Id.*; *see also id.* ("Essentially, everyone in the mortgage industry uses the same few vendors, everyone knows what they all do, and there are no significant secrets."). Thus, while Better's claims may not necessarily involve loan origination systems, pricing engines, or fraud detection software, these products still illustrate the commoditized nature of the industry.

The Court therefore declines to preclude Garrett from testifying as to his opinion on the significance of "secret sauce" in the mortgage industry as irrelevant.

### ii. Garrett's Opinions Challenging Holzen's Reasonable Royalty Calculation

Better also moves to exclude Garrett's opinions (1) that "Better and Beeline . . . are not true competitors," *id.* at 4, and (2) refuting Holzen's assertion that "Better was a highly successful lender before the alleged misappropriation of information from Better by Beeline," *id.*, as irrelevant. Pl. *Daubert* Motion at 20; Pl. *Daubert* Reply at 9-10. The Court disagrees that these opinions are irrelevant because they respond directly to Holzen's reasonable royalty analysis.

Holzen, in his Report, constructs a hypothetical negotiation between Better and Beeline to determine what a reasonable royalty rate would be to measure the value of any wrongfully obtained Better Information. Holzen Report ¶¶ 109-10; *accord Vt. Microsys.*, 88 F.3d at 151-52. To do so, Holzen analyzed certain "qualitative factors" including "the commercial relationship between . . . Better and Beeline, such as, whether they are competitors in the same territory in the same line of business," and "Better's established profitability, its commercial success, and its popularity." Holzen Report at 38-39, 41 (capitalization omitted). As to the commercial relationship between Better and Beeline, Holzen opines that the two companies "are direct

competitors, in the same industry, offering similar services, to similar customers.  Therefore, this factor has an upward impact on the amount of the hypothetically negotiated royalty."  *Id.* ¶ 128.[16] As to "Better's established profitability," Holzen notes that "[i]n recent years, Better has emerged as a leader in the nonbank mortgage lending industry," and that "this factor indicates Better is operating a commercially successful business that has increasingly become more financially successful over time," and so "this factor has an upward impact on the hypothetically negotiated royalty."  *Id.* at 41, ¶ 132.

Garrett's opinions directly refute both of these points.  In contrast to Holzen who opines that Better and Beeline are direct competitors, Garrett asserts that they "are not true competitors . . . [d]ue to the difference in the two companies' size."  Garrett Report at 4; *see also id.* ("One of the nation's largest mortgage lenders would not possibly find one of the nation's smallest mortgage lenders to be a threat.").  Better maintains that none of the fourteen factors that Holzen considered involves an analysis of the companies' relative sizes.  Pl. *Daubert* Reply at 10. But just because Holzen failed to consider the companies' relative sizes in assessing whether they are direct competitors does not preclude Garrett from refuting Holzen's opinion by pointing to such evidence.  *Zimmer*, 2021 WL 1405185, at *2; *Mattress Firm*, 2016 WL 589667, at *4.  And Garrett can rely on his mortgage industry expertise to opine as to how size might be particularly relevant in the mortgage industry context.

Similarly, in contrast to Holzen who opines that Better's increasing financial success warrants an upward impact on the hypothetical negotiated royalty, Holzen Report ¶ 132, Garrett

---

[16] Earlier in the Report, Holzen also opines that "[t]his [m]atter involves a dispute between Better and Beeline, which are competitors.  Both companies are nonbank mortgage lenders, and both provide online loan services.  In addition, both companies facilitate and expedite the home ownership process."  Holzen Report ¶ 15 (footnotes omitted).  Garrett's opinion specifically rebuts this proposition for the same reasons discussed *infra*.

opines that "Better was, and is, a company struggling financially," based on several pieces of evidence, Garrett Report at 4-5.  Better asserts that this opinion is irrelevant because "Better's damages theory is based not on lost profits, but rather on the value of the Better Information which Beeline wrongfully obtained." Pl. *Daubert* at 20.  But evidence of Better's commercial losses, and Garrett's opinion as to their impact on Better's success within the mortgage industry is clearly relevant to refute Holzen's assessment of this factor in his reasonable royalty negotiation scenario.  In sum, while both of Holzen's opinions led to him determining an "upward impact on the hypothetically negotiated royalty," Holzen Report ¶¶ 128, 132, Garrett proffers evidence and testimony to logically suggest that Holzen's opinion on such an impact might be erroneous.  This testimony therefore is relevant to the jury's determination of a reasonable royalty.

Finally, Better argues that the opinion should be excluded because Garrett is not qualified as a damages expert.  Pl. *Daubert* Motion at 23.  While this is undoubtedly true, and while Garrett admits as much at deposition, Garrett Dept. Tr. at 23:17-22, 24:24-25:15, Garrett is not purporting to act as a damages expert.  Rather, he is opining on certain corporate characteristics of Better and Beeline in the context of the mortgage industry in which he is an expert, and such analysis just happens to be relevant to rebutting Holzen's damages calculation.  Accordingly, the Court declines to preclude Garrett from refuting anything that Holzen says solely because he has a different area of expertise.

Thus, the Court declines to exclude Garrett's opinions regarding Better and Beeline's relative sizes and Better's financial troubles on the basis of relevance.

### iii.        Garrett's Opinions Regarding Specific Pieces of Better Information

Lastly, Better moves to preclude Garrett from testifying as to whether specific pieces of Better Information are sufficiently proprietary such that Beeline's possession of them amounted

44

to an unfair competitive advantage.  Better argues that these opinions are unreliable, conclusory, contradictory, and speculative, and does so by pointing to specific portions of Garrett's deposition where he contradicts the opinions stated in his Report.  Pl. *Daubert* Motion at 21-22, 23-24. Beeline entirely fails to address any of these arguments.  And in any event, the Court agrees that Garrett fails to put forward a sufficient basis to support these opinions.  Accordingly, Better's request to exclude Garrett's testimony regarding whether specific pieces of Better Information are sufficiently proprietary is granted.

### 3.    Flynn Zaiger

Beeline retained Zaiger as a "digital marketing" expert.  Dkt. 194-5 ("Zaiger Report") ¶ 7. Zaiger graduated from Tulane University's Freeman School of Business with a B.A. in marketing and communications, with a minor in management in 2012.  *Id.* ¶ 2.1.11, Exh. 1.  After working for several months as a digital marketing specialist at Falck Safety Services, Zaiger founded and is currently the Chief Executive Officer of his own "creative digital marketing agency that specializes in managing and/or supporting organizations with their online advertising efforts." *Id.* ¶¶ 2.1.1, 2.1.10, Exh. 1.  He "manages over 1.5 million dollars per year in digital advertising spend for more than two dozen clients" on various social media platforms including Facebook.  *Id.* ¶¶ 2.1.1, 2.1.3.    Zaiger is also a "Meta[17] Certified Media Buying Professional"—a "credential . . . awarded to digital advertising professionals who demonstrate proficiency in designing an end-to-end Meta marketing strategy that aligns to business goals and complements a holistic marketing plan." *Id.* ¶ 2.1.4.

---

[17] On October 28, 2021, Facebook's parent company "changed its corporate name to Meta Platforms, Inc."  Meta Platforms, Inc., Current Report (Form 8-K) (Oct. 28, 2021).

Zaiger was asked to provide his expert opinion regarding whether "Better derives an independent economic benefit from keeping the Ad Data secret," *id.* ¶ 2.2.2 (quoting Am. Compl. ¶ 52), and to analyze "whether there is any evidence that Beeline did, or did not, utilize Better's Facebook advertising data to shortcut their own ads' optimization process," *id.* ¶ 2.2.3.  As relevant to Better's *Daubert* Motion, Zaiger concludes that "there is no secondary market for the Facebook Ad Data at issue in this Matter" because "[t]his type of export would only be done if a user were looking to duplicate very similar ads copy, but would not allow the user to duplicate any of the ads targeting," and upon a comparison of Beeline's Facebook Business Manager portal and the Better Information data export, Zaiger found no such evidence of exact copying or use in any way.  *Id.* ¶¶ 5.1, 5.3, 5.13.  Zaiger also opines that "Better's own actions show a lack of reasonable measures to keep their Facebook advertising secret."  *Id.* ¶ 8.1.1.

> **i.    Zaiger's Opinion Regarding the Lack of "Secondary Market" for the Facebook Ad Data**

Better moves to exclude Zaiger's opinion that no "secondary market" exits for the Facebook Ad Data as irrelevant and unreliable.  Pl. *Daubert* Motion at 27.  The Court agrees that this opinion is irrelevant.  Zaiger opines:

> In my expert opinion, and based on my years of experience in the industry, there is no secondary market for the Facebook Ad Data at issue in this Matter.  While exporting data from a company's Facebook Business Manager account could provide valuable insights *if* the exports included competent data sets, which, per below, they did not in this Matter—there is no secondary market of which I am aware in my years of experience for such information.

Zaiger Report ¶ 5.1.  Beeline argues:

> [T]his expert opinion is valid in response to Mr. Holzen's assumption that, in a hypothetical negotiation [for a reasonable royalty rate], a willing buyer would pay upwards of $6 million for Ad Data that is virtually useless. . . .  If Mr. Holzen, who is in no way, shape, or form an expert in digital marketing, can assume for his analysis that there is a secondary market, certainly Mr. Zaiger, who *is* an expert in digital marketing, can opine as to the *lack* of a secondary market.

Opposition to Pl. *Daubert* at 29.

Beeline misunderstands Holzen's analysis. Holzen bases his reasonable royalty analysis on what he calls the "cost approach," which essentially values the Better Information based on the cost incurred to develop it. Holzen Report ¶¶ 118-20. In particular, Holzen incorporates his calculation of unjust enrichment damages—*i.e.*, his opinion that the cost to replace the Better Information would be roughly $6.27 million and the cost to reproduce the Better Information would be roughly $6.31 million—into his reasonable royalty analysis. *Id.* ¶ 119. These numbers are a function of the direct labor costs, the overhead costs, the third-party costs, and opportunity costs of producing the Better Information. Thus, when Holzen opines that the outcome of the parties' hypothetical negotiation would be "a one-time royalty payment that ranges from $6.27 million to $6.31 million," this number is solely based on what he estimates the cost of producing the data (*i.e.*, the cost approach), and not any sort of notion of the Better Information's intrinsic market value.

In fact, in choosing to analyze the reasonable royalty based on the cost approach, Holzen explicitly rejects what he calls the "market approach," which would seek to value the Better Information "based on comparable transactions between unrelated parties" and which would entail "an examination of the terms of transfer for similar technology . . . and inferences . . . drawn from those observations to identify terms the parties might have agreed to at the time of the hypothetical negotiation." *Id.* ¶ 117. Holzen opines that the market approach would not "offer an indication as to a royalty acceptable to both parties" in this case because "[n]either party has produced any relevant license agreements in the present dispute, and I am not aware of any publicly available licensing transactions that grant rights to intellectual property that are economically or technically comparable to the Better Information which is at issue in this dispute," including the Facebook Ad

Data.[18]  *Id.*; *accord id.* ¶ 20.  Thus, contrary to Beeline's assertion, Holzen did not "assum[e] that, in a hypothetical negotiation, a willing buyer would be willing to pay upwards of $6 million for Ad Data" because that would be taking the market approach.  Opposition to Pl. *Daubert* at 29. Instead, he valued the royalty based on the cost to produce the Facebook Ad Data, regardless of whether anyone would be willing to buy the Facebook Ad Data for that amount.

To be clear, this is not to say that none of Zaiger's opinions regarding the utility of the Facebook Ad Data are relevant.  To the contrary, Holzen incorporates assumptions that the Facebook Ad Data export was useful to Beeline into both his damages calculation and his reasonable royalty calculation.  *See* Holzen Report ¶¶ 89-92, 134-38.  However, Holzen stops short of concluding that the Facebook Ad Data has market value, and so Zaiger's opinion as to the lack of secondary market for the Facebook Ad Data is irrelevant to any rebuttal of Holzen's testimony. Better's motion to exclude that opinion as irrelevant is therefore granted.

ii.    **Zaiger's Opinions Regarding the Usefulness and Beeline's Use of the Facebook Ad Data**

Zaiger further opines that the Facebook Ad Data is useless to Beeline.  He begins by opining that the Facebook Ad Data is of the type that "would only be [exported] if a user were looking to duplicate very similar ads copy, but would not allow the user to duplicate any of the ads targeting."  Zaiger Report ¶ 5.3.  According to Zaiger, the Facebook Ad Data lacks any information as to "the number of times your ads were on screen," "the number of people who saw your ads at

---

[18] Indeed, Holzen's testimony—that there is no evidence from which to ascertain market value of the Better Information—appears to be consistent with Zaiger's opinion that there is no secondary market for the Facebook Ad Data.  The opinion therefore arguably would also be excludable as improper rebuttal testimony, since a rebuttal expert testimony may be offered "*solely to contradict or rebut* evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." (internal quotation marks omitted)).

least once," "[t]he estimated total amount of money you've spent on your [ad] during its schedule," "the average number of times each person saw your ad," the number of people who clicked on each ad, the cost-efficiency of each ad, and the number of times each ad obtained a pre-selected outcome despite such information being readily available on the Facebook Manager platform. *Id.* ¶ 5.5 (internal quotation marks and brackets omitted).   Moreover, Zaiger believes these metrics are "absolutely necessary if one is trying to determine the success, or failure, of any advertisement on Facebook," and so by lacking this information, the Facebook Ad Data "would provide little to no value to anyone attempting to replicate or learn from it." *Id.* ¶ 5.6; *see also id.* ¶ 5.8. ("[A]lthough an individual exporting [the Facebook Ad Data] could attempt to use it to utilize similar copy of the ads that Better previously ran, that individual would have no way of knowing which copy was effective, and which copy amounted to a waste of ad spend.").

Relatedly, Zaiger opines that "Beeline did not make any changes to their Facebook ad creative to replicate the Better Ad Data or the underlying contents of the ads." *Id.* ¶ 5.13.5.   Zaiger reached this conclusion by "compar[ing] the campaigns that Beeline has run in its lifetime to the Better Facebook campaigns, ad sets, and ads that are referenced in [the Facebook Ad Data]" using a data export to a spreadsheet. *Id.* ¶ 5.13.3.   He then reviewed certain "metrics to identify potential replication of the ad creative and/or digital marketing strategies between [the Facebook Ad Data] and the entire history of Beeline's Facebook Ad Manager campaign." *Id.* ¶ 5.13.4.   First, he "checked the body of the ads, which is where the main messaging is contained" and noted that "[o]ut of the 10,947 individual ads that Beeline ran, compared to the 26,930 ads that Better had ran, zero ads had identical bodies." *Id.* ¶ 5.13.4.1.   Second, he "checked the ad scheduling, which allows for advertisers to set up ad campaigns to only run during certain times" and noted that

"[n]one of Beeline's ads were changed to run the same ad schedule as any of the ads in [the Facebook Ad Data]." *Id.* ¶ 5.13.4.2.

Better challenges these opinions as unreliable and usurping the role of the jury.[19]   The Court addresses each argument in turn, but is unconvinced by either.

### a.    Reliability

Better argues that Zaiger's opinion regarding the utility of the Facebook Ad Data is unreliable because it is "based solely on Zaiger's personal views" without "any input from Beeline as to what it might have considered useful (or not)." Pl. *Daubert* Motion at 28.   But of course, by its very nature, an opinion expresses the personal views of its holder.   Federal Rule of Evidence 703 permits an expert witness to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed."   Here, Zaiger, personally examined the Facebook Ad Data and determined that it was lacking certain necessary qualities to make it useful for the purposes alleged.   Zaiger Report ¶¶ 5.5, 5.6.   He then concluded, based on his expertise in digital marketing, that the Facebook Ad Data would not be particularly useful for any purpose other than trying "to duplicate very similar ads copy." *Id.* ¶¶ 5.3, 5.6.   This opinion is therefore supported by a perfectly valid basis.   Any arguments that the opinion is not informed by Beeline's fact witnesses,

---

[19] Better also argues that neither of its "experts offers an opinion on whether Beeline used the Better Information." Pl. *Daubert* Motion at 29 n.12.   As previously discussed, Holzen's analysis of the reasonable royalty negotiation specifically includes a factor analyzing "the extent to which . . . Beeline has made use of the Better Information and any evidence probative of the value of that use." Holzen Report at 42 (capitalization omitted).   But with respect to the Facebook Ad Data in particular, Holzen also opines that "Better's total advertising spend" on Facebook marketing is "relevant to the replacement and reproduction costs" of the Facebook Ad Data because "Better was able to optimize its Facebook marketing spend over time by focusing only on those Facebook campaigns that successfully increased mortgage applications" and that after Abramowitz shared the Facebook Ad Data, "Beeline did not spend millions of dollars in its first year on advertising on Facebook as Better had done," thus implying that Beeline used Better's Facebook Ad Data to avoid such costs in landing upon a strategy that works. *Id.* ¶¶ 90-92.

or that Zaiger walked back his opinion at his deposition, *see* Pl. *Daubert* Motion at 29 (noting that Zaiger testified that "[i]t is hard for me to say it has no value to anyone. . . . So I can't say that it's of zero value . . . ." (quoting Dkt. 194-6 at 201:11-22)), go to weight and not admissibility. *See Bocoum*, 2022 WL 902465, at *15 ("[T]o the extent Plaintiff seeks to argue that the assumptions underlying [the proffered expert]'s calculations and his conclusions based on the calculations are inconsistent with other evidence in the record, 'contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" (quoting *Zerega Ave. Realty*, 571 F.3d at 214)); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (refusing to strike expert testimony allegedly based upon unfounded assumptions; challenge to expert testimony "go[es] to the weight, not the admissibility, of the testimony"); *Aventis Env't*, 383 F. Supp. 2d at 514 ("Defendants are free to challenge the basis and source for [the proposed expert]'s numbers, but a challenge to the facts or data relied upon by [the proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Nor does the Court agree that the methodology behind Zaiger's opinion regarding whether Beeline used the Facebook Ad Data is overly "rudimentary" or "crude[]" to constitute a proper expert methodology. Pl. *Daubert* Reply at 12-13. While Better complains that "Zaiger's analysis consisted of using Microsoft Excel to sort and deduplicate spreadsheets of the Facebook Ad Data" merely to "compare if they were identical or not," Pl. *Daubert* Motion at 29 (internal quotation marks omitted), courts in this Circuit have endorsed similar methodologies as sufficient to survive a *Daubert* motion, *see, e.g., In re Payment Card Interchange Fee & Merch. Discount Antitrust*

*Litig.*, No. 05 Md. 1720 (MKB), 2022 WL 14814183, at *11 (E.D.N.Y. Oct. 26, 2022) (rejecting the plaintiff's argument that an expert's methodology "merely compares one set of numbers to another, which is within the ability of a lay person and is therefore not proper expert testimony" given the "voluminous and complex [nature of the] transaction data" rendering it "beyond the ken of a layperson and the proper subject of expert testimony" (internal quotation marks omitted)); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 85 (S.D.N.Y. 2017) (Expert methodology which "involve[s] using a forensic tool to convert Plaintiff's . . . metadata into data readable in an Excel spreadsheet, reviewing hundreds of data fields, and performing a comparative analysis . . . . [is] well beyond the capabilities of a typical lay person."); *see also Scott*, 315 F.R.D. at 45 ("Expert testimony is, however, admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamlines the[e] presentation of the data to the jury, saving the jury time and avoiding unnecessary confusion.'" (quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015))).   Better also argues that this analysis is "of limited value given that Zaiger did not consider other ways Beeline could use or emulate Better's advertising other than exact duplication of scheduling and content," and that "Zaiger did not have the 'before and after' data necessary to determine how Beeline might have altered its Facebook advertising scheduling and content after Better's Ad Data were taken."   Pl. *Daubert* Motion at 29-30.   Again, these arguments go to weight and not admissibility; Better is welcome to cross examine Zaiger on such points before the jury.  *See Bocoum*, 2022 WL 902465, at *15 (collecting cases).

Accordingly, the Court declines to preclude Zaiger from testifying as to the utility and Beeline's actual use of the Facebook Ad Data as unreliable.

### b.      Usurpation

Better also objects to these opinions because "they purport to tell the jury what to find on a fundamental issue in the case," namely "Beeline's use (or not) of Better's Ad Data is a central

and hotly disputed issue in the case, as to which numerous percipient fact witnesses and ample documentary evidence are available." Pl. *Daubert* Motion at 30. The Court disagrees. True, expert testimony must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (internal quotation marks omitted); *see also Bocoum*, 2022 WL 902465, at *25. But while "[i]t is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of *legal conclusions*," *Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) (emphasis added) (internal quotation marks omitted); "Rule 704 expressly permits experts to opine on 'ultimate issues,'" *Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 394 (S.D.N.Y. 2017); *accord* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). In this case, Better will need to prove at trial that Beeline actually used the Better Information, and so evidence of Beeline's "use" certainly goes to an "ultimate issue" in the case. Plus, it is important to remember the exact contours of Zaiger's opinion. Zaiger opines that the exported Facebook Data could only be used "to duplicate very similar ads copy but would not allow the user to duplicate any of the ads targeting," and that based on his analysis, "Beeline did not make any changes to their Facebook ad creative to replicate the Better Ad Data or the underlying contents of the ads." Zaiger Report ¶¶ 5.3, 5.13.5. Thus, he leaves open for the jury the ultimate question of whether Beeline actually used the data (which could be done in other ways).[20]

---

[20] To the extent Better also seeks to argue that Zaiger's opinion is an improper legal conclusion, the Court disagrees. Zaiger is not opining as to whether evidence satisfies the legal requirements of use under the DTSA or New York common law. *See Scentsational Techs.,* 2018 WL 1889763, at *7 (permitting expert to "offer an opinion as to how unique or valuable ST's technology is within the industry" so long as she did not "offer the legal conclusion that the technology is a trade secret" (citing *Hygh v. Jacobs*, 962 F.2d 359, 363 (2d Cir. 1992))).

* * *

Accordingly, Better's request to exclude Zaiger's testimony regarding the usefulness and Beeline's use of the Facebook Ad Data is denied.

### iii.        Zaiger's Opinions Regarding Reasonable Measures

Zaiger also opines that "Better's own actions show a lack of reasonable measures to keep their Facebook advertising secret, particularly from a disgruntled employee whom Better alleges left their employ without providing any advance notice." *Id.* ¶ 8.1.1.

First, Better argues that "Zaiger is not qualified to offer this opinion" because his "personal experience . . . is limited to his own 30-person company" and "[h]e has no relevant certifications or licenses, and he did not rely on any books in formulating his opinion in this regard." Pl. *Daubert* Motion at 30-31 (internal quotation marks omitted). The Court disagrees. Zaiger has been the CEO of a "digital marketing agency" for over 10 years. Zaiger Report ¶ 2.1.1. His company "manages over 1.5 million dollars per year in digital advertising spend for more than two dozen clients . . . . on platforms including Facebook." *Id.* ¶ 2.1.3. And regarding Facebook in particular, Zaiger is certified as a "Meta Certified Media Buying Professional" which "certify[ies] someone's understanding of Facebook marketing concepts." *Id.* ¶ 2.1.4. Thus, Zaiger is particularly qualified to understand the Facebook Ad Data at issue and to know how it is customarily used and protected. *See, e.g.*, *Neural Magic, Inc. v. Meta Platforms, Inc.*, No. 20 Civ. 10444 (DJC), 2023 WL 2383172, at *19-20 (D. Mass. Mar. 1, 2023) (rejecting the defendant's argument that a law professor was unqualified to testify as to whether protective measures were "reasonable" for lack of technical expertise because the expert's "expertise would still be helpful to the jury by contextualizing, based upon her academic and consulting work, what level of measures similar organizations, companies, and broader industry take to protect their trade secrets").

Second, Better argues that "Zaiger's opinion about the reasonableness of Better's measures is an improper legal conclusion."  Pl. *Daubert* Motion at 31.  Again, this misunderstands the distinction between "ultimate issues" and "legal conclusions."  While an opinion as to whether the measures taken meet the statutory requirements under the DTSA is clearly a "legal conclusion," whether the measures were reasonable with respect to comparable marketing data is merely an "ultimate issue" and therefore the permissible subject of expert testimony.  *See Neural Magic, Inc.*, 2023 WL 2383172, at *21.  In fact, other courts have permitted experts to testify as to this exact issue, concluding that such testimony does not usurp the role of the jury.  *See, e.g.*, *id.*; *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19 Civ. 4238 (MMC), 2021 WL 2588974, at *2 (N.D. Cal. June 24, 2021) (permitting an expert to testify as to as to the plaintiffs' failure to demonstrate reasonable efforts to protect trade secrets, reasoning, "[a]lthough [the proffered expert], of course, cannot frame his opinion as a comment on whether plaintiffs have met their burden of proof, the Court does not understand [the proffered expert] to be offering a legal opinion, but, rather, an opinion that the evidence in the record he reviewed does not show plaintiffs took reasonable measures").

Third, Better argues that "Zaiger ignores most of the evidence of Better's measures to protect the Facebook Ad Data" and only focuses on "a single measure—Better's discontinuation of Abramowitz's access to its Facebook Ad Manager Account after his termination."  Pl. *Daubert* Motion at 31.  First, apart from general measures pertaining to all confidential information, such as requiring employees to sign the PII Agreement, Pl. 56.1 Stmt. ¶ 281, the record does not contain evidence of any additional measures taken specifically with respect to the Facebook Ad Data, except that access to the Facebook Ad Manager Account is restricted to marketing employees and that the marketing department has practices of terminating access both periodically and upon an employee's departure.  *Id.* ¶¶ 291-94.  Zaiger's opinion concerns this protective measure: the

failure to disable Abramowitz's access.  But even if there were additional protective measures, Zaiger's opinion would still be relevant with respect to this particular measure, and arguments of Zaiger's failure to consider other evidence go to the weight of his opinion rather than its admissibility.  *See Bocoum*, 2022 WL 902465, at *15 (collecting cases).

Accordingly, the Court declines to preclude Zaiger from opining as to the reasonableness of any protective measures analyzed in his Report.

* * *

In sum, while Zaiger is precluded from testifying as to the existence of a secondary market for the Facebook Ad Data, he may testify as to the utility of the Facebook Ad Data and whether it was actually used by Beeline, and as to whether Better's measures to protect the Facebook Ad Data were reasonable.

### 4.   Karl Weisheit

Karl Weisheit is a Certified Public Accountant ("CPA"), Certified in Financial Forensics ("CFF"), and a Certified Valuation Analyst ("CVA").   Dkt. 194-7 ("Weisheit Report"), Attachment 1 ("Weisheit CV") at 1.  He graduated with a B.S. in accounting from Nicholas State University in 1987, and has worked as an accountant continuously since 1988.  *Id.* at 1-2.  Weisheit has also provided expert testimony in dozens of litigation matters.  *Id.* at 2-7.

Beeline retained Weisheit to determine:

1.   Whether Beeline benefitted from possessing the Better Information;
2.   Whether the Holzen Report can be relied on within a reasonable degree of certainty to establish damages claimed by Better . . . as a result of Beeline allegedly possessing the Better Information.
3.   If the trier-of-fact determines that Beeline is liable to Better as a result of Better's claims, the amount of its damages.

Weisheit Report at 1 (footnote omitted).  Weisheit renders three corresponding opinions:

1.   Beeline did not benefit from possessing the Better Information ["Weisheit Opinion 1"];

2.      The Holzen Report cannot be relied on within a reasonable degree of certainty to establish damages claimed by Better as a result of Beeline allegedly possessing the Better Information, and should such damages be awarded, would place Better in a healthier financial position that it would be had the alleged events precipitating this dispute never occurred ["Weisheit Opinion 2"]; and

3.      If the trier-of-fact determines Beeline is entitled to damages as a result of Beeline's alleged possession of the Better Information, and if Better is entitled to recover "avoided costs," Better's damages range from $45,000 to $55,000 ["Weisheit Opinion 3"].[21]

*Id.* at 2.  Better moves to exclude each of these opinions.  *See* Pl. *Daubert* Motion at 31-46.

**i.      Weisheit Opinion 1**

Weisheit opines that Beeline "did not benefit from possessing the Better Information." Weisheit Report at 2.  Specifically, Weisheit opines that Beeline "neither utilized nor benefited" from the Operating Model based on (1) a "comparison of the Better Financial Model to the Beeline Financial Model," *id.* at 24, to determine "[h]ow information is presented from one model to the other," Dkt. 194-8 ("Weisheit Dep. Tr.") at 22:25-23:17; (2) comparing the version of Beeline's operating model from before Abramowitz joined the company to the version of that model from after his departure, Weisheit Report at 24; Weisheit Dep. Tr. at 46:17-20; and (3) reviewing deposition testimony from current Beeline employees as well as the deposition, exit interview, and affidavit of Abramowitz, Weisheit Report at 9-24.  Weisheit's opinion is the same as to the Facebook Ad Data, and is based on "(1) the comparison of the Better Facebook Ad Spend to the

---

[21] Better also characterizes Weisheit's statements as to his "understanding" of what damages are available as a separate "opinion," which it moves to exclude as an improper legal conclusion.  Pl. *Daubert* Motion at 39.  While the availability of certain types of damages is clearly a question of law, the Court does not interpret Weisheit as offering such an opinion.  Much like Better's own damages expert, Weisheit is merely stating his "understanding" of what damages are available—*i.e.*, he is laying out an assumption on which his subsequent damages analysis is based.  *See* Weisheit Report at 34-36; *accord* Holzen Report ¶¶ 33-34.  Thus, Better's motion in this respect is denied without prejudice.  In the event Weisheit seeks to offer an opinion as to what damages are available at trial, Better may renew its motion.

Beeline Facebook ad spend; and (2) the deposition testimony of Beeline personnel" and is "reinforced" by the Zaiger Report.  *Id.* at 24-29.  And finally, Weisheit opines that Beeline "neither used nor benefited from its alleged possession of Better's Partner Agreements based on: (1) [a] comparison of Better Partner Agreements and relationships to Beeline Partner Agreements and relationships; and (2) the deposition of Beeline personnel."  *Id.* at 29-33.

First, the Court finds that Weisheit is not qualified to testify as whether Beeline used or benefited from any of the Better Information.  Beeline asserts that "whether or not Beeline actually used or benefited from the Better Information is a question of fact, and Mr. Weisheit's in-depth analysis based on experience and skill in complex matters that he is qualified to address will undoubtedly assist the trier of fact."  Opposition to Pl. *Daubert* at 37.  "[A]lthough an expert is permitted to support his opinions by reference to his experience, he must demonstrate that this experience is a sufficient basis for these opinions."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 (S.D.N.Y. 2010) (internal quotation marks omitted); *see also Bocoum*, 2022 WL 902465, at *22.  Here, it is undisputed that Weisheit is a CPA, CFF, and CVA with over thirty years of experience.  But Beeline has not demonstrated how this experience qualifies him to evaluate the Better Information at issue and whether Beeline actually used it.  *See Bocoum*, 2022 WL 902465, at *22.  Weisheit does not contend that he is qualified to testify about the Better Information through his education, training, or work experience, and even under the most generous reading of his CV, the Court is unable to conclude that Weisheit is qualified to testify about the Better Information—particularly the Partner Agreements, which are essentially contracts and do not involve any sort of financial information.[22]

---

[22] While Weisheit testified that he "work[s] in Excel spreadsheets every day," Weisheit Dep. Tr. at 46:21-47:5, such experience is not, on its own, sufficient to qualify Weisheit to opine as to whether Beeline used the Better Information.

Nor does Weisheit proffer any methodology, reliable or otherwise, that he applied in concluding that Beeline neither used nor benefitted from the Better Information. "Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702." *Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013) (internal quotation marks omitted). Yet that is precisely what Weisheit endeavors to do. As to his comparison of the Beeline and Better operating models, Weisheit "merely look[ed] at the two models to determine whether Beeline mimicked Better's model or they didn't" without applying any "specialized method" such as "compar[ing] . . . the formulas within the cells of the two models," or comparing the underlying assumptions between the models, or checking to see if Beeline was "changing how it benchmarked certain data points in its model." Weisheit Dep. Tr. at 23:18-21, 24:24-25:9, 34:6-14. As to the Facebook Ad Data, Weisheit simply compared the amount of money both companies spent on Facebook advertising to conclude that "[t]he large variance in Facebook marketing spend points to Beeline using a different marketing strategy than Better, and further indicates that Beeline did not utilize the information contained in Better's 'Ad Manager' tool." Weisheit Report at 24. Weisheit also read Partner Agreements from the two companies to determine whether they are "similar." Weisheit Dep. Tr. at 77:11-15, 78:10-16, 85:5-10. Weisheit then summarized any differences or similarities in his Report along with cutting and pasting block quotes from Abramowitz and Beeline employees which were consistent with his overall conclusions. Weisheit Report at 3-33. Nowhere does Weisheit explain how any of these comparisons involve accounting expertise or why these comparisons involve some sort of technical methodology that he—as a CPA—can uniquely apply.

Beeline paints Weisheit's analysis, such as it is, as "employ[ing] the many years of experience he has as an accountant [to] review[] Excel documents and complex tables including

multiple tabs, each one containing complex data points on financial information."  Opposition to Pl. *Daubert* at 38.  But unlike Zaiger who synthesized thousands of cells of Excel data, Weisheit for example, merely compared two Excel spreadsheets, and notes that one has twelve tabs while the other has twenty-eight tabs.  Weisheit Report at 3.  Moreover, the fact that Weisheit admitted that he "didn't need a specialized method" apart from "look[ing] at the two models to determine whether Beeline mimicked Better's" only underscores the fact that expert testimony is unnecessary here.  Weisheit Dep. Tr. at 25:6-9; *see Lickteig*, 589 F. Supp. 3d at 329-31; *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 460 (S.D.N.Y. 2014) ("[E]xpert witnesses are generally not permitted to address issues of fact that a jury is capable of understanding without aid of expert testimony.").  And again, while Weisheit is certainly entitled to rely on deposition testimony to formulate an opinion, he must apply some methodology apart from quoting and concluding therefrom.  *See Arista Records*, 608 F. Supp. 2d at 424 ("[A]n expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."); *United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) ("The expert may not . . . simply repeat[] hearsay evidence without applying any expertise whatsoever, a practice that allows [its proponent] to circumvent the rules prohibiting hearsay." (internal quotation marks omitted)).

Thus, Better's motion to preclude Weisheit from opining that "Beeline did not benefit from possessing the Better Information" and offering supporting opinions is granted.

### ii.      **Weisheit Opinion 2**

Weisheit's second opinion is that Holzen's damages analysis is unreliable, and any damages awarded "would place Better in a healthier financial position that it would be had the alleged events precipitating this dispute never occurred."  Weisheit Report at 2.  In particular, Weisheit opines that "Holzen misconstrues the methodology he relies upon by conflating valuation

of intangible assets with costs" and that "Holzen misapplies the valuation methodology he relies upon by ignoring the methodology's instruction." *Id.* at 40.   In support, Weisheit critiques, at length, Holzen's reliance "on two cost-approach methods to 'value' the cost of Better's Information" because "costs' are not [necessarily] equal to value." *Id.* at 37 & n.115.   Weisheit also contests Holzen's citations to *Valuing Intangible Assets*, pointing to differences between the 1999 and 2016 versions to show the flaws in Holzen's methodology, and sections which Holzen ignores but which Weisheit considers relevant. *Id.*   Then, Weisheit opines that Holzen was wrong to include opportunity costs and third-party costs in his damages analysis, noting that Holzen "cites no authority because no authority would include opportunity costs in a valuation of an intangible asset for the purposes of calculating damages" and that "[t]hird-party costs can be included in the cost of a valuation of an intangible asset or the calculation of avoided cost, but only to the extent that those third-party costs add value to the asset or were a part of creating the asset." Weisheit Report at 45.

Better moves to exclude this proffered testimony, arguing that Weisheit's opinions as to Holzen's use of the "cost approach" are contradictory and unsupported. Pl. *Daubert* Motion at 39-43.   For example, Better argues that *Valuing Intangible Assets* in fact endorses the "cost approach" as one of three generally accepted methods of valuation, and that Weisheit in fact admitted at deposition that the "cost approach" can sometimes be appropriate. *Id.* at 41.   Beeline disagrees, arguing that Better mischaracterizes Weisheit's testimony. Opposition to Pl. *Daubert* at 45-48 Beeline also filed a supplemental declaration from Weisheit attempting to dispute Better's characterizations and further clarify some of his opinions. Dkt. 234-6.

The parties' dispute as to the exact nature of Weisheit's opinion is understandable since his Report and affidavit are not models of clarity.   However, it appears that much of Weisheit's

proffered testimony passes the *Daubert* test.  First, Weisheit—a CPA with decades of accounting experience—is qualified to testify as to damages.  And his proffered testimony is clearly relevant as it directly rebuts Holzen's damages analysis.  Thus, the only question is whether the testimony would be "so fundamentally unsupported that it can offer no assistance to the jury." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013).  The Court does not believe it is.

Importantly, "[t]he task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.  There is no requirement that a rebuttal expert himself offer a competing analysis." *Focus Prods Grp. Int'l LLC v. Kartri Sales Co.*, No. 15 Civ. 10154 (PAE), 2022 WL 17851810, at *61 (S.D.N.Y. Dec. 22, 2022).  Thus, Weisheit need not present a methodology of his own; he can instead merely critique and rebut Holzen's opinions using his expertise in calculating damages.  This is precisely what Weisheit does.  For example, he challenges Holzen's extensive reliance on *Valuing Intangible Assets* by pointing out inconsistencies between different editions, and pointing to other sections of the book which might arguably undermine Holzen's assumptions.  And while Better may argue that some of these contentions are themselves contradictory or unsupported, such arguments go to weight and not admissibility.  Better is welcome to inquire on cross-examination as to statements Weisheit made at his deposition or portions of *Valuing Intangible Assets* which may be inconsistent with Weisheit's opinions in his Report.  Thus, the Court declines to preclude Weisheit from offering testimony to rebut Holzen's analysis or the authorities on which he relies.

That said, some of Weisheit's critique in Opinion 2 is based on his opinion that Beeline did not benefit from possession of the Better Information, which the Court has already excluded.  *See, e.g.*, Weisheit Report at 38 ("Because Beeline did not utilize or benefit from the Better Information, the utility at issue is negligible."), 39 ("As discussed above, Beeline did not benefit from

possessing the Better Information. . . .  Nevertheless, Holzen fails to address this, despite claiming

to rely on the methodology set forth in *Valuing Intangible Assets*.").  "In general, an expert whose

proffered testimony relies on . . . theories that have been or may be excluded as unreliable should

also be excluded." *S.F. Baykeeper v. City of Sunnyvale*, No. 20 Civ. 824 (EJD), 2022 WL 4133299,

at *10 (N.D. Cal. Sept. 12, 2022); *see also Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17 Civ.

589 (LGS), 2021 WL 4243309, at *3 (S.D.N.Y. Aug. 25, 2021) (excluding expert opinions all of

which were premised on another expert opinion which was already excluded).  Thus, any critique

of Holzen that is premised on Weisheit's excluded opinion that Beeline neither used nor benefited

from the Better Information would be improper and is inadmissible.

### iii.        Weisheit Opinion 3

Finally, Weisheit engages in a (relatively brief) alternative damages calculation.  In

contrast to Holzen who calculates total damages to be over $6 million, Weisheit opines that the

total replacement costs would be $54,755, and that reproduction costs would be $45,125.  Weisheit

Report at 52.  These numbers relate solely to the Operating Model—Weisheit does not calculate

any damages with respect to the Facebook Ad Data or the Partner Agreement "because there's no

benefit to Beeline."  Weisheit Dep. Tr. at 165:6-67:5.  Moreover, Weisheit excludes from these

damages the costs to maintain the Operating Model, which Holzen includes.  *Id.* at 164:5-9.  As to

reasonable royalty, Weisheit's Report mostly quotes from Holzen's analysis as to the fifteen

factors in the hypothetical negotiation.  Weisheit Report at 49-51.  While Weisheit ultimately

agrees with Holzen's conclusion that the factors have a neutral impact on the negotiation, Weisheit

Dep. Tr. at 158:17-20, 159:24-60:7, he opines that "there would be no reasonable royalty," *id.* at

159:5-9, because, "[b]ased on [his] knowledge of the relationship of the parties, it does not seem

likely that the parties would negotiate any license."  Weisheit Report at 49; *see also* Weisheit Dep.

Tr. at 160:8-16 ("[T]his assertion of a reasonable royalty in this situation would never have occurred. It would never have occurred at the dollar amount that Mr. Holzen is suggesting that it would occur. He's suggesting that there would be a one-time royalty payment ranging between $6.2 million and $6.3 million on a company that its top-line revenue is $3 to $4 million. It was never going to happen.").

These opinions are unreliable. As to Weisheit's damages calculation, his Report provides no explanation for why there are no damages associated with the Facebook Ad Data or the Partner Agreements, or why he excluded maintenance costs from damages associated with the Operating Model. At his deposition, Weisheit explained that he calculated $0 in damages with respect to those items based on his continued assertion that Beeline did not benefit from those sources of information. Weisheit Dep. Tr. at 164:22-25, 166:17-67:7. But the Court has already decided that this opinion from Weisheit is inadmissible, and so Weisheit's damages calculations, which he admits are premised on the same opinion, must be excluded as well as inherently unreliable.

Moreover, Weisheit appears to misunderstand how a reasonable royalty analysis works. "[I]n those trade secret cases where measuring either the defendant's profits or the plaintiff's losses is too hard or speculative, [the Second Circuit has] approved the concept of a 'reasonable royalty award' that 'attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from plaintiff." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 858 F.3d 744, 748 (2d Cir. 2017). This is done "[b]y means of a suppositious meeting between the parties" to determine "what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." *Vt. Mcrosys., Inc.*, 88 F.3d at 151 (internal quotation marks omitted). Thus, to the extent that Weisheit is opining that the parties would ultimately negotiate for a $0 royalty, it appears that his sole basis for the opinion is that "[b]ased on [his] knowledge of the relationship

of the parties, it does not seem likely [to Weisheit] that the parties would negotiate any license." Weisheit Report at 49.  But this is precisely the assumption that the reasonable royalty analysis requires.

Thus, Better's motion to exclude Weisheit's alternative damages calculation is granted.

\* \* \*

In sum, the Court precludes Weisheit from testifying as to his opinions regarding whether Beeline used or benefited from the Better Information, or from offering an alternative damages calculation.  However, Weisheit may attack the authorities on which Holzen relies, provided such attacks are not premised on his opinion that Beeline did not use or benefit from the Better Information.

### III.  Summary Judgment Motion

Beeline seeks summary judgment on each of Better's four remaining claims: misappropriation of trade secrets under the DTSA and his claims under New York common law for misappropriation, tortious interference with a contract, and aiding and abetting the breach of a fiduciary duty.[23]

### A.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists if 'the evidence is such that a reasonable jury could return a verdict

---

[23] "The parties' briefs assume that New York law controls this dispute" with respect to Better's common law claims, and "such implied consent is sufficient to establish choice of law." *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) (ellipsis and internal quotation marks omitted); *see also Newton v. Meyer*, No. 22 Civ. 540 (JPC), 2023 WL 2563115, at \*9 n.13 (S.D.N.Y. Mar. 17, 2023).

for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *id.* at 322. "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings." *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and . . . may not rely on conclusory allegations or unsubstantiated speculation. . . . [A] nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted); s*ee also Anderson*, 477 U.S. at 252 (requiring the non-movant to present more than a "scintilla of evidence"). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props.*, 542 F.3d at 309. At the same time, however, "in

considering 'what may reasonably be inferred' from witness testimony, the court should not accord

the nonmoving party the benefit of 'unreasonable inferences, or inferences at war with undisputed

facts.'" *Taylor*, 2022 WL 744037, at *7 (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.

Supp. 2d 334, 342 (S.D.N.Y. 2005)).

## B.    DTSA Claim

The Court begins with Better's DTSA Claim.  "The DTSA provides a private right of action

for '[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product

or service used in, or intended for use in, interstate or foreign commerce.'" *Zabit v. Brandometry,*

*LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (brackets and ellipsis in original) (quoting 18

U.S.C. § 1836(b)(1)).[24]  To prevail on its claim for trade secret misappropriation under the DTSA,

a plaintiff must prove that "(1) it possessed a trade secret, and (2) the defendant misappropriated

the trade secret."  *Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y.

2019) (internal quotation marks omitted); *Syntel Sterling Best Shoes Mauritius Ltd. v. TriZetto*

*Grp.*, No. 15 Civ. 211 (LGS) (SDA), 2020 WL 1442915, at *8 (S.D.N.Y. Jan. 27, 2020), *report*

*and recommendation adopted*, 2020 WL 1911205 (S.D.N.Y. Apr. 20, 2020).  Better asserts its

DTSA claim with respect to the Operating Model and the Facebook Ad Data, but not the Partner

Agreements.  S.J. Opposition at 14, 30 n.18; *see also* Am. Compl. ¶ 93.  Beeline argues that the

Operating Model and Facebook Ad Data do not constitute protectable trade secrets, S.J. Motion at

9-17, that there is no evidence of misappropriation, *id.* at 17-19, and that "Plaintiff's claimed

damages are not recoverable under the DTSA," *id.* at 19 (capitalization omitted).  For the reasons

that follow, because there is sufficient factual basis for a reasonable jury to conclude that Better

---

[24] The parties do not appear to dispute that the "interstate or foreign commerce" element is
satisfied.

has established each of the required elements of a DTSA claim, and in addition, because avoidance costs damages are clearly recoverable under the DTSA, Beeline's motion for summary judgment as to Better's DTSA claim is denied.

### 1.    Existence of Trade Secrets

The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," so long as: (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3); *see also Zabit*, 540 F. Supp. 3d at 421.  "The existence, *vel non*, of a trade secret usually is treated as a question of fact," and properly the province of the jury. *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021); *Syntel Sterling*, 2020 WL 1442915, at *9.  That said, summary judgment may be appropriate "where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known."  *Catalyst Advisors, L.P., v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022) (addressing the propriety of granting a motion to dismiss a DTSA claim).

Here, Beeline asserts that there is no evidence that Better took reasonable steps to protect the Facebook Ad Data and that the Facebook Ad Data and the Operating Model generate independent economic value from not being generally known.  The Court disagrees.

i.       **Reasonable Measures**

"It is axiomatic that a plaintiff cannot recover for the misappropriation of a trade secret if he revealed that secret" to the world.  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 518 (S.D.N.Y. 2017).  "The reason for this is obvious.  If a defendant could have obtained the allegedly protected information with impunity from a third party and if that third party was at liberty to publish the trade secret to the world, including to the defendant, the law will not prevent that defendant alone from exploiting the trade secret."  *Town & Country*, 556 F. Supp. 3d at 258.  "Although absolute secrecy is not required, a trade secret must be veiled in sufficient secrecy that except by use of improper means, there would be difficulty in acquiring the information."  *Id.* (brackets, ellipsis, and internal quotation marks omitted).  Thus, for information to constitute a "trade secret" under the DTSA, a plaintiff must have "taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A).

The Second Circuit has yet to construe the term, "reasonable measures," for purposes of the DTSA in a precedential opinion.  *See Xavian Ins. Co. v. Marsh & McLennan Cos.*, No. 18 Civ. 8273 (DLC), 2019 WL 1620754, at *4 (S.D.N.Y. Apr. 16, 2019)).  "But given that trade secrets may appear in a wide variety of 'forms and types,' 'what measures are "reasonable" must depend in significant part on the nature of the trade secret at issue."  *Turret Labs USA, Inc., v. CargoSpirit, LLC*, No. 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (brackets omitted) (quoting first 18 U.S.C. § 1839(3), then *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 380 (N.D.N.Y. 2021)).  Thus, the "reasonableness" of any protective measure is a case-specific inquiry and a question of fact.  And so, to defeat a motion for summary judgment, a plaintiff need only point to evidence of protective measures, and then it becomes the jury's task to evaluate whether they were reasonable.  *Cf. Town & Country*, 556 F. Supp. 3d at 266-67 (granting summary judgment in part

because "Plaintiffs . . . have not proffered evidence from which a reasonable jury could find that they took appropriate steps to protect [the] alleged [trade secrets]").

In this case, the record contains evidence of both generally applicable protective measures and protective measures specifically pertaining to the Operating Model and the Facebook Ad Data. First, Better requires all its employees, including Abramowitz, to sign its PII Agreement.  Pl. 56.1 Stmt. ¶ 281.  Pursuant to that Agreement, each employee must affirm that she "will not, during and after [her] employment . . . directly or indirectly disclose . . . any of the Company's confidential or proprietary information or trade secrets."  PII Agmt. ¶ 1.  Better also maintains "a 100+-page Information Security Management Program, which contains the company's policies regarding confidential information, including how such information is protected and how access to such information is regulated within the company."  Pl. 56.1 Stmt. ¶ 282.  Abramowitz was also asked to sign Better's Data and Information Security Policy before starting at Better.  *Id.* ¶ 28.  And when an employee leaves Better, "a 'ticket' is generated as part of the 'offboarding' process, which results in the employee's access to Better's systems being terminated by Better's IT security group," and "[t]he time and date that such access is revoked are recorded on the ticket."  *Id.* ¶¶ 287-88.

In addition, the Operating Model in particular is protected by "two-factor authentication," and access to it is limited to only those "employees who are actively working on the Operating Model."  *Id.* ¶¶ 284, 286.  Similarly, Better limits access to its Facebook Ad Manager Account— where the Facebook Ad Data is stored—to only those employees who are actively working on Better's Facebook advertising.  *Id.* ¶ 291.  Better's marketing group is charged with maintaining who has access to Better's Facebook Ad Manager Account—a function Better considers to be "important."  *Id.* ¶¶ 292, 295.  That group has a practice of terminating access upon an employee's

departure, and they also do periodic reviews to ensure that no unauthorized user has erroneously retained access. *Id.* ¶¶ 293-94; *accord* Doolittle Dep. at 26:6-17.  These are precisely the types of measures which courts have held are sufficiently reasonable to withstand a motion to dismiss or a motion for summary judgment.  *See, e.g.*, *Catalyst Advisors*, 602 F. Supp. 3d at 675 ("Generally speaking, [reasonable] measures can include the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." (internal quotation marks omitted)); *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19 Civ. 7367 (JPO), 2020 WL 4570047, at *3 (S.D.N.Y Aug. 7, 2020) ("Ad Lightning appears to have taken [reasonable] measures to protect its trade secrets, for example by requiring employees and clients to sign non-disclosure agreements. . . .  [I]ts proprietary information was accessible only to parties with permission to view such information, and only after they have agreed to contracts that include strict confidentiality provisions that require them not to disclose this information." (internal quotation marks and citations omitted)); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) ("Defendants have alleged that they have taken reasonable measures to keep the information secret by making those who use it subject to confidentiality provisions and limitations, and only making it accessible through strictly controlled servers such as the Customer Exchange."); *see also Mediadata Sol., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589 (LGS), 2021 WL 467110, at *10-11 (S.D.N.Y. Feb. 9, 2021) (holding, given "evidence that [the plaintiff] implements procedural, technical and physical measures to safeguard each Trade Secret," that "summary judgment on the question of trade secret protection [was] not warranted").

Beeline argues that "Plaintiff failed to take sufficient protective measures regarding its Facebook Ads Manager data" because "[t]here is no question that Abramowitz retained access to Plaintiff's Facebook Ads Manager account after he left Plaintiff's employ, in contravention of Plaintiff's own security policies."  S.J. Motion at 12; *see also id.* at 14 ("Plaintiff's lackadaisical attitude toward revoking Abramowitz's access utterly belies its unilateral classification of its Facebook Ads Manager data as a 'trade secret.'").  But protective measures are not automatically unreasonable simply because they did not succeed in preventing wrongful disclosure.  Indeed, many, trade secrets claims arise due to an unauthorized disclosure of the information, and so such a rule would be a death knell to trade secret plaintiffs.

In support of this argument, Beeline cites two out-of-Circuit cases from the Northern District of Illinois, *Westrock Company and Victory Packaging, LP v. Dillon*, No. 21 Civ. 5388, 2021 WL 6064038 (N.D. Ill. Dec. 22, 2021), and *Ziegler Auto Group II, Inc. v. Chavez*, No. 19 Civ. 2748, 2020 WL 231087 (N.D. Ill. Jan. 15, 2020), which, it suggests, illustrate the prompt termination of employee access that courts have found to constitute a sufficient protective measure. *See* S.J. Motion at 13.  But those cases in fact illustrate that Better can satisfy the standard for sufficient protective measures, particularly at the summary judgment stage.

In *Westrock*, for example, the Honorable John Robert Blakeley expressed concern, at the preliminary injunction stage, that "WestRock has not marshalled convincing evidence about how it protects the files at issue," primarily because even though its security policy requires confidential files to be marked as such and prohibits employees from conducting business via personal email, "[n]ot a single file at issue bears such a mark" and "the record shows that [the defendant] routinely used his personal email to conduct business."  2021 WL 6064038, at *7; *see also id.* at *7-8 ("In addition, the Confidentiality Agreement at issue required [the defendant] to return or delete

confidential files upon his departure and further to certify his compliance in writing.   Yet, WestRock neither asked him to delete anything nor asked for written certification. . . .   Further, WestRock generally does not explain where it stores the files at issue, whether it applies special password protection to them, or whether and how it restricts access to them." (citation omitted)).   But ultimately, Judge Blakeley recognized that "the law 'requires only reasonable measures, not perfection' to maintain secrecy," and so because the plaintiff "presented general policies aimed at safeguarding its confidential information, the record at [that] stage [did] not establish that WestRock categorically failed to take reasonable efforts, but this evidentiary weakness undermines WestRock's likelihood of future success in proving that these files constitute trade secrets." *Id.* at *8 (quoting *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004)).   And while the court in *Ziegler* held that the plaintiff company acted reasonably when it terminated the defendant's access to its computer system "within a day of his resignation," 2020 WL 231087, at *4, such speed is not a *sine qua non* for reasonableness.   Indeed, the *Ziegler* court even notes that "trade secret owners need only take reasonable, not perfect, measures to maintain secrecy." *Id.* (citing *Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004).

So here too, while Better neglected to terminate Abramowitz's access to the Facebook Ad Manager Account until months after he quit, in contravention of the marketing group's practices, Pl. 56.1 Stmt. ¶ 88, at best, this creates a factual dispute as to whether Better's protective measures were reasonable.   The Court cannot say that Better "categorically failed to take reasonable efforts." *Westrock*, 2021 WL 6064038, at *8.

ii.        **Independent Economic Value from Secrecy**

"Under the DTSA, a trade secret must [also] 'derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Town & Country*, 556 F. Supp. 3d at 274 (quoting with slight changes 18 U.S.C. § 1839(3)(B)).   In this case, factual disputes remain as to whether the Operating Model and the Facebook Ad Data derive independent economic value from being not generally known.

Starting with the Facebook Ad Data, there is a factual dispute as to its exact functionality and utility.   Beeline's marketing expert, Zaiger, contends that the Facebook Ad Data could only be used "to duplicate very similar ads copy" and would not "allow the user to duplicate any of the ads targeting" because it lacks any information as to "[t]he number of times your ads were on screen," "the number of people who saw your ads at least once," "the estimated total amount of money you've spent on your campaign, ad set or ad during its schedule," "the average number of times each person saw your ad," the number of people who clicked on each ad, the cost-efficiency of each ad in achieving campaign objectives, and the number of times each ad obtained a pre-selected outcome—metrics which are *absolutely necessary* if one is trying to determine the success, or failure, of any advertisement on Facebook."   Zaiger Report ¶¶ 5.3, 5.5, 5.6 (emphasis added) (brackets and internal quotation marks omitted).   Thus, Zaiger opines that "although an individual exporting [the Facebook Ad Data] could attempt to use it to utilize similar copy to the ads that Better previously ran, that individual would have no way of knowing which copy was effective, and which copy amounted to a waste of ad spend."   *Id.* ¶ 5.8.   On the other hand, even Zaiger admits that the Facebook Ad Data might have "limited" value.   *See, e.g.*, *id.* ¶¶ 4.3.1, 4.3.3, 5.5, 5.7.2, 5.10.   Meanwhile, Better's Director of Paid Media, who is responsible for, among other

things, "optimizing Facebook ads," Doolittle Dep. at 9:42-10:1, testified that the Facebook Ad

Data includes information regarding "[t]he settings on an individual campaign; the individual bid

strategies on a campaign; the audiences on a campaign[;]" "click through rate[s]; impressions;

people . . . reached; cost per result; [and] cost per received application," none of which is public

information, *id.* at 72:3-14.  And finally, Beeline did not object to, and thus admitted, Better's

statements that "Abramowitz downloaded approximately 27,000 lines of data from the Better

Facebook Ad Manager Account," Pl. 56.1 Stmt. ¶ 188, and that the Facebook Ad Data, which

Better defines as the "[a]dvertising data and other information *copied and downloaded* from

Better's Facebook Ad Manager Account," *id.*, Exh. A, shows "click-through rates, impressions,

audiences, cost per result, and cost per received application for Better's Facebook advertising, *id.*

¶ 193.  Thus, the jury will ultimately need to determine the exact functionality of the information

downloaded by Abramowitz, based on the evidence adduced at trial.

As to the Operating Model, there is more than sufficient evidence for a reasonable jury to

find Better derived independent economic value from its secrecy.  There is no dispute that the

Operating Model "is a massive Excel workbook comprised of dozens of worksheets which details

Better's unique and proprietary approaches and methods for organizing, staffing (including

proprietary compensation information and other information about Better's operations), and

financing its business, as well as marketing and executing its business" and therefore "constitutes

a roadmap of Better's [business] strategies."  *Id.* ¶¶ 198, 214.  Nor does Beeline dispute that the

Operating Model cannot be replicated by a competitor using proper means "because it is compiled

on an ongoing basis and organically from Better's own confidential and proprietary data to which

competitors do not have lawful access," *id.* ¶ 239, or that Better invested significant time and

means in compiling the Operating Model, *id.* ¶¶ 233-38.  Courts have found similar information

that could reasonably have independent economic value from not being generally known sufficient to constitute a trade secret. *See, e.g.*, *DFO Glob. Performance Com. Ltd. (Nev.), v. Nirmel*, No. 20 Civ. 6093 (JPO), 2021 WL 3475596, at *4 (S.D.N.Y. Aug. 6, 2021) (information regarding "the products in Plaintiffs' pipeline, Plaintiffs' vendor information, and the sales volume and profitability of Plaintiffs' offerings" could potentially constitute a trade secret under the DTSA because "[a] competitor with access to the information could bypass an expensive trial-and-error process to determine which products to stock, what pricing schemes to use, and how many units to order, from whom"); *see also Medidata*, 2021 WL 467110, at *8 (noting that "[d]ata relating to pricing and costs," "sales information," "[i]nformation relating to customers," and "business and marketing information" are all protectable trade secrets).

Beeline asserts that "[t]he concept of the Operating Model and the type of information contained therein are simply not unique to members of the mortgage-lending industry" because most mortgage-lending companies, including Beeline, have their own operating models tracking similar information. S.J. Motion at 11. Putting aside that this argument is almost entirely premised on Garrett's and Weisheit's opinions which the Court has already excluded, it does not matter that other mortgage companies track similar metrics for themselves because those companies do not have access to *Better's* metrics. Indeed, Beeline does not dispute that key Beeline employees consider its own similar data to be "confidential and proprietary and not something Beeline shares with anyone outside the company." Pl. 56.1 Stmt. ¶ 301. Ultimately, Beeline's argument only serves to prove the point that the mortgage lending industry considers this information to be valuable, and thus the proper subject of a trade secret.

* * *

In sum, because there is sufficient evidence in the record that Better took reasonable measures to protect the Facebook Ad Data and the Operating Model, and that Better derives independent economic value from the Facebook Ad Data and Operating Model not being generally known, a reasonable jury could find that the Facebook Ad Data and Operating Model constitute trade secrets under the DTSA.

### 2.    Misappropriation

The DTSA defines "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who," *inter alia*, "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who had used improper means to acquire the trade secret."   18 U.S.C. § 1839(5).   "'Improper means' includes 'theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy,' but excludes 'reverse engineering, independent derivation, or any lawful means of acquisition.'" *Town & Country*, 556 F. Supp. 3d at 255 (quoting 18 U.S.C. § 1839(6)).   The statute therefore "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."   *AUA Priv. Equity Partners, LLC. v. Soto*, No. 17 Civ. 8035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018).   The parties in this case focus on use, which the Court agrees is the applicable theory with which to evaluate Better's claim.   The Court finds that there is sufficient evidence for a reasonable jury to conclude that Beeline misappropriated the Operating Model and the Facebook Ad Data within the meaning of the DTSA.[25]

---

[25] Beeline's assertion that it "simply had no idea that Abramowitz intended to, and did, misappropriate Plaintiff's allegedly confidential information," which "necessarily means that Beeline never *used* the information," S.J. Motion at 4-5, is belied by the evidence.   There is no

First, there is no dispute that Abramowitz himself "used Better's Operating Model in the course of his employment at Beeline, referring to it in responding to questions from Beeline personnel about Better's margins, its growth rate, and its volume of originations."  Pl. 56.1 Stmt. ¶ 245; *see  Linkco, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 237838, at *4 (S.D.N.Y. Feb. 19, 2002) (finding evidence that the defendant "used elements" of Plaintiff's computer programs to be sufficient to create a genuine issue of fact on misappropriation precluding summary judgment); *Imaginative Rsch. Assocs., Inc. v. Ramirez*, 718 F. Supp. 2d 236, 246-47 (D. Conn. 2010) (finding triable issue on use because the defendant's work at new employer incorporated confidential information learned at his former employer).  Moreover, any use of the Better Information by Abramowitz on Beeline's behalf would plainly constitute "improper means" within the meaning of the DTSA since such use "breach[ed] . . . a duty to maintain secrecy," 18 U.S.C. § 1839(6)(A), as Abramowitz was bound by the PII Agreement "during *and after* his employment with Better" and that agreement prevents him from "using" Better's "confidential or proprietary information or trade secrets."  PII Agmt. ¶ 1 (emphasis added); *see also KCG Holdings, Inc. v. Khandekar*, No. 17 Civ. 3533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020).

Second, there is evidence in the record which, viewed in light most favorable to Better, demonstrates that Beeline knew Abramowitz was providing information in violation of the PII Agreement, yet actively made use of the Better Information.  There is no dispute that Abramowitz emailed a copy of the PII Agreement to Beeline's President (Gonzalez), CEO (Liuzza), and

---

factual dispute that other Beeline employees besides Abramowitz were aware of Abramowitz's use of the Better Information.  *See, e.g.*, Pl. 56.1 Stmt. ¶¶ 265-67 (Abramowitz convened an in-person meeting one month after starting at Beeline, during which he showed the Operating Model to Gonzalez and another Beeline executive); 182-83 (Abramowitz and Stockwell had a zoom meeting where Abramowitz shared his screen and accessed Better's Facebook Ad Manager Account); Stockwell Dep. at 182:19-183:8 (Stockwell admitting that he later learned that Abramowitz saved the Facebook Ad Data to the Beeline system, but did nothing to report it).

General Counsel (Kennedy) before even starting at Beeline.  *See* Pl. 56.1 Stmt. ¶ 74; Dkt. 243-32.

Thus, senior management at Beeline knew or should have known that Abramowitz was bound by

nondisclosure obligations.   Yet those same executives encouraged Abramowitz to use the

Operating Model in connection with Beeline work product.   For example, on July 13, 2020,

Abramowitz emailed Liuzza and Gonzalez an excerpt from the Operating Model showing

"Better's App, Lock, Fund and Revenue from 1Q18 to 3Q19."  Pl. 56.1 Stmt. ¶ 250.  After sharing

the information with other executives at Beeline, Liuzza instructed Abramowitz and another

Beeline employee to use the information in connection with developing Beeline's "staffing

model."  *Id.* ¶¶ 253-55, 270.  This clearly creates a factual dispute as to whether Beeline used the

Operating Model, as the jury could infer that Beeline used the Operating Agreement to revise and

improve its own business processes.[26]   And moreover, the evidence supports a conclusion that

such use was "improper" within the meaning of the DTSA because individuals at Beeline

"kn[e]w[] or ha[d] reason to know" that Abramowitz was sharing this information in "breach of a

duty to maintain secrecy."  18 U.S.C. § 1839(5)-(6); *see also Town & Country*, 556 F. Supp. 3d at

256 ("It is sufficient that the plaintiff present evidence that the defendant used the information

---

[26] Beeline argues that this cannot constitute "use" because "Beeline has had its own Financial Model since it started its business—long before Abramowitz was ever a blip on the screen."  S.J. Reply at 6.  That may be true, but the evidence is such that a reasonable jury could find that Beeline altered or improved its "financial model" based on Better's.  Beeline also urges that Court to disregard these factual disputes because Better cites only to "circumstantial evidence," "[l]argely relying upon weak deposition testimony by Beeline members, unsupported by irrefutable evidence that is undoubtedly available."  *Id.* at 7.  In particular, Beeline points to its operating model to show that there is no evidence of actual change based on Better's Operating Model.  *Id.*  But Beeline misunderstands the inquiry at summary judgment.  It is not for the Court to decide which evidence is most persuasive; that is a job for the jury.  Because Better's theory of the case is not "blatantly contradicted" or "so utterly discredited by the record that no reasonable jury could believe [it]," summary judgment is inappropriate.  *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

knowing it was acquired through improper means or that it used it in violation of an agreement or confidential relationship or duty . . . .").

Evidence from which a jury could infer use of the Facebook Ad Data, while less robust, nonetheless exists.  As previously stated, on August 11 and 12, 2020, Abramowitz uploaded to Beeline's Google Drive the screenshots of Better's Facebook Ad Manager Account and much of the 27,000 lines of data that he had downloaded.  Pl. 56.1 Stmt. ¶ 189.  Moreover, Stockwell admitted that he knew that the data was stored on Beeline's systems.  Stockwell Dep. at 182:19-183:8.  This alone would be sufficient evidence for a jury to find that Beeline "used" the Facebook Ad Data within the meaning the DTSA, thus precluding summary judgment.  *See Syntel Sterling*, 2020 WL 1442915, at *11 (""[A] jury could infer use from, for example, the fact that certain test cases and automation scripts were found on the computer belonging to the [alleged misappropriator] . . . .").  In addition, the Google Drive Audit Logs indicate that both Abramowitz and Gonzalez subsequently downloaded the Facebook Ad Data after it was stored on the Beeline Google Drive.  Pl. 56.1 Stmt. ¶ 196.[27]  The parties' experts, of course, dispute whether the "download" notation actually means that a person purposefully downloaded the file, or whether it can indicate some automated process.  *Compare* Schnell Report ¶ 24 (concluding that the "Event Description" notation of "downloaded" "means that the individual indicated actually downloaded the document.  In other words, 'downloaded' here is not an umbrella term for other actions such

---

[27] Beeline claims, on reply, that the Audit Logs incontrovertibly show that "Beeline did not access any of Plaintiff's Facebook Ad Data," S.J. Reply at 6, but this is inconsistent with the factual statement in paragraph 196 of Better's statement of additional material facts pursuant to Rule 56.1, to which Beeline did not lodge an objection, *see generally* Deft. Reply 56.1 Stmt.  And even if it did, this would further create a factual dispute for the jury to decide.  While Beeline once again argues that its purported "direct evidence" should trump Better's meager "circumstantial evidence," S.J. Reply at 5, Beeline has not even established that the exhibit to which it cites—a table prepared by counsel purporting to summarize the audit logs, Dkt. 269-2—is admissible.

as access, share, etc."), *with* Caruso Report ¶ 12 (opining that "there [is] nothing in the audit logs [that] indicates that a user actually downloaded a file onto their computer or even viewed that file" and that the "downloaded" notation could be caused by "an automated process, such as a system back up").  But this just means that another factual dispute precludes a finding of summary judgment on Better's DTSA claim.

Interpreting the evidence in light most favorable to Better—the nonmovant—a jury could find that Gonzalez and Abramowitz actually downloaded the files.  Of course, the act of downloading, itself, would not be enough to show "use" under the DTSA.  But the jury could infer subsequent use from the downloads.  For example, if Abramowitz and Gonzalez studied the information, it may have well informed their subsequent decisionmaking and work product, which would certainly be sufficient to constitute "use" under the DTSA.  *See KCG Holdings*, 2020 WL 1189302, at *11 (finding that "reviewing another's trade secrets to develop one's personal knowledge constitutes use, and therefore misappropriation" under the DTSA).  And finally, the jury could also infer improper means given that Abramowitz sent Gonzalez a copy of the PII Agreement, and thus both were on notice of Abramowitz's nondisclosure obligations to Better.

Accordingly, these disputes of material fact preclude a finding of summary judgment on Better's DTSA claim.

### 3.    Damages

Finally, Beeline challenges Better's damages under the DTSA.  Beeline first notes that "courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims."  S.J. Motion at 19 (quoting *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020)).  Beeline then points to the New York Court of Appeals' decision in *E.J. Brooks Co. v. Cambridge Security Seals*, in which the Court of Appeals responded to a certified question from the Second Circuit and held that under New York common law, "damages in trade secret

actions must be measured by the losses incurred by the plaintiff, and . . . damages may not be based on the infringer's avoided development costs."  105 N.E.3d 301, 311 (N.Y. 2018); *accord* S.J. Motion at 19.  Thus, Beeline argues it "is entitled to judgment as a matter of law dismissing Plaintiff's claim of misappropriation of trade secrets pursuant to the DTSA" because "avoided costs are the only damages alleged by Plaintiff."  S.J. Motion at 19.

This line of reasoning has several problems.  First, and contrary to both parties' assertions, *accord* S.J. Opposition at 14, "damages are not an element of a DTSA claim."  *Chmura Econs. Analytics, LLC v. Lombardo*, No. 19 Civ. 813, 2021 WL 3234607, at *19 (E.D. Va. July 29, 2021); *see also Democratic Nat'l Comm.*, 392 F. Supp. 3d at 447 (listing the elements of a DTSA claim and not listing damages as one of them).  However, the Court will construe Beeline's motion as seeking summary judgment on the issue of what damages Better would be owed if the jury were to find liability under the DTSA.  *But see Chmura Econs. Analytics*, 2021 WL 3234607, at *19 (declining to address damages because the moving party sought summary judgment only on the question of liability, not the question of damages).

Second, and more to the point, the DTSA expressly permits the damages calculated by Better's damages expert.  The DTSA permits (1) "damages for actual loss," 18 U.S.C. § 1836(b)(3)(B)(i)(I) and (2) "damages for any unjust enrichment caused by the misappropriation of the trade secret not addressed in computing damages for actual loss," *id.* § 1836(b)(3)(B)(i)(II), or (3) "damages caused by the misappropriation measured by imposition of liability for a reasonable royalty," *id.* § 1836(b)(3)(B)(ii).  *See also Medidata*, 2021 WL 4243309, at *4.  Beeline makes no argument as to why *E.J. Brooks*'s holding would bar Better from seeking damages in the form of a reasonable royalty, despite Better explicitly raising the issue in its opposition.  *See* S.J. Opposition at 23 n.13.  But putting even this to the side, the DTSA also permits damages

measured in the form of avoidance costs, because avoidance costs fall under the umbrella of unjust enrichment damages. *See Syntel Sterling*, 2021 WL 1553926, at *6 ("Unjust enrichment damages include what the parties call 'avoided costs' -- *i.e.* the development costs that Syntel avoided incurring when it misappropriated TriZetto's trade secrets. These avoided costs are recoverable as damages for unjust enrichment under the DTSA . . . .").

Beeline concedes that the DTSA provides for unjust enrichment damages, but argues that "it does not define 'unjust enrichment.' Therefore, because there is no federal tort for unjust enrichment, every single case considering what damages are compensable as 'unjust enrichment' under the DTSA can inevitably be traced back to a *state law* definition of the available damages," and "[h]ere, New York's highest court has done just that and found that 'unjust enrichment' cannot include a plaintiff's 'development costs.'" S.J. Reply at 4. But the text of the DTSA make clear that the statute creates a distinct federal remedy for a misappropriation claim, not an unjust enrichment claim. *See* 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection . . . ."); *see also* H.R. Rep. 114-529 at 1 (2016) (noting the purpose of the DTSA is "to provide a Federal civil remedy for the misappropriation of trade secrets"). Thus, *E.J. Brooks*'s holding regarding the availability of compensatory damages for an unjust enrichment action is irrelevant on the question of damages under the DTSA. Moreover, while Beeline is correct that "[i]n assessing DTSA claims, courts in this Circuit often look to New York trade secret law," *Zabit*, 540 F. Supp. 3d at 421, they do so only with respect to DTSA liability, because New York and federal law have clearly diverged on the issue of damages. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075 (LJL), 2022 WL 2757643, at *13 (S.D.N.Y. July 14, 2022) ("[W]hile the requirements for showing such misappropriation are similar under federal and state law, the damages available once such

misappropriation has been shown are not the same." (emphasis omitted)).   Per *E.J. Brooks*, damages for misappropriation under New York common law "must be measured by the losses incurred by the plaintiff, and . . . may not be based on the infringer's avoided development costs," 105 N.E.3d at 311, but under federal law, a plaintiff may recover both "damages for actual loss" (like under state law) *and* "damages for any unjust enrichment" provided there is no double counting, 18 U.S.C. § 1836(b)(3)(B)(i)(I)-(II).   *See also Syntel Sterling*, 2021 WL 1553926, at *7.[28]

\* \* \*

Accordingly, Beeline's motion for summary judgment as to liability and damages for Better's DTSA claim is denied.

## C.   New York Misappropriation

### 1.   Confidential Information vs. Trade Secrets

Before turning to the merits of Better's misappropriation claim, the Court must determine the exact nature of the claim alleged in Count I of the Amended Complaint.   Beeline contends that Count I is an amalgamation of an unfair competition claim and a trade secret misappropriation claim.   S.J. Motion at 3.   It is not.   The phrase "unfair competition" does not appear anywhere in

---

[28] Beeline cites *Vertellus Holdings LLC v. W.R. Grace & Co.*, No. SAG-18-3298, 2021 WL 3883597, at *29 (D. Md. Aug. 12, 2021), for the proposition that "*E.J. Brooks* . . . conclude[d] that, under the DTSA, the plaintiff was 'not entitled to [the defendant's] alleged saved development costs.'"   S.J. Reply at 4 n.14; *see also* S.J. Motion at 23-24.   But the quoted portion of that case applied to a holding under New York misappropriation law, not the DTSA, and the court explicitly recognized that the DTSA permits avoidance cost damages.   *See Vertellus*, 2021 WL 3885397, at *29 ("Under the DTSA and some state uniform trade secrets statutes, saved costs of development are an accepted measure of unjust enrichment damages. . . .   However, the New York Court of Appeals has unequivocally held in response to certification of the question from the Second Circuit, that this theory is not permitted under New York common law . . . .").

the paragraphs comprising of that count, *see* Am. Compl. ¶¶ 84-91, and Better, in its opposition

brief, makes clear that it is not asserting an unfair competition claim, *see* S.J. Opposition at 5. n.2.

Rather, Better styles its claim as "misappropriation of confidential information." Am.

Compl. at 22 (capitalization omitted). Better's choice to refer to the subject of the

misappropriation as "confidential information" rather than "trade secrets" may be deliberate as it

seeks recovery based on the Partner Agreements, which is not part of its DTSA claim, in addition

to the Operating Model and the Facebook Ad Data. *See e.g.*, S.J. Opposition at 30 n.18. Beeline

argues that "New York law recognizes the cause of action for misappropriation of confidential

information only to the extent that the allegedly 'confidential information' qualifies for trade secret

protection." S.J. Reply at 1. The Court agrees.

To be sure, some courts have distinguished between "misappropriation of trade secrets"

and "misappropriation of confidential information." *See, e.g.*, *Bancorp Servs., LLC v. Am. Gen.*

*Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at *10 (S.D.N.Y. Feb. 11, 2016) ("To

plead misappropriation of a trade secret under New York law, a party must plead (1) that it

possessed a trade secret, and (2) that the defendants used that trade secret in breach of an

agreement, confidential relationship or duty, or as a result of discovery by improper

means. . . . Similarly, to state a claim for misappropriation of confidential information, a plaintiff

must allege that the defendant used the plaintiff's confidential information for the purpose of

securing a competitive advantage." (internal quotation marks omitted)); *Mastercraft Decorators,*

*Inc. v. Orlando*, 356 F. Supp. 3d 259, 269 (W.D.N.Y. 2018) (same). But this distinction appears

to be merely a formality, as "[c]ourts often analyze misappropriation of trade secret and

confidential information . . . claims together." *Mastercraft Decorators*, 356 F. Supp. 3d at 269

(quoting *Bancorp Servs.*, 2016 WL 4916969, at *10); *see also A Star Grp., Inc. v. Manitoba Hydro*,

No. 13 Civ. 4501 (PAC), 2014 WL 2933155, at *8 (S.D.N.Y. June 30, 2014) ("AStar also fails to

state a claim against KPMG for misappropriation of trade secrets (Count X) and misappropriation

of confidential information . . . (Count XI). Since these claims are duplicative of each other, the

Court will consider them as a single cause of action."). Indeed, while Better asserts that the

standard for determining whether information is "confidential" is different than that governing

"trade secrets," the case to which Better cites involved a claim for breach of contract where the

parties disputed the meaning of the term "confidential information" in the agreement. *BLT Rest.*

*Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 21, 26 (S.D.N.Y. 2012); *see* S.J. Opposition at 7 n.3.

And the majority of the cases to which Better cites in the misappropriation section of its brief were

clear "trade secrets" cases rather than "confidential information" cases. *See* S.J. Reply at 1 n.3

(collecting examples). Accordingly, the Court will apply New York trade secret misappropriation

law to Better's Count I.

### 2. Liability

Under New York law, "[a] plaintiff claiming misappropriation of a trade secret must prove:

(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement,

confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs.,*

*Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (internal quotation marks

omitted); *see also E.J. Brooks*, 105 N.E.3d at 310; *Zabit*, 540 F. Supp. 3d at 421. In assessing

whether the allegedly misappropriated information was a trade secret, New York courts consider:

> (1) the extent to which the information is known outside of [the] business; (2)
> the extent to which it is known by employees and others involved in [the]
> business; (3) the extent of measures taken by [the business] to guard the secrecy
> of the information; (4) the value of the information to [the business] and to [its]
> competitors; (5) the amount of effort or money expended by [the business] in
> developing the information; (6) the ease or difficulty with which the
> information could be properly acquired or duplicated by others.

*Integrated Cash*, 920 F.2d at 173 (quoting *Eagle Comtronics, Inc. v. Pico, Inc.*, 453 N.Y.S.2d 470, 472 (App. Div. 1982)).  The "'most important consideration' in determining whether information is a trade secret is 'whether the information was secret.'"  *Broker Genius*, 280 F. Supp. 3d at 514 (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)).  "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."  *Structured Cap. Sol., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016) (alteration omitted) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).

Because "[t]he elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim, the Court's holding that Beeline is not entitled to summary judgment as to liability on Better's DTSA claim concerning the Operating Model and the Facebook Ad Data applies equally to Better's misappropriation claim.  *See Iacovacci*, 437 F. Supp. 3d at 380 (noting that "courts have found that a '[c]omplaint sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law'" (alterations in original) (quoting *ExpertConnect*, 2019 WL 3004161, at *7)).

As to the Partner Agreements, while Better appears to concede that they do not constitute trade secrets, *see* S.J. Opposition at 30 n.18, it did so in the context of explaining damages for its tortious interference claim.  Moreover, neither party has made any arguments as to whether the Partner Agreements constitute trade secrets, when analyzed under the above factors.  Thus, the Court declines to grant summary judgment on Better's misappropriation claim as to the Partner Agreements.[29]  However, if the evidence adduced at trial does not support a finding that the Partner

---

[29] Assuming *arguendo* that the Partner Agreements do constitute trade secrets under New York law, there is certainly sufficient evidence of Beeline "using that trade secret . . . as a result

Agreements constitute trade secrets under New York law, when analyzed under the above factors, Beeline may move for partial judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.

### 3.    Damages

As with Better's DTSA claim, Beeline argues that *E.J. Brooks* precludes Better's proffered theory of damages.  Fortunately for Beeline, this argument fares better in the context of New York trade secret misappropriation.

In *E.J. Brooks*, the plaintiff sought damages for its New York misappropriation of trade secrets claim "based on defendants' avoided costs."  *E.J. Brooks*, 858 F.3d at 748.  The Second Circuit noted that it had previously recognized three types of damages in New York trade secrets cases:  (1) "the profit unjustly received by a defendant," (2) a plaintiff's actual losses, and (3) "in those trade secret cases where measuring either the defendant's profits or the plaintiff's losses is too hard or speculative, we have approved the concept of a 'reasonable royalty award' that 'attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff.'"  *Id.* (quoting *Vt. Microsys., Inc.*, 88 F.3d at 151).  However, the Second Circuit realized that "[a]ssuming New York law requires that trade secret damages bear some connection to the plaintiff's losses, it is not apparent to us that assessing damages based on the defendant's avoided costs satisfies the requirement."  *Id.* at 750.  It therefore certified to the New York Court of Appeals the question of "[w]hether, under New York law, a plaintiff asserting claims of

---

of discovery by improper means."  *Integrated Cash*, 920 F.2d at 173.  Much like the Operating Model and the Facebook Ad Data, Abramowitz saved the Partner Agreements to the Beeline Google Drive, and they were downloaded and viewed by multiple Beeline employees, multiple times.  Pl. 56.1 Stmt. ¶¶ 132-55.  Again, if the jury concludes that those employees actually downloaded the information, they could then infer subsequent use.  *See Syntel Sterling*, 2020 WL 1442915, at *11.

misappropriation of a trade secret . . . can recover damages that are measured by the costs the defendant avoided due to its unlawful activity." *Id.* at 746.

The New York Court of Appeals responded that a plaintiff cannot. *See E.J. Brooks*, 105 N.E.3d at 311 ("We agree that damages in trade secret actions must be measured by the losses incurred by the plaintiff, and that damages may not be based on the infringer's avoided development costs."). The court reasoned that "[a]uthorities embracing the avoided cost method of damages almost universally consider them a measure of the defendant's unjust gains, rather than the plaintiff's losses," and so "[b]ecause this figure is tied to the defendant's gains rather than the plaintiff's losses, it is not a permissible measure of damages." *Id.* The court, however, recognized the following:

> It is true that, in trade secret cases, loss is broadly defined and must account for the fact that trade secrets inherently derive their value from their confidentiality. The plaintiff's injury in trade secret misappropriation cases includes the loss of competitive advantage over others by virtue of its exclusive access to the secret. Where disclosure of a trade secret has destroyed that competitive edge, the plaintiff's costs of developing the product may be the best evidence of the (now-depleted) value that the plaintiff placed on the secret. However, it is neither automatic nor presumptively the case that the costs avoided by the *defendant* will be an adequate approximation of the *plaintiff's* investment losses, any more than it can be presumed that the defendant's sales would approximate those of the plaintiff.

*Id.* at 311-12 (internal quotation marks, citations, and alterations omitted).

In this, case, while Better's damages expert, Holzen, may refer to his damages as "unjust enrichment damages," Holzen Report ¶ 33, his "cost approach" clearly calculates what the *E.J. Brooks* court refers to as "the plaintiff's costs of developing the product," *E.J. Brooks*, 105 N.E.3d at 311. Indeed, what Holzen refers to as "reproduction cost" and "replacement cost" are both a function of Better's "direct labor costs, benefit costs, indirect overhead costs, third-party costs, and opportunity costs," expended to create the Better Information. Holzen Report ¶ 36. Holzen further explains:

89

I measure direct labor costs as the salary and benefit costs of a professional tasked with reproducing or replacing the Better Information. These costs are based on the estimated actual time spent by Better employees in developing and maintaining the Better Information multiplied by an industry average labor rate (under the Replacement Cost approach) or by Better's own actual labor rate (under the Reproduction Cost approach). Overhead costs relate to certain indirect overhead expenses (e.g., rent, utilities, depreciation). Third-party costs, or out-of-pocket costs, are the amounts paid to others to develop the Better Information. The expected opportunity costs relate to the profit one would expect to earn from an investment of capital and resources.

*Id.* (footnote omitted). Thus, Holzen's damages are calculated in terms of money Better spent, not money Beeline saved.

The problem is, as Beeline argues, that Better fails to put forward any evidence or to quantify in any way the actual loss it suffered. S.J. Motion at 8 ("Plaintiff can cite no evidence to show that it has lost, or will lose in the future, business relationships, employees, profits, or goodwill due to the alleged misappropriation of its confidential information. Plaintiff has not alleged even a single dollar in actual losses."). Better responds by pointing to the above-quoted portion of *E.J. Brooks* to argue that "the court left open the option for a plaintiff to recover misappropriation damages based on its development costs" and that "what Better actually spent to create the Better Information . . . . is the best evidence of the (now-depleted) value that Better placed on that information." S.J. Opposition at 13-14 (internal quotation marks omitted). But as noted above, the Court of Appeals stated that "[w]here disclosure of a trade secret has destroyed that competitive edge, the plaintiff's costs of developing the product *may* be the best evidence of the (now-depleted) value that the plaintiff placed on the secret." *E.J. Brooks*, 105 N.E.3d at 311 (emphasis added). It did not say that the plaintiff's costs of developing the product are *always* or *automatically* a good measure of damages, but rather that they "may be the best evidence" of harm in those cases "where disclosure of a trade secret has destroyed that competitive edge." That is, if a plaintiff has suffered a certain kind of actual loss—*i.e.*, "destr[uction of] competitive edge"—

then development costs are an appropriate measure of damages since they would represent the "now-depleted value" of the trade secret. But in the words of the Court of Appeals, this is "neither automatic nor presumptively the case," and at summary judgment, Better must point to some evidence from which a reasonable jury could find that Beeline's misappropriation of the Better Information destroyed its economic value to Better. *See Susana v. NY Waterway*, No. 20 Civ. 455 (JPC), 2023 WL 2575050, at *7 (S.D.N.Y. Mar. 20, 2023) ("In federal court, the absence of evidence at the summary judgment stage redounds to the detriment of the plaintiff, not the defendant." (internal quotation marks omitted)).

That burden has not been carried. While Better has presented sufficient evidence from which a reasonable jury could find that Better derived value from the Better Information not being generally known, and that the Better Information was disclosed and possibly used by Beeline, it has not demonstrated how that value was "destroyed" or "depleted" by the misappropriation. There is no evidence that the Better Information is now worthless or has diminished value to Better following its disclosure to Beeline, and so there is no evidence from which a reasonable jury could find damages on Better's New York misappropriation claim.[30]

However, as with Better's DTSA claim, damages are not a required element of misappropriation of trade secrets under New York law. *See E.J. Brooks*, 105 N.E.3d at 310 (stating

---

[30] Better does not argue that its reasonable royalty calculation would be an appropriate measure of damages under New York law, but the Court notes that while the Second Circuit has previously "approved the concept of a reasonable royalty award" for misappropriation cases "where measuring either defendant's profits or the plaintiff's losses is too hard or speculative," *E.J. Brooks*, 858 F.3d at 748; *see also Vt. Microsys.*, 88 F.3d at 151, it did so prior to the New York Court of Appeals' decision in *E.J. Brooks* (and one of those cases—*Vermont Microsystems*— involved a trade secret claim under California law). Moreover, as noted above, Better's reasonable royalty damages are premised entirely on the costs it incurred to develop the Better Information because Holzen found that the *Georgia-Pacific* factors suggested a neutral negotiating outcome. Holzen Report ¶¶ 144-46. Thus, permitting Better to seek a reasonable royalty for its New York misappropriation claim would circumvent the Court of Appeals' holding in *E.J. Brooks*.

that to prove misappropriation of a trade secret, a plaintiff need only show that "(1) it possessed a

trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or

duty, or as a result of discovery by improper means" (internal quotation marks omitted)).  Under

New York law, "a court may award a plaintiff nominal damages when a cause of action for a tort

exists but no harm has been caused by the tort or the amount of harm is not significant or is not so

established that compensatory damages can be given." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d

216, 244 (2d Cir. 2020) (internal quotation marks omitted).  Accordingly, because Better has

presented sufficient evidence demonstrating liability on its New York misappropriation claim but

has not demonstrated harm, it may only seek nominal damages.  Beeline's motion for summary

judgment as to *liability* on Better's misappropriation of trade secrets claim under Count I, though,

is denied.

**D.    Tortious Interference**

Next, the Court turns to Better's tortious interference claim—Count III.  To prevail at trial

on a claim for tortious interference with a contract, a plaintiff must prove "[1] the existence of a

valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract,

[3] defendant's intentional procurement of the third-party's breach of the contract without

justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox

News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (brackets in original) (quoting *Lama

Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).  "In order for the plaintiff

to have a cause of action for tortious interference of contract, it is axiomatic that there must be a

breach of that contract by the other party." *Jack L. Inselman & Co. v. FNB Fin. Co.*, 364 N.E.2d

1119, 1120 (N.Y. 1977).  Moreover, a plaintiff must prove that "the contract would not have been

breached but for the defendant's conduct." *Burrowes v. Combs*, 808 N.Y.S.2d 50, 53 (App. Div. 2006) (internal quotation marks omitted).[31]

In this case, Beeline does not dispute that the PII Agreement constitutes a valid contract between Better and Abramowitz and that Beeline knew of its existence.  S.J. Motion at 20.  Nor does Beeline contest that Abramowitz breached the PII Agreement, which the evidence supports as well.  *Id.*  Thus, the Court focuses on the remaining three elements: (1) intentional procurement without justification, (2) but-for causation, and (3) damages.

### 1.    Intentional Procurement Without Justification

To prove intentional procurement without justification, Better must satisfy two elements: (1) that "the *target* of a defendant's conduct was the third party's contractual arrangements with the plaintiff," *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 350 (S.D.N.Y. 2020) (brackets omitted) (quoting *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995)), and (2) "that 'the defendant's *objective* was to procure such a breach,'" *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 328 (S.D.N.Y. 2017) (quoting *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013)).  Indeed, the interference "must be intentional, not merely negligent or incidental to some other, lawful purpose." *Republic*

---

[31] Beeline asserts that the jury would also need to find that it "used *wrongful means* to induce the third party to breach the contract."  S.J. Motion at 20 (quoting *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 450 (S.D.N.Y. 2014), *abrogated on other grounds by Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85 (2d Cir. 2023)); *see also* S.J. Reply at 9-10 (discussing *Ace Arts*).  However, "a claim for tortious interference with contract . . . requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware." *Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 268 (E.D.N.Y. 2016) (quoting *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015)).  On the other hand, a claim for tortious interference with business relations, which Better is not asserting, "requires a plaintiff to show, 'as a general rule,' that 'the defendant's conduct amounted to a crime or an independent tort,'"—*i.e.*, wrongful means.  *16 Casa Duse*, 791 F.3d at 262 (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)).

*of Turkey v. Christie's, Inc.*, 425 F. Supp. 3d 204, 218 (S.D.N.Y. 2019) (quoting *Alvord & Swift v. Stewart M. Muller Const. Co.*, 385 N.E.2d 1238, 1241 (N.Y. 1978)).  Thus, "merely acting with knowledge that a third party may breach a contract with some other party is not sufficient to constitute procurement of the breach."  *Vinson*, 256 F. Supp. 3d at 328.

Given that this factor is highly fact-specific, and involves a determination of a defendant's mental state, courts are disinclined to grant summary judgment on the basis of this factor when there is some evidence from which a jury could infer that the defendant intentionally procured the breach.  *See, e.g.*, *24/7 Records, Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 47-48 (2d Cir. 2005) (reasoning that a jury could infer from a large music producer's (defendant) economic influence over a smaller music producer, and its repeated expressions of displeasure to the smaller music distributor concerning the release of the plaintiff's songs that the defendant intentionally procured the breach of the distribution agreement between the smaller music producer and the plaintiff); *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 483 (E.D.N.Y. 2012) (denying summary judgment due to a genuine issue of fact as to whether the defendant companies, acting through a common executive, intentionally procured a cherry supplier's alleged breach of installment contracts with producer); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 305 (S.D.N.Y. 2010) ("[A] reasonable factfinder could conclude that BMB Defendants intended to procure, and in fact did procure, Tolmakov's breach of the Emir Contract . . . [because t]he timing and the context of BMB Defendants' payment to Tolmakov suggests an intent to frustrate performance under the Emir Contract.").  *But see Turkey*, 425 F. Supp. 3d at 219 (granting summary judgment on tortious interference claim because the alleged acts of interferences were judicially authorized, and so "no reasonable juror could conclude that

these efforts were an intentional effort to induce breach without justification rather than incidental to the lawful purpose of pursuing" litigation).

In this case, the Court cannot conclude that no reasonable jury could find a lack of intentional procurement. It is undisputed that several executives at Beeline, including Liuzza and Gonzalez, knew that Abramowitz was bound by the PII Agreement, *e.g.*, Dkt. 243-32, yet they continuously asked him to disclose information that they understood Abramowitz was obtaining from the misappropriated Better Information. Liuzza, for example, asked Abramowitz to share "Better's closings per month," and when asked whether he cared that Abramowitz was sending him Better's confidential information, he testified that he "[d]idn't think about it." Pl. 56.1 Stmt. ¶¶ 256-58. Liuzza also asked Abramowitz for information regarding Better's performance, seeking nonpublic information about Better's average loan amount, origination, and other issues. *Id.* ¶ 109. In addition, Stockwell repeatedly asked Abramowitz to populate spreadsheets with confidential information about Better, and during the Facebook Ad Manager Account zoom call, he asked Abramowitz to click on certain portions of Better's Facebook Ad Manager Account, revealing the data therein, and directed Abramowitz to take screenshots. *Id.* ¶¶ 107, 166, 188; Abramowitz Aff. ¶ 22; Abramowitz Dep. at 135:1, 136:7-9; Stockwell Dep. at 180:2-181:15. Thus, there is evidence from which a reasonable jury could conclude that Beeline intentionally sought to have Abramowitz breach the PII Agreement to obtain Better's confidential information and trade secrets.

### 2.    But-For Cause

Beeline argues that Better cannot prove but-for causation based on Abramowitz's testimony that he took the Better Information from Better on his own volition, and not at the request of Beeline. S.J. Motion at 23-24. Again, this of course raises a factual dispute for the jury given the evidence noted above of Beeline employees asking Abramowitz to disclose Better's

confidential information.  Viewed in light most favorable to the nonmovant, the evidence in the record suggests that but-for cause is satisfied.  Take, for example, the evidence, discussed above, of Liuzza asking Abramowitz to disclose Better's "closings per month."  Pl. 56.1 Stmt. ¶ 256.  A jury could reasonably conclude that, but for Liuzza asking Abramowitz the question, he would not have shared the pertinent information from the Operating Model.  That would satisfy but-for causation.

Beeline argues that "Abramowitz breached his contractual commitments to Plaintiff before even beginning employment" with Beeline because he took the relevant files from Better before he started working at Beeline.  S.J. Reply at 9.  But the PII Agreement prohibits disclosure and use, not acquisition.  *See* PII Agmt. ¶ 1 ("I will not, during and after my employment with **Better** . . . *disclose* to any person or entity, or *use*. . . confidential or proprietary information . . . ." (last two emphases added)).  Thus, each time Abramowitz shared some of Better's confidential information with Beeline or used that information to perform work for Beeline, he breached the PII.  Moreover, "the degree to which the contract would have been breached anyway is a question properly left for . . . jury determinations."  *Rich*, 939 F.3d at 127.

### 3.    Damages

Damages for tortious interference with a contract under New York law are "those recognized under the more liberal rules applicable to tort actions" "including consequential damages."  *Id.* at 128 (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 455, 452 n.6 (N.Y. 1980)).  These include "(a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."  *Int'l Minerals & Resources, S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir.

1996) (quoting Restatement (Second) of Torts § 774A(1) (1979)); *see also Rich*, 939 F.3d at 128 (same).

Better argues that it should be able to recover the full "value of the thing that was lost as a result of Abramowitz's breaches" of the PII because "Beeline's interference with the PII Agreement deprived Better of that agreement's confidentiality protections, resulting in the wrongful disclosure of Better's valuable confidential and proprietary information and trade secrets." S.J. Opposition at 29. But Better fails to explain how this damages theory fits into any of the three categories of tortious interference damages. Category (a) is inapplicable because the PII Agreement is a nondisclosure agreement and not the type of contract that entitles Better to receive a monetary benefit in the future. *Cf., e.g.*, *GateGuard, Inc. v. Amazon.com, Inc.*, No. 21 Civ. 9321 (JGK), 2023 WL 2051739, at *10 n.12 (S.D.N.Y. Feb. 16, 2023) (holding that because "GateGuard plausibly alleges that some of its customers canceled their contracts" with GateGuard because of the defendant's tampering, the "alleged loss is a direct and foreseeable consequence of gaining unauthorized access"). Category (b) is inappropriate because, as explained in connection with its New York misappropriation of trade secrets claim, Better has failed to point to any evidence demonstrating that the wrongful disclosure of the Better Information caused Better harm in any way, including by decreasing the value of the Better Information. And Category (c) is inappropriate because Better's claim does not involve any emotional distress or actual reputational harm.[32]

Thus, Better has failed to present any applicable damages theory to support its tortious interference claim. And because, in contrast to misappropriation, damages are a required element

---

[32] To the extent Better suggests that it is entitled to damages for unjust enrichment on this claim, *see* S.J. Opposition at 29, such damages are not available in New York for a tortious interference of a contract claim. *See Rich*, 939 F.3d at 128 (listing available damages).

of tortious interreference, *see Rich*, 939 F.3d at 127, Beeline is entitled to summary judgment as to Count III.

* * *

Accordingly, Beeline's motion for summary judgment with respect to Better's tortious interference with a contract claim is granted.

### E.   Aiding and Abetting the Breach of a Fiduciary Duty

Finally, the Court addresses Beeline's Motion with respect to Count IV, which is Better's claim for aiding and abetting a breach of a fiduciary duty.  "The elements of that tort are: (1) a breach by a fiduciary of obligations to another; (2) the defendant's knowing inducement of or participating in the breach; and (3) damages suffered by the plaintiff from the breach." *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 134 (2d Cir. 2008).

As to the first element, "[u]nder New York law, employees owe fiduciary duties to their employers, independent of any contractual duties, and some such duties survive termination." *Zurich*, 538 F. Supp. 3d at 403.  For example, "former employees may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their endeavors for the company." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998).  Thus, because it is undisputed that Abramowitz was an employee at Better, Pl. 56.1 Stmt. ¶ 30, and because the evidence supports that Abramowitz took Better's confidential and proprietary information and disclosed it to Beeline, this element has been established.

"With respect to the second element, one participates in a fiduciary's breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed." *Catskill Dev.*, 547 F.3d at 134 (internal quotation marks and brackets omitted).  The

Court has summarized in this Opinion and Order at length the evidence of the many instances where Abramowitz disclosed or used Better Information at the request of or with encouragement from Beeline employees, all of whom knew that he was a former Better employee.  A reasonable jury could therefore find sufficient evidence of Beeline's participation in Abramowitz's breach of a fiduciary duty.  And while Beeline once again points to evidence of Abramowitz claiming that no one at Better knew of or asked him to disclose the Better Information, S.J. Motion at 27, this only serves to show the presence of a factual dispute for the jury.

However, Better's claim once again falters on the element of damages.  Better points to *Apollo Management, Inc. v. Cernich*, 163 N.Y.S.3d 503 (App. Div. 2022), to argue that "the development costs of confidential information are properly recoverable as compensatory damages on an aiding and abetting claim."  S.J. Opposition at 32.  While true that the Appellate Division in that case affirmed the denial of a motion to dismiss by noting that the plaintiff was permitted "to seek, among other things, compensatory damages in the form of recovery of their development costs of confidential information with respect to the aiding and abetting claims," it did so in part because "the complaint sufficiently allege[d] that, by aiding and abetting the primary wrongdoers' conduct, defendants diminished the worth of plaintiff's confidential information by robbing it of the value of its confidentiality."  *Apollo Mgmt.*, 163 N.Y.S.3d at 505 (citing *E.J. Brooks*, 105 N.E.3d at 168-69).  But as discussed above, there is no evidence as to how or what extent Abramowitz's disclosure of the Better Information "diminished [its] worth . . . by robbing it of the value of its confidentiality."  And because damages is a required element of Better's aiding and abetting claim, *see Catskill Dev.*, 547 F.3d at 134, Beeline is entitled to summary judgment as to Count IV.

Accordingly, Beeline's motion for summary judgment as to Better's aiding and abetting claim is granted.

### IV.   Conclusion

For the foregoing reasons, Plaintiff Better Holdco, Inc.'s motion to exclude expert testimony is granted in part and denied in part.  Defendant Beeline Loans, Inc.'s motion to exclude expert testimony is denied, and its motion for summary judgment is granted in part and denied in part.  The parties are directed to appear for a status conference on April 11, 2023, at 2:00 p.m., in Courtroom 12D of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007 to discuss a trial date.

The Clerk of Court is respectfully directed to close Docket Numbers 192, 205, 209, 245, and 263.

SO ORDERED.

Dated: March 30, 2023
      New York, New York

                                             JOHN P. CRONAN
                              United States District Judge